IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **SILICON HILLS CAMPUS, LLC,** | § | **Case No. 20-10042-tmd** |
| **DEBTOR,** | § | |
| **and** | § | |
| **WC HIRSHFELD MOORE, LLC,** | § | **Case No. 20-10251-tmd** |
| **WC 103 EAST FIFTH, LLC,** | § | **Case No. 20-10252-tmd** |
| **WC 320 CONGRESS, LLC,** | § | **Case No. 20-10253-tmd** |
| **WC 422 CONGRESS, LLC,** | § | **Case No. 20-10254-tmd** |
| **WC 805-809 EAST SIXTH, LLC,** | § | **Case No. 20-10255-tmd** |
| **WC 901 EAST CESAR CHAVEZ, LLC,** | § | **Case No. 20-10256-tmd** |
| **WC 1212 EAST SIXTH, LLC,** | § | **Case No. 20-10257-tmd** |
| **WC 9005 MOUNTAIN RIDGE, LLC,** | § | **Case No. 20-10258-tmd** |
| **DEBTORS.** | § | |
| | § | |
| **SILICON HILLS CAMPUS, LLC, WC** | § | |
| **HIRSHFELD MOORE, LLC, WC 805-809** | § | |
| **EAST SIXTH, LLC, WC 320 CONGRESS,** | § | |
| **LLC, WC 901 EAST CESAR CHAVEZ,** | § | **Adversary No. 21-01029-tmd** |
| **LLC, WC 1212 EAST SIXTH, LLC, WC** | § | |
| **9005 MOUNTAIN RIDGE, LLC, WC 103** | § | **Removed from the District Court for** |
| **EAST FIFTH, LLC, AND WC 422** | § | **the 261st Judicial District in Travis** |
| **CONGRESS, LLC** | § | **County, Texas** |
| **Plaintiff-Debtors** | § | |
| **v.** | § | |
| | § | |
| **ATX DEBT FUND 1, LLC, ATX DEBT** | § | |
| **FUND 2, LLC, CONGRESS AVENUE** | § | |
| **HOLDINGS, LLC, KARLIN REAL** | § | |
| **ESTATE, LLC, KARLIN ASSET** | § | |
| **MANAGEMENT, INC., PENNYBACKER** | § | |
| **CAPITAL, LLC, CONGRESS AVENUE** | § | |
| **HOLDINGS GP, LLC, AND CONGRESS** | § | |
| **AVENUE HOLDINGS, LP** | § | |
| **Defendants** | § | |

## AMENDED EXHIBIT A TO NOTICE OF REMOVAL

Defendants ATX Debt Fund 1, LLC, ATX Debt Fund 2, LLC, Karlin Real Estate, LLC,

and Karlin Asset Management, Inc. (collectively, the "**ATX Defendants**") respectfully submit this

amendment to Exhibit A of the *Notice of Removal* [Docket No. 1] (the "**Notice**").[1] An index of documents filed in the State Court Action is attached to the Notice as Exhibit A (the "**Original Index**"). The Original Index inadvertently excluded documents that were filed in the State Court Action prior to the ATX Defendants' filing of the Notice because such documents were not included on the State Court Action's docket at the time the Notice was filed. Accordingly, attached hereto is an amended Exhibit A to the Notice.

Respectfully submitted,

POLSINELLI PC

*/s/ Savanna Barlow*
Liz Boydston (SBN 24053684)
Savanna Barlow (SBN 24109617)
Trinitee Green (SBN 24081320)
POLSINELLI
2950 N. Harwood Street, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
lboydston@polsinelli.com
sbarlow@polsinelli.com
tgreen@polsinelli.com

*Counsel for ATX Debt Fund 1, LLC, ATX Debt Fund 2, LLC, Karlin Real Estate, LLC, Karlin Asset Management, Inc.*

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Notice.

78692517.1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she caused a true and correct copy of the foregoing document to be electronically filed with the Court and served through the CM-ECF system to all counsel of record registered to receive a Notice of Electronic Filing for this case.


_/s/ Savanna L. Barlow_
Savanna L. Barlow

**<u>Amended Exhibit A to Notice</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| SILICON HILLS CAMPUS, LLC, | § | Case No. 20-10042-tmd |
|     DEBTOR, | § | |
|        and | § | |
| WC HIRSHFELD MOORE, LLC, | § | Case No. 20-10251-tmd |
| WC 103 EAST FIFTH, LLC, | § | Case No. 20-10252-tmd |
| WC 320 CONGRESS, LLC, | § | Case No. 20-10253-tmd |
| WC 422 CONGRESS, LLC, | § | Case No. 20-10254-tmd |
| WC 805-809 EAST SIXTH, LLC, | § | Case No. 20-10255-tmd |
| WC 901 EAST CESAR CHAVEZ, LLC, | § | Case No. 20-10256-tmd |
| WC 1212 EAST SIXTH, LLC, | § | Case No. 20-10257-tmd |
| WC 9005 MOUNTAIN RIDGE, LLC, | § | Case No. 20-10258-tmd |
|     DEBTORS. | § | |

| | | |
|---|---|---|
| | § | |
| SILICON HILLS CAMPUS, LLC, WC | § | |
| HIRSHFELD MOORE, LLC, WC 805-809 | § | |
| EAST SIXTH, LLC, WC 320 CONGRESS, | § | |
| LLC, WC 901 EAST CESAR CHAVEZ, | § | Adversary No. 21-01029-tmd |
| LLC, WC 1212 EAST SIXTH, LLC, WC | § | |
| 9005 MOUNTAIN RIDGE, LLC, WC 103 | § | Removed from the District Court for |
| EAST FIFTH, LLC, AND WC 422 | § | the 261st Judicial District in Travis |
| CONGRESS, LLC | § | County, Texas |
|     Plaintiff-Debtors | § | |
| v. | § | |
| | § | |
| ATX DEBT FUND 1, LLC, ATX DEBT | § | |
| FUND 2, LLC, CONGRESS AVENUE | § | |
| HOLDINGS, LLC, KARLIN REAL | § | |
| ESTATE, LLC, KARLIN ASSET | § | |
| MANAGEMENT, INC., PENNYBACKER | § | |
| CAPITAL, LLC, CONGRESS AVENUE | § | |
| HOLDINGS GP, LLC, AND CONGRESS | § | |
| AVENUE HOLDINGS, LP | § | |
|     Defendants | § | |

## INDEX OF DOCUMENTS FILED IN STATE COURT

78692517.1

| **Exhibit** | **Date Filed/Entered** | **Description** |
|---|---|---|
| A-1 | N/A | State Court docket sheet |
| A-2 | 06/23/2021 | Petition |
| A-3 | 06/28/2021 | Request for Process |
| A-4 | 06/28/2021 | Plaintiffs' Emergency Motion for Expedited Discovery |
| A-5 | 06/28/2021 | Proposed Order on Motion for Expedited Discovery |

**<u>Exhibit A-1</u>**

⭐  (https://www.traviscountytx.gov)

## District Clerk - AARO - Attorney Access to Records Online

# Details

**Updated : Wednesday, June 30, 2021 4:35:37 AM**

**Cause Number**
D-1-GN-21-002896

Request Documents (https://www.traviscountytx.gov/district

**Style**
SILICON HILLS V ATX DEBT FUBD

New Search (/aaro/)

**Filed Date**
6/23/2021
**Court**
261
**Type**
OTHER CIVIL (GEN LIT )
**Case Status**
PENDING
**Action/Offense**
**Hearing Date**

| Attorney | Type | Party - Full/Business | Party - Person |
|---|---|---|---|
| | DEFENDANT | KARLIN ASSET MANAGEMENT INC | |
| | DEFENDANT | CONGRESS AVENUE HOLDINGS LP | |
| | DEFENDANT | CONGRESS AVENUE HOLDINGS GP LLC | |
| | DEFENDANT | PENNYBACKER CAPITAL LLC | |
| | DEFENDANT | KARLIN REAL ESTATE LLC | |
| | DEFENDANT | CONGRESS AVENUE HOLDINGS LLC | |
| | DEFENDANT | ATX DEBT FUND 2 LLC | |
| | DEFENDANT | ATX DEBT FUND 1 LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC 422 CONGRESS LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC 103 EAST FIFTH LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC 9005 MOUNTAIN RIDGE LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC 1212 EAST SIXTH LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC 901 EAST CESAR CHAVEZ LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC 320 CONGRESS LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC 805 809 EAST SIXTH LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | WC HIRSHFELD MOORE LLC | |
| FRIEDMAN LAWRENCE J. | PLAINTIFF | SILICON HILLS CAMPUS LLC | |

| Date | Court | Party | Description | Category | Pages | |
|---|---|---|---|---|---|---|
| 6/28/2021 | 261 | PL | OTHER FILING | OTHER | 2 | Download (/aaro/Default/GetPdf?barCodeId=7663266) |
| 6/28/2021 | 261 | | OTHER FILING | OTHER | 3 | Download (/aaro/Default/GetPdf?barCodeId=7662890) |
| 6/28/2021 | 261 | PL | MTN:MOTION | MOTION | 4 | Download (/aaro/Default/GetPdf?barCodeId=7662888) |
| 6/23/2021 | 261 | PL | ORIGINAL PETITION/APPLICATION | PET-PL | 148 | Download (/aaro/Default/GetPdf?barCodeId=7655014) |

Request Documents (https://www.traviscountytx.gov/district-clerk/records-request)

New Search (/aaro/)

© 2021 Travis County, Texas - All rights reserved.

## Exhibit A-2

6/23/2021 3:10 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-21-002896
Victoria Benavides

CAUSE NO. D-1-GN-21-002896

| | | |
|---|---|---|
| **SILICON HILLS CAMPUS LLC, WC HIRSHFELD MOORE, LLC, WC 805-809 EAST SIXTH, LLC, WC 320 CONGRESS, LLC, WC 901 EAST CESAR CHAVEZ, LLC, WC 1212 EAST SIXTH, LLC, WC 9005 MOUNTAIN RIDGE, LLC, WC 103 EAST FIFTH, LLC AND WC 422 CONGRESS, LLC,** | § | **IN THE DISTRICT COURT** |
| **Plaintiffs,** | § | |
| **v.** | § | 261st **JUDICIAL DISTRICT** |
| **ATX DEBT FUND 1, LLC, ATX DEBT FUND 2, LLC , CONGRESS AVENUE HOLDINGS, LLC, KARLIN REAL ESTATE, LLC KARLIN ASSET MANAGEMENT, INC., PENNYBACKER CAPITAL, LLC, CONGRESS AVENUE HOLDINGS GP, LLC, AND CONGRESS AVENUE HOLDINGS, LP,** | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

# PLAINTIFFS' ORIGINAL PETITION AND EMERGENCY APPLICATION FOR RECEIVER

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW,** Plaintiffs Silicon Hills Campus, LLC, WC Hirshfeld Moore, LLC, WC 805-809 East Sixth, LLC, WC 320 Congress, LLC, WC 901 EAST CESAR CHAVEZ, LLC, WC 1212 EAST SIXTH, LLC, WC 9005 MOUNTAIN RIDGE, LLC, WC 103 EAST FIFTH, LLC, and WC 422 CONGRESS, LLC (collectively hereinafter "Plaintiffs," and/or "Properties"), who file this, their Plaintiffs' Original Petition and Emergency Application for Receiver in the above referenced cause, complaining of and against Defendants ATX

Unofficial copy Travis Co. District Clerk Velva L. Price

Debt Fund 1, LLC, ATX Debt Fund 2, LLC, Karlin Real Estate, LLC, Karlin Asset Management, Inc., Pennybacker Capital, LLC, Congress Avenue Holdings, GP, LLC and Congress Avenue Holdings, LP (collectively "Defendants") and, for cause of action, would show unto this Honorable Court as follows:

<div align="center">PARTIES</div>

1.      **Plaintiff Silicon Hills Campus, LLC** ("Silicon Hills" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

2.      **Plaintiff WC Hirshfeld Moore, LLC** ("WC Hirshfeld" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

3.      **Plaintiff WC 805-809 East Sixth, LLC** ("WC 805-809" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

4.      **Plaintiff WC 320 Congress, LLC** ("WC 320 Congress" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

5.      **Plaintiff WC 901 East Cesar Chavez, LLC** ("WC 901 East Cesar Chavez" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

6.      **Plaintiff WC 1212 East Sixth, LLC** ("WC 1212 East Sixth" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

7.    **Plaintiff WC 9005 Mountain Ridge, LLC** ("WC 9005 Mountain Ridge" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

8.    **Plaintiff WC 103 East Fifth, LLC** ("WC 103 East Fifth" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

9.    **Plaintiff WC 422 Congress LLC** ("WC 422 Congress LLC" and/or "Plaintiff") is a Delaware limited liability company authorized to transact business in the State of Texas with its principal place of business in Travis County, Texas.

10.    **Defendant ATX Debt Fund 1, LLC** ("ATX1" and/or Defendant") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of Texas, as more fully described below. In this regard, Defendant has contracted by mail or otherwise with Texas residents in which a party is or was to perform the contract in whole or in part in the state of Texas and/or has committed a tort in whole or in part in the state of Texas. Defendant ATX Debt Fund 1, LLC is a non-resident of the state of Texas and does not maintain a regular place of business in the state of Texas and has no designated agent in Texas on whom service of citation may be made in this action.  Accordingly, pursuant to Section 17.044 of the Texas Civil Practice & Remedies Code, the Secretary of State of Texas is an agent for service of process or complaint on Defendant ATX Debt Fund 1, LLC which may be served with citation by and through the Texas Secretary of State by serving its home office at 11755 Wilshire Blvd., Floor 1400, Los Angeles, CA 90025 or, alternatively, its registered agent National Registered Agents, Inc at its registered office located at 1209 Orange Street, Wilmington Delaware, 19801.

11.      **Defendant ATX Debt Fund 2, LLC** ("ATX2" and/or Defendant") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of Texas, as more fully described below. In this regard, Defendant ATX2has contracted by mail or otherwise with Texas residents in which a party is or was to perform the contract in whole or in part in the state of Texas and/or has committed a tort in whole or in part in the state of Texas. Defendant ATX2, LLC is a non-resident of the state of Texas and does not maintain a place of regular business in the state of Texas and has no designated agent in Texas on whom service of citation may be made in this action.  Accordingly, pursuant to Section 17.044 of the Texas Civil Practice & Remedies Code, the Secretary of State of Texas is an agent for service of process or complaint on Defendant ATX2 which may be served with citation by and through the Texas Secretary of State at its home office address at 11755 Wilshire Blvd., Floor 1400, Los Angeles, CA 90025, alternatively, its registered agent National Registered Agents, Inc at its registered office located at 1209 Orange Street, Wilmington Delaware, 19801.

12.      **Defendant CONGRESS AVENUE HOLDINGS, LLC**, ("Congress Avenue and/or Defendant") is a limited liability company, which may be served with citation by serving its registered agent Vincent P. Reyna at its registered address located at 3800 North Lamar Blvd. Suite 350, Austin, Texas 78756.

13.      **Defendant KARLIN REAL ESTATE, LLC** ("KARLIN" and/or Defendant") is a Delaware limited liability company, which at all material times to this action, is engaged and has been engaged in business in the state of Texas, as more fully described below. In this regard, Defendant has contracted by mail or otherwise with Texas residents in which a party is or was to perform the contract in whole or in part in the state

of Texas and/or has committed a tort in whole or in part in the state of Texas. Defendant Karlin Real Estate, LLC is a non-resident of the state of Texas and does not maintain a place of regular business in the state of Texas and has no designated agent in Texas on whom service of citation may be made in this action. Accordingly, pursuant to Section 17.044 of the Texas Civil Practice & Remedies Code, the Secretary of State of Texas is an agent for service of process or complaint on Defendant Karlin Real Estate, LLC which may be served with citation by and through the Texas Secretary of State at its home office address at 11755 Wilshire Blvd., Floor 1400, Los Angeles, CA 90025.

14.     **Defendant PENNYBACKER CAPITAL, LLC** ("Pennybacker" and/or Defendant") is a Texas limited liability company, which may be served with citation by serving its registered agent Michael C. O'Malley at its registered address located at 3800 North Lamar Blvd. Suite 350, Austin, Texas 78756.

15.     **Defendant CONGRESS AVENUE HOLDINGS GP, LLC,** ("Congress Avenue," and/or Defendant") is a Texas limited liability company, which may be served with citation by serving its registered agent Vincent P. Reyna at its registered address located at 3800 North Lamar Blvd. Suite 350, Austin, Texas 78756.

16.     **Defendant CONGRESS AVENUE HOLDINGS, LP,** ("Congress Avenue," and/or Defendant") is a Texas limited partnership, which may be served with citation by serving its registered agent Vincent P. Reyna at its registered address located at 3800 North Lamar Blvd. Suite 350, Austin, Texas 78756.

17.     **Defendant KARLIN ASSET MANAGEMENT, INC.** ("Karlin," and/or Defendant") is a Delaware entity, which at all material times to this action, is engaged and has been engaged in business in the state of Texas, as more fully described below. In this regard, Defendant has contracted by mail or otherwise with Texas residents in which a

party is or was to perform the contract in whole or in part in the state of Texas and/or has committed a tort in whole or in part in the state of Texas. Defendant is a non-resident of the state of Texas and does not maintain a place of regular business in the state of Texas and has no designated agent in Texas on whom service of citation may be made in this action.  Accordingly, pursuant to Section 17.044 of the Texas Civil Practice & Remedies Code, the Secretary of State of Texas is an agent for service of process or complaint on Defendant which may be served with citation by and through the Texas Secretary of State at its home office address at 11755 Wilshire Blvd., Floor 1400, Los Angeles, CA 90025, alternatively, its registered agent Corporation Service Company, located at 251 Little Falls Drive, Wilmington Delaware, 19801.

### *Predatory Affiliations*

18.     Plaintiffs believe and hereby allege, on information and belief, that at all times mentioned herein, each of the Defendants were the agents, servants, employees, and/or partners, of one or more or all of the other Defendants, and acted within the scope and authority of such agency, master-servant relationship, employer-employee relationship, and/or partnership, joint venture or co-venture, and with the knowledge, consent, approval, direction, understanding, agreement, and/or ratification of one or more or all of the Defendants.

19.     Unless a particular Defendant is named, whenever this Petition references the acts of any Defendant such allegation shall be deemed to mean the acts of those Defendants named in the particular cause of action and each other Defendant acting individually, jointly and severally.

<u>SUMMARY OF CLAIMS</u>

20.    This case is about the Defendants, predatory lenders, "loan to own" lenders, and the scheme they devised to steal the properties that Plaintiffs have worked hard to develop and, accordingly, create significant value.  Defendants recently conducted a series of sham foreclosure sales in violation of the Deeds of Trust on each property and the Texas Property Code.  The sales were not properly noticed, the substitute trustees did not have lawful authority to sell the properties and the foreclosure sales were conducted under fraudulent and unlawful chilled bidding procedures that were not previously disclosed to Plaintiffs or any competing bidders.

21.    The fraudulent "loan to own" scheme was orchestrated to enable the Defendants to fraudulently misappropriate the Plaintiffs' properties, valued at more than $300,000,000, for themselves.

22.    In addition, by disregarding the lawful foreclosure process the Defendants were able to artificially deflate the sales price of the properties at the foreclosure sales in order to enable Defendants to both take the valuable properties for themselves well below fair market value while leaving a large artificial deficiency to pursue against Natin Paul, the guarantor on the loans.

23.    The sham foreclosure sales were merely the latest fraudulent, bad faith, intentionally oppressive acts in the fraudulent "loan to own" scheme orchestrated by Ladder Capital and perpetrated by ATX1 and ATX2, affiliates of Karlin Asset Management, Inc., who intentionally hid its identity in an effort to shield itself from liability for this fraudulent scheme.

24.    The Defendants' conduct violates Texas law as they purposely ignored the provisions of the Deeds of Trust encumbering the Plaintiffs' properties, as well as the

Texas Property Code. Specifically, Karlin did so by improperly appointing substitute trustees to conduct sham foreclosure sales and then file substitute trustee deeds in the real property records to take the properties for themselves and the other Defendants after the unlawful foreclosure sales. Karlin did so or did to force Plaintiffs into a title dispute and to litigate the matter for years while Defendants attempt to enjoy the use and benefits of Plaintiffs' properties.

25.     Karlin should not be able to intentionally conduct unlawful foreclosure sales, file void deeds, and then be allowed the use and enjoyment of Plaintiffs' properties. The pre-mediated scheme and resulting unclean hands of the Defendants necessitate that a receiver be appointed so that the properties, including the leases and rents from the tenants who occupy the properties, may be safeguarded by the Court, pending the resolution of the disputes herein. In this regard, Plaintiffs are entitled to the appointment of a receiver pursuant to: (a) the Texas Civil Practice and Remedies Code, §64.001(a)(1) to vacate a fraudulent purchase of property; (b) the Texas Civil Practice and Remedies Code §64.001(6), in any other case in which the receiver maybe appointed under the rules of equity; or alternatively, (c) the Texas Business Organizations Code §11.403(b)(2) and (4), since the properties are in danger of being lost, removed or materially injured in the absence of a receivership and

 the receivership is necessary to conserve the properties and avoid damage to interested parties.

26.     Defendants' inequitable and unlawful actions clearly have made a mockery of the non-judicial foreclosure process and are clear evidence the Defendants' bad faith and unclean hands in the instant dispute. As set forth below, this is simply the latest effort in a series of actions taken by Karlin to fraudulently misappropriate the Plaintiffs'

valuable properties by any means possible, including orchestrating sham foreclosure sales, taking the properties, manufacturing deficiencies on the foreclosure sale of the properties.

### DISCOVERY CONTROL PLAN

27.     Discovery shall be conducted under Level 3 pursuant to Rule 190.4 of the TEXAS RULES OF CIVIL PROCEDURE.

### JURISDICTION & VENUE

28.     Jurisdiction is proper in this Court as the relief requested falls within the jurisdictional limits of the Court.  Venue is mandatory in Travis County, Texas pursuant to Section 15.011 of the Texas Civil Practice & Remedies Code for the reason that this suit involves an action for recovery of real property or an estate or interest in real property or to quiet title to real property in Travis County. Alternatively, venue is proper in Travis County, Texas, pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code for the reason that all or a substantial part, of the events or omissions giving rise to the claim occurred in Travis County, Texas.

29.     Pursuant to TEX. R. CIV. P. 47, the Plaintiff seeks monetary relief of over $100,000,000.00.[1]

### FACTS

**BACKGROUND AND HISTORY OF THE PARTIES.**

30.     On or about February 6, 2018, Silicon Hills executed a Promissory Note, dated as of February 6, 2018, in the original amount of $64,000,000.00 ("Silicon Hills Loan") from Ladder Capital Finance, LLC ("Ladder Capital" and/or "Original Lender").

---

[1]Plaintiffs reserve the right to amend, decrease and/or increase the amount of damages plead based on evidence developed before trial.

The Loan is secured by, among other collateral, an over 100-plus acre property containing 1.3 million square feet of improvements and an attendant power plant, pursuant to a deed of trust (the "Silicon Hills Deed of Trust"). Sometime thereafter, the Original Lender purportedly transferred all of its right, title and interest in the Loan and loan documents to an affiliate of Ladder Capital, namely Tuebor REIT Sub LLC ("Tuebor"). The Silicon Hills Property was recently appraised at a value of approximately $250,000,000 and has a current Travis County appraisal district tax value of $100,905,435.

31.     In a series of transactions later in 2018, WC Hirshfeld, WC 805-809, WC 320 Congress, WC 901 East Cesar Chavez, WC 1212 East Sixth, WC 9005 Mountain Ridge, WC 103 East Fifth, and WC 422 Congress LLC, purchased properties secured by a loan in the original principal amount of approximately $47,614,000 from Ladder Capital ("Hirshfeld Loan").

**IT IS REPRESENTED THAT THE PROPERTIES ARE UNDER SECURED TO PAVE THE WAY TO CHILL THE FORECLOSURE SALES.**

32.     During the course of the bankruptcy proceedings for the Plaintiffs, the Original Lender, a public company, took the position in the bankruptcy court that they were under secured in the underlying loans, while at the same time their CEO and other executives represented to investors in public earnings reports and public earnings calls that Ladder was vastly over secured. For example, on a February 27, 2020 earnings call, Ladder's CEO Brian Harris was asked how confident he was that he could recover his basis and any accrued interest on the Silicon Hills loan, to which he replied, "we're very confident . . . [it] will be a pretty big windfall if we collect all that interest." A true and correct copy of the February 27, 2020 Earnings Call Transcript is attached as **Exhibit "1."**

33.     Additionally, in urging the bankruptcy court to grant it relief from the automatic stay so that Ladder (or its successors ATX1 and ATX2) could proceed with foreclosure, Robert Perelman a founder and Head of Asset Management of Ladder Capital of Ladder testified that Ladder had not taken any impairment or write-down on the Silicon Hills Loan. Ladder Capital's statements to the Bankruptcy Court that the Silicon Hills Property and The Properties were worth less than the amount outstanding on the loans were entirely contrary to its representations made regarding the value of the loans and underlying collateral in its public earnings calls, as well as contradictory to the amount for which it subsequently sold the notes to Karlin.

34.     Ladder and Karlin engaged in similar representations with respect to the properties securing the Hirshfeld Loan when seeking to lift the automatic stay in order to proceed with foreclosure sales on the properties with false claims that there was negative equity in the properties. Further, upon information and belief, the timing of the Claims Transfers and the stay relief hearings suggest that Ladder was actively marketing its loans during the time in which it was seeking relief from the automatic stay from the bankruptcy court.[2]

35.     In other words, Ladder and Karlin, in order to persuade the Court to lift the automatic stay to allow Karlin to pursue non-judicial foreclosure sales in which Karlin

---

[2] On February 26, 2021, Seeking Alpha published the "Ladder Capital Corp. (LADR) CEO Brian Harris on Q4 2020 Results - Earnings Call Transcript" (the "Earnings Call Transcript"). A true and correct copy of the Earnings Call Transcript is attached hereto as **Exhibit "2."** and incorporated herein for all purposes. In the Earnings Call Transcript, Paul Miceli (Director of Finance and Chief Financial Officer of Ladder Capital Corp.) stated that "Ladder reduced its balance of non-accrual loans by 35%, mainly by selling forward defaulted loans at near par value. We sold two defaulted loans in bankruptcy in Austin, Texas, with an outstanding principal balance of $101 million."[2] Additionally, in the Earnings Call Transcript, Marc Fox (Chief Financial Officer of Ladder Capital Corp.) stated that "we mentioned that we sold some non-performing loans this quarter and got almost par for all of them." Further, in the Earnings Call Transcript, Brian Harris (Chief Executive Officer of Ladder Capital Corp.) stated that "we've been able to sell . . . defaulted loans, bankrupt loans, and all of them with a 98-ish type number, you know, across the board."

would plan to convey the properties to themselves, represented to the bankruptcy court that they were vastly under-secured in the loans and that the underlying properties lacked equity. At the same time, Ladder publicly reported the opposite that the loans were over-secured and it negotiated a loan sale to Karlin that allowed nearly a total recovery on the loans.

36.     Karlin, through its entity ATX1, continued to further the scheme and knowingly taking the false position that there was no equity in the Silicon Hills Property when it opposed a refinancing of the loan that would have paid ATX1 *in full*.  Karlin, through its entityATX2, refused to consider allowing any refinancing deals or sales that would have repaid its loans on the properties in the Hirshfeld Loan one by one and, instead insisted that all eight of the properties securing the Hirshfeld Loan be repaid at the same time.

### Karlin's Corporate Shell Game to Hide its Fraudulent Scheme

37.     ATX1 and ATX2 were organized to intentionally hide the identify of their principals and beneficial owners and fought hard not to disclose any such disclosure in the bankruptcy court proceedings. When the Plaintiffs urged for identifying information to be disclosed so that the Plaintiffs could determine if ATX1 or ATX2 had any previous relationship with the Plaintiffs or their affiliates, ATX1 and ATX2 refused. At one point during the bankruptcy proceedings, certain Plaintiffs and ATX2 had actually agreed to a settlement of the dispute over the motion for relief from stay, but ATX2 resisted when the Plaintiffs would not acquiesce to ATX2's late hour demand that in order to agree to the settlement, the Plaintiffs would need to stop pursuing discovery regarding the identity of the real owners, managers, members or control persons of ATX1 and ATX2 in the bankruptcy proceedings.

---

38.     The actual owners, members, managers and controlling persons of ATX1 and ATX2 have insisted on their anonymity since the purchase of the loan, resisting discovery as to their identity, without explanation. To further obfuscate the beneficial owners, ATX1 and ATX2 even had their lawyers hire a "straw man" named Navid Moshtaghi to act as the only business person disclosed to the Plaintiffs.

39.     The "straw man" nature of Mr. Moshtaghi became clear in testimony he provided with respect to the Borrowers in which he too insisted on hiding behind the same anonymity. A true and correct copy of the transcript of Mr. Moshtaghi's April 1, 2021 testimony is attached hereto as **Exhibit "3**."

40.     The unclean hands and "straw man" approach was also followed by Pennybacker Capital, who formed other Defendants including Congress Avenue Holdings, LP and Congress Avenue Holdings GP, LLC just days before the June Foreclosure. In fact, these Congress Avenue entities both list Pennybacker Capital's headquarters as their principal place of business and home office. Moreover, ATX1 which was the grantee of the Substitute Trustee's Deed (as discussed below) lists a mailing address of 11755 Wilshire Blvd., Floor 1400, Los Angeles CA 90025 which is Karlin's Los Angeles office address.

41.     Despite being the only disclosed business person associated with ATX2, Mr. Moshtaghi testified under oath on behalf of ATX2 that he knew practically nothing about the ATX2 loan or the Properties. He specifically stated that he wasn't "clear on who the principals [of ATX1] are," did not know how much debt was held under the Note[s], and had no information at all with regard to the ATX entities or the Properties themselves.

42.     In fact, Mr. Moshtaghi testified that the only thing he knew about the ATX2 loan at all was "that there are guarantees outstanding and that's a big part of the claim."

This admission was made before the automatic stay was lifted, and before any foreclosure sales were noticed. Mr. Moshtaghi's testimony indicated that he was aware that ATX2 became involved with the loans with a pre- mediated plan to pursue guarantees.

43.    Only later and in connection with the chilled foreclosure sales, did the Plaintiffs become aware that the beneficial owner of ATX was Karlin, a company with whom affiliates of Plaintiffs had done repeat business with over the last decade, and who had received confidential information regarding the Silicon Hills property, the Properties and the loans related thereto, prior to its purchase of those loans from Ladder because the Plaintiffs considered engaging in transactions with Karlin until they informed Plaintiffs of an internal conflict of interest which precluded the transaction. Further, Karlin and Pennybacker, the other purchaser and only other allowed bidder at the June Foreclosure sale, were known to one another because Karlin had previously sold a loan affiliated with Plaintiffs to Pennybacker.

**KARLIN'S MAY 2021 FAILED FORECLOSURE ATTEMPT.**

44.    In April 2021, ATX1 issued a notice of foreclosure sale of the Silicon Hills Property to be held on May 4, 2021 ("May Foreclosure Notice"). Prior to the foreclosure sale, the Silicon Hills borrower presented a financing motion to the bankruptcy court to approve $85 million in financing that would have repaid ATX1 *in full* on its approximately $78 million of claimed outstanding indebtedness. ATX1 opposed the motion and opposed being paid in full[3]. Instead, ATX1 insisted that it proceed with the May 4 foreclosure auction.

---

[3] ATX1's opposition to being paid in full at approximately $78 million, and bidding on the property for $90 million are both particularly egregious given the June Foreclosure credit bid of only $53 million.

45.     The Silicon Hills Property was posted for a foreclosure sale to occur between 1:00 p.m. and 4:00 p.m. on May 4, 2021. The sale commenced within that window of time and competitive bidding took place, with Defendant ATX1 bidding against a third-party bidder. The bidding on the Silicon Hills Property reached $90,500,000 with the third-party bidder being the high bidder and the Defendant ATX1 being the second highest bidder, with a bid of $90,000,000 (which consisted of both a credit bid and additional cash of over $10 million above the outstanding debt on the Silicon Hills Property, including interest, default interest and fees that Defendant ATX1 claims to be due and owing under the Silicon Hills Note).

46.     It became clear at this auction that the reason ATX1 opposed a payoff in full of its note is that it desired to take the property for itself. It was also clear that ATX1 believed the property to be worth at least the $90 million it bid at the May foreclosure sale. Ultimately, the third party bidder outbid ATX1, but then the Substitute Trustee designated by ATX1 abused his discretion and mandated the onerous and unusual requirement that the third-party bidder tender the sale proceeds via a cashier's check in the amount of $90,500,000, rather than by wire transfer (as is the usual procedure for foreclosure sales of this size in Travis County), and required that such cashier's check must be delivered by 1:45 p.m. on May 4, 2021, approximately one hour after the bidding had concluded.

47.     Upon information and belief, the third-party bidder's representative arrived back at the Courthouse to consummate the sale at approximately 3:50 p.m. on May 4, 2021, but the Substitute Trustee had already recommenced that a new auction take place without any other notice to the third-party bidder. However, since bidding at the recommenced sale continued past 4:00 p.m., and the Texas Property Code requires sales

to be completed by 4:00 p.m., the Substitute Trustee announced that the May foreclosure sale was adjourned and that foreclosure of the Silicon Hills Property would need to be re-noticed for June 1, 2021.

**KARLIN ORCHESTRATED A SCHEME OR PLAN IN CONCERT WITH THE OTHER DEFENDANTS AND THE SUBSTITUTE TRUSTEES TO DISCOURAGE FREE AND COMPETITIVE BIDDING AT THE SALE, THEREBY CREATING A WINDFALL FOR THE BUYER.**

48.     Having been unsuccessful in acquiring the Silicon Hills property for itself at the May foreclosure sale, Karlin then undertook a scheme to ensure it would come to own the Properties it desired at the prices it desired at the June foreclosure auction, as set forth in greater detail below.

49.     To effectuate the scheme, on May 10, 2021, ATX1 first filed in the Travis County real property records a Notice of Appointment of Substitute Trustee, in which it purported to replace the named trustee under the Deed of Trust for the Silicon Hills Property with nine substitute trustees including two new trustees, Chris Neilson and David Tomek.

50.     On May 10, 2021, ATX2 similarly filed in the Travis County real property records 8 separate Notices of Appointment of Substitute Trustee for The Properties, in which ATX2 purported to replace the named trustee under the Deeds of Trust with nine substitute trustees including Chris Neilson and David Tomek.

51.     On May 11, 2021, Defendant ATX1 then re-noticed a foreclosure sale of the Silicon Hills Property to be held on June 1, 2021 ("June Foreclosure Notice of Silicon Hills Property"). The foreclosure sale notice included an Exhibit "A," containing an

incorrect legal description of the Property, rendering the June Foreclosure Notice void.[45]

52.   Plaintiff ATX2 also noticed a foreclosure sale of each of the H8 Properties to also be held on June 1, 2021 ("June Foreclosure Notice of the H8 Properties").

53.   Plaintiffs informed both Defendant ATX1 and Defendant ATX2 and the substitute trustees Chris Nielson and David Tomek, ("Primary Substitute Trustees") of the defects and irregularities of the June foreclosure notices prior to the date and time of the sale. A true and correct copy of said correspondence is attached hereto as **Exhibit "4,"** and incorporated here by reference for all purposes.

54.   ATX1, ATX2, and the substitute trustees David Tomek and Chris Neilson did not respond to Plaintiffs' notices of the defects with the foreclosure sales sent by counsel and instead ignored the defects and irregularities of the June foreclosure notices – which did not comply with Texas Law. They did not cancel the sales in order to cure the defects and irregularities as required by law, but instead insisted on proceeding with the foreclosure sales in spite of their defects and invalidity.

---

[4] The legal description attached to the June Foreclosure Notice was "The legal description of the property in the notice of substitute trustee sale for Silicon Hills. It lists the legal description as **all of Lots 1, 2, 3, and 4**." However, the actual property owned by the Plaintiff at the time of the June Foreclosure Notice, as evidenced in the 2021 Travis County tax records, was limited to:

- Lot 1;
- 107.2117 Acres in Lots 2 & 4
- 17.4107 acres of Lot 3

[5]    Additionally, the June Foreclosure Notice listed the names of nine (9) purported substituted trustees.  This was especially problematic because this sale was noticed for the same time as the eight other properties further detailed below, which also purported to have the same nine (9) substitute trustees.   The Deed of Trust only permits a single substitute trustee to be named.

Upon information and belief, the nine (9) separate substitute trustees were appointed to purposely cause confusion, and to deter foreclosure bidders from being able to locate the actual Substitute Trustee selling a particular property at the foreclosure sale (and, as it turns out, to make sure that the other bidders could not have bank checks made out to the correct Substitute Trustee under the surprise rules established for these foreclosure sales by ATX and its Substitute Trustees).

Plaintiff alerted the ATX Defendants and the Substitute Trustees of the defect in the foreclosure notice and the lack of authority for the Substitute Trustees listed to conduct the sales promptly on May 31, 2021, well in advance of the June Foreclosure Sale.

55.      On information and belief, ATX1 and ATX2 filed the May 11 trustee appointments naming 9 different Substitute Trustees for The Properties and the Silicon Hills Property in order to create chaos and confusion for prospective bidders at the foreclosure sale. In reality, they only intended to utilize the 2 newly added Primary Substitute Trustees and leave the other 7 Substitute Trustees, who work for a professional company that regularly conducts foreclosure auctions in Travis County, as decoys. On information and belief, ATX added the Primary Substitute Trustees to ensure that the auctions would achieve the chilled results set forth below.

56.      At the foreclosure site were several interested bidders who were prepared to bid on the Silicon Hills Property and The Properties with good funds in the form of cash, cashier's checks or immediate wire transfer. The site of the foreclosure sale was crowded with protests about the surprise changes in the rules making the site chaotic and nearly impossible to hear any announcements regarding the foreclosure sales.

57.      Prior to the time set for the foreclosure sales to commence, the Co-Founder of Karlin, Matt Schwab confirmed in a conversation with Natin Paul and others that Karlin and Schwab were the controlling persons or owners of the ATX Defendants who had hidden their identity.  Mr. Schwab was confirmed that he was both aware of and informed of the defects in the foreclosure notices.  Mr. Schwab did nothing to cure the deficiencies and insisted on proceeding with the June 1, 2021 sales.

58.      Mr. Schwab confirmed that Karlin was aware of Plaintiffs' prior notices of defects and Plaintiffs' complaints about the proposed foreclosures. Schwab stated that his group would own the Plaintiffs' Properties after the foreclosure sales, and affirmatively stated that "there _**will**_ be a deficiency from this sale", "we [Karlin/ATX] are taking the properties today," and any defects in the sale "could be litigated" in court at a later time.

In other words, Mr. Schwab had prior knowledge of what the results of the auction would be – the Defendants would win the auction, purchase the properties at a steep discount and then litigate with Mr. Paul (the Guarantor) on the contrived deficiency.

59.     In addition, the Primary Substitute Trustees, acting on behalf of the Defendants, imposed unlawful, unreasonable, onerous, surprise and oppressive conditions on the foreclosure sale designed to exclude ready, willing and able third-party bidders with good funds from participating and preventing such third-party bidders from making competitive bids. These included refusing to let any party bid at the foreclosure sale that did not have a pre-prepared cashier's check payable specifically to the Defendant or in the name of the particular Substitute Trustee (even though there were 9 different Substitute Trustees listed for the sale of each of Plaintiffs' Properties) and the amount of the winning bid was yet unknown.

60.     The foregoing surprise conditions are not stated in the deeds of trust, the Texas Property Code nor are they the customary practice for foreclosure sales in Texas. Again, this condition was especially problematic because a prospective bidder could not determine the appropriate payee of the Cashier's Check prior to the commencement of bidding and eight (8) other properties that were noticed to foreclosure at the same time and date as more fully set forth below.

61.     The result of this egregious restrictive bidding condition is that ATX1 and ATX2 were the only bidders allowed to participate in the majority of the foreclosure sales, except for those in which they allowed their colleague, Pennybacker, to participate in.  The foreclosure sales occurred over the objection of not only the Plaintiffs, but also third-party bidders with available good funds, who were all deprived of the opportunity to bid at the sales.

62.     Upon information and belief, the designation of nine (9) separate substitute trustees was done to cause chaos, confusion, and to prevent any competing bidders at the foreclosure sale. In effect, a successful bidder would have had to guess the amount of the winning bid, the correct name of the appointed Substitute Trustee prior to the commencement of bidding and/or have multiple cashier's checks available for tender to the one Substitute Trustee appointed at the time of the sale as the one of the 9 Substitute Trustees actually conducting the particular sale.

63.     The substitute trustees who conducted the sales refused to allow any bidder to bid who did not meet their arbitrary and capricious requirements.

64.     Further, the primary substitute trustee refused to speak to Plaintiffs' representatives and refused to allow Plaintiffs' representatives to bid on any of the properties. The primary substitute trustee even went so far as to conduct several of the auctions speaking quietly behind a binder so that the public could not hear that an auction was even being conducted at all.

65.     Upon information and belief, interested purchasers were, therefore, prohibited from bidding at the foreclosure sale, thereby resulting in a grossly inadequate, below fair market value sales prices of Plaintiffs' properties and manifest error pursuant to the Deeds of Trust. For example, the "credit bid" that ATX1 claims that it successfully won the Silicon Hills Property Auction with was only $53,000,000, which was $37,500,000 less than was bid at the cancelled May foreclosure sale, $37,000,000 less than *ATX1 itself* had actually bid at the canceled May foreclosure sale, nearly $20,000,000 less than the outstanding debt due and owing on the Silicon Hills Property (including default interest and fees), approximately only half of the $101, 254, 533 Travis

County Appraisal District appraised value of the property, and nearly $200,000,000 less than a recent appraisal of the property.

66.    The comments made by the designated representatives of the Defendants ahead of the alleged sale, indicating the Defendants would be looking to collect on the guarantees and that there would be a deficiency at the conclusion of the auction, evidences that this wholly defective process and unlawful and improper result was intentional, premeditated, unlawful, in bad faith, fraudulent and oppressive.

67.    On June 2, 2021, the Substitute Trustee then filed and recorded a Substitute Trustee's Deed for the Silicon Hills Property in the Public Records of Travis County, Texas, a true and correct copy of which is attached hereto as **Exhibit "5"** and incorporated herein by reference. ("Substitute Trustee's Deed for Silicon Hills Property"). The Substitute Trustee's Deed for Silicon Hills Property contains the incorrect legal description which had been disclosed to the Substitute Trustee (and to Mr. Schwab) before the foreclosure sale. The Substitute Trustee's Deed for the Silicon Hills Property purports to transfer the Silicon Hills Property to Defendants as Grantee based upon a purchase price of $53,000,000.

68.    Finally, the Substitute Trustee's Deed represents that the Substitute Trustee had conducted all of the prerequisites to conducting a foreclosure sale, including announcing the bidding conditions, reading the property description, qualifying bidders and any and all other announcements required prior to opening bidding, **and completed** the Trustee's sale by 10:05 a.m.-all in just 5 minutes after the foreclosure sales were allowed to commence by statute-which scenario is entirely unlikely unless there had been pre-sale collusion and planning among the Defendants and Substitute Trustees prior to the foreclosure sales. By contrast, the May foreclosure sale, which

included competitive bidding, took approximately 3 hours before it was concluded and rescheduled.

69.     As Defendant ATX1's Substitute Trustee did in the Silicon Hills sham foreclosure, the Primary Substitute Trustees, acting on behalf of the Defendant ATX2, imposed the same defective, unlawful, onerous and oppressive conditions on the foreclosure sales of the Hirshfeld Loan Properties. These conditions were not reasonable, including refusing to let any party even bid at the foreclosure sale that did not have a pre-prepared cashier's check made payable specifically to the Defendant ATX2 or in the name of the correct Substitute Trustee conducting the sale, the name of whom was impossible to ascertain in advance.

70.     The foregoing condition is an irregularity in the foreclosure sale and not the lawful standard or a typical set forth in the deeds of trust, the Texas Property Code, nor is it the customary practice for foreclosure sales in Texas. Again, this condition was especially problematic because a prospective bidder could not determine the amount of the winning bid or the appropriate payee of the Cashier's Check prior to the commencement of bidding, particularly because the condition was not announced prior to the commencement of the auctions as is required by the Deed of Trust and the Texas Property Code.

71.     On information and belief, Defendant ATX2 had agreed on this requirement with the Substitute Trustee, and did not disclose the bidding requirements to any other party except for Congress Avenue Holdings, LLC ("Pennybacker") an entity associated with Pennybacker Capital, LLC, with whom Karlin or its affiliates have a previous relationship and which entity's co-founder is George P. Bush, current candidate for Texas Attorney General.

72.     According to the void deeds filed by Defendants in the local real property records, the results of the purported foreclosure sales were as follows:

a.      10:14 a.m: 805 E. Sixth St. and 809 E. Sixth St. were purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $1 million. The Substitute Trustee excluded all bidder's other than ATX 2. The appraisal district valued the properties at about $2.45 million.

b.      10:21 am:  9005 Mountain Ridge Drive was sold to ATX Debt Fund 2, LLC for a credit bid of $1.5 million. The Substitute Trustee excluded all bidder's other than ATX 2. The building was valued at nearly $6 million by the appraisal district.

c.      10:29 am: 901 East Cesar Chavez was purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $1.5 million. The Substitute Trustee excluded all bidder's other than ATX 2. The property is valued at $4.74 million by the appraisal district.

d.      10:37 a.m.: 305-309 West 9th was purportedly sold for $5.7 million to Pennybacker. The Substitute Trustee excluded all bidder's other than ATX 2 and Pennybacker.

e.      10:49 a.m.: 103 E. Fifth St. was purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $5,000,000. The Substitute Trustee excluded all bidder's other than ATX Debt Fund 2, LLC. The property is valued at $6.56 million by the Travis Central Appraisal District.

f.      10:58 a.m.: 320 Congress Avenue was purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $13,200,000.  The Substitute Trustee excluded all bidder's other than ATX Debt Fund and Pennybacker.

g.     11:33 a.m.: 1212 East Sixth St. was purportedly sold for $5.9 million to Pennybacker. The Substitute Trustee excluded all bidder's other than ATX Debt Fund and Pennybacker

h.   11:54 a.m.: 422 Congress Avenue was purportedly sold to ATX Debt Fund 2, LLC for a credit bid of $10,000,000. The Substitute Trustee excluded all bidder's other than ATX Debt Fund 2, LLC

73.     The foreclosure sales of the Properties that were held on June 1, 2021 were unlawful, improper, unlawful, and were designed as part of a fraudulent scheme by Defendants, to take ownership of highly desirable and valuable downtown Austin, Texas property by Karlin and Pennybacker, along with false and manufactured deficiency claims against the guarantor.

<u>C</u>AUSE<u>S OF</u> A<u>CTION</u>

**FRAUDULENT FILINGS -- VIOLATIONS OF CHAPTER 12 OF THE TEX. CIV. PRAC. REM. CODE**

74.     Plaintiffs reassert and incorporate all preceding paragraphs by reference and re-alleges them as if set forth herein in full.

75.     Plaintiffs are, and have been, the rightful owner of the Properties. Defendants were aware, or reasonably should have been aware, that Plaintiffs were and are the owner of the Properties.

76.     At no time did Plaintiffs participate in, acquiesce to, or authorize the improper foreclosure sale of the Properties to Defendants. Indeed, Defendants with knowledge that the following documents or other records were fraudulent court records or a fraudulent lien or claim against real property or an interest in real property made, presented or used such documents or other records with an intent that such documents or other records be given the same legal effect as a valid court record or document of a

court record evidencing a valid lien or claim against real property or an interest in real property. In fact, the irregularities and defects in the improper foreclosure sale in June 2021, and the attempted foreclosure sale in May 2021, concealed such information from the public records.

77.     Despite the foregoing, Defendants have filed, and/or participated in the filing, of at least two fraudulent filings against each of the Properties including, without limitation, (a) the June Foreclosure Notice; and (b) the Substitute Trustee's Deed for each of the Properties (the "Fraudulent Filings").  Defendants, by filing the Fraudulent Filings, seek to fraudulently transfer ownership of the Properties to themselves and have fraudulently imposed improper liens against the Property.

78.     The Fraudulent Filings were all filed with the intent of fraudulently transferring ownership of the Properties and for imposing improper liens against the Properties, as well as with the intent of damaging Plaintiffs and causing Plaintiffs financial injury.

79.     Defendants are liable to Plaintiffs for the greater of $10,000, or the actual damages caused by the Fraudulent Filings in violation of Chapter 12 off the Texas Civil Practice & Remedies Code, together with court costs, expenses incurred in bringing this action, including investigative expenses, reasonable attorneys' fees, and exemplary damages in an amount to be determined by the Court, for which Plaintiffs now sue Defendants.

**CONSPIRACY TO DEFRAUD PURSUANT TO CHAPTER 12 OF THE TEX. CIV. PRAC. REM. CODE**

80.     Plaintiffs reassert and incorporate all preceding paragraphs by reference and re-alleges them as if set forth herein in full.

81.     The Defendants were members of a combination of two or more persons. The object of the combination was to accomplish (1) an unlawful purpose, or (2) a lawful purpose by unlawful means.

82.     The members had a meeting of the minds on the object or course of action.

83.     One of the members committed an unlawful, overt act to further the object or course of action.

84.     The Plaintiffs suffered injury as a proximate result of the wrongful act.

**SUIT TO QUIET TITLE**

85.     Plaintiffs reassert and incorporate all preceding paragraphs by reference and re-alleges them as if set forth herein in full.

86.     Plaintiffs are, and have been, the rightful owner of the Properties. Defendants are aware, or reasonably should have been aware, that Plaintiffs were and are the owner of the Properties.

87.     The following parties have, through the Fraudulent Filings, wrongfully, knowingly and intentionally asserted claims in and to the title to the Properties contrary to Defendants' actual interest and rights.

88.     Defendants filed, and/or participated in the filing, of the Fraudulent Filings, claiming ownership of the Properties and intending such documents to (a) fraudulently transfer ownership of the Properties from Plaintiffs and to Defendants and (b) fraudulently impose a lien against each of the Properties.

89.     The Fraudulent Filings are void and invalid, and Defendants had no authority to file the Fraudulent Filings, all of which interfere with Plaintiffs' title to the Properties, and which are legally of no force or effect.

90.     Plaintiffs request that the Court issue a judgment declaring that the Fraudulent Filings are invalid and unenforceable, and ordering that the Fraudulent Filings be removed from the title to the Properties or otherwise require Defendants to file and record a release and withdrawal of the Fraudulent Filings, thereby quieting the title of Plaintiffs in and to the Property.

**TRESPASS TO TRY TITLE – TEX. PROP. CODE, SECTION 22.001.** *et seq*

91.     Plaintiffs reasserts and incorporates all preceding paragraphs by reference and re-alleges them as if set forth herein in full.

92.     Defendants have unlawfully converted title to and possession of the Properties to the exclusion of Plaintiffs.

93.     Plaintiffs have a superior claim to title to, and possession of, the Properties, for which Plaintiffs now sue Defendants.

94.     Defendants have acted in bad faith and with knowledge of the irregularities in the foreclosure sales and Plaintiffs' superior right to title to, and possession of, the Properties. As such, Plaintiffs are entitled to such title and possession without Defendants' recovery of any amounts for reimbursements specified under section 22.021 of the Texas Property Code.

**REQUEST FOR APPOINTMENT OF RECEIVER PURSUANT TO TEX. CIV. PRAC. & REM. CODE §64.001 et. seq.**

95.     Plaintiffs reassert and incorporate all preceding paragraphs by reference and re-allege them as if set forth herein in full.

96.     Since the execution and filing of the fraudulent deeds, Defendant has attempted to take possession and in doing so has disturbed the quiet enjoyment of various tenants as well as block personnel from maintaining and safeguarding the Silicon Hills property which requires around the clock maintenance and care.

97.    Plaintiffs are seeking to vacate a fraudulent purchase of the properties.  As such, Plaintiffs are entitled to the appointment of a receiver pursuant to Tex. Civ. Prac. & Rem. Code, § 64.001(a)(1).  Under Section 64.001(a)(6), the Court may also appoint a receiver "in any other case in which a receiver may be appointed under the rules of equity."

98.    Plaintiffs request that the Court appoint a qualified receiver over the Properties, until such time as a final determination on the merits of Plaintiffs' claims are made, and that the Court vest the receiver with the with the powers and duties enumerated in Tex. Civ. Prac. & Rem. Code, § 64.031, including the powers and duties to: a) take charge and keep possession of the properties; b) lease commercial space and operate the buildings on the properties; c) maintain the properties and make repairs; d) receive rents, pay expenses and submit a monthly report of income and expenses to the court; d) collect and compromise demands; e) make transfers; and f) perform such other acts in regard to the Properties as authorized by the Court.  The requirements of Texas Civil Practice and Remedies Code Section 64.001 receivership test are met because the Property's condition places it in imminent danger of being lost or damaged.

**REQUEST FOR APPOINTMENT OF RECEIVER PURSUANT TO TEX. BUS. ORG. CODE §11.401 et. seq.**

99.    Plaintiffs reassert and incorporate all preceding paragraphs by reference and re-allege them as if set forth herein in full.

100.    Plaintiff seeks appointment of a receiver over the property at issue in this case under Sections 11.402 and 11.403 of the Texas Business Organizations Code.

101.    Plaintiffs right to or interest in the property or the proceeds from the property is probable in that Plaintiffs are the rightful owners of the properties despite Defendants fraudulent and oppressive conduct at the foreclosure sale as more fully alleged above.

102.    Plaintiffs apply for the appointment of a receiver over the Properties at issue herein in the possession of the Defendants pursuant to TEX. BUS. ORG. CODE § 11.403(a)(4).

103.    The court has jurisdiction over the Plaintiffs' properties since Plaintiffs are Delaware entities authorized to transact business in Texas, and thus may appoint a receiver of Plaintiffs' Properties.

104.    Plaintiffs seeks appointment of a receiver since it appears that the mortgaged property is in danger of being lost or transferred to a subsequent transferee in that circumstances exist that necessitate the appointment of a receiver to conserve the Plaintiffs' Properties and avoid damage to interested parties. Specifically, the original lender as a condition precedent to executing the loan required that the properties be leased. At this time, without a receiver appointed to protect Plaintiffs interests by maintain the status quo by keeping the tenants in place and to collect rents, pay expenses (including adequate liability insurance), and maintain the properties pending the ultimate disposition of the Properties.

105.    The Properties are in danger of being lost, removed, or materially injured in the absence of a receivership, and are likely to be transferred again without any value being received in return. TEX. BUS. ORG. CODE § 11.403(b)(1). A receivership is necessary to conserve the Properties and avoid damage to interested parties. TEX. BUS. ORG. CODE § 11.403(b)(2). All other available legal and equitable remedies would be inadequate. TEX. BUS. ORG. CODE § 11.403(b)(4).

106.    Plaintiffs have complied with all other requirements of law. Plaintiffs have no other adequate or available legal and equitable remedies.

107. For all these reasons, appointment of a receiver is justified under 11.402 and 11.403 of the Texas Business Organizations Code.

## ATTORNEYS' FEES – DECLARATORY RELIEF

108. Plaintiffs reassert and incorporate all preceding paragraphs by reference and re-allege them as if set forth herein in full.

109. Plaintiffs are entitled to declaratory relief declaring that sole and exclusive title in and to the Properties belongs to Plaintiffs.

110. Plaintiffs are further entitled to recover their reasonable attorney's fees and costs incurred in prosecuting Plaintiffs' declaratory judgment claims, for which amounts Plaintiffs now sue Defendants.

## EXEMPLARY DAMAGES

111. Plaintiffs reassert and incorporate all preceding paragraphs by reference and re-allege them as if set forth herein in full.

112. The acts of Defendants complained of herein were committed knowingly, willfully, intentionally, with actual awareness, or with actual malice. To punish Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiffs seeks recovery from Defendants of exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

## NO WAIVER

113. By filing this lawsuit, Plaintiffs do not waive or release any rights, claims, causes of action, or defenses or make any election of remedies that they have, but expressly reserve such rights, claims, causes of action and defenses.

### CONDITIONS PRECEDENT

114.    All conditions precedent to the Plaintiffs' right to recovery has been performed, have occurred, and/or have been waived.

### PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs request that Defendants be cited to appear and answer, and that on final trial, Plaintiffs have judgment against Defendants, as follows:

a)    actual damages in an amount within the jurisdictional limits of the Court or at least $250,000,000;

b)    exemplary damages in the amount of at least three times the amount of actual damages;

c)    declaratory relief, declaring that the Fraudulent Filings are void, and/or voidable, and are otherwise invalid and unenforceable;

d)    declaratory relief and judgment for Plaintiff clearing title to the Properties, removing the Fraudulent Filings to the Properties from the Dallas County Records, declaring sole ownership in and to the Properties in Plaintiffs; and establishing title to, and right of possession of, the Properties in and to Plaintiffs;

e)    granting the appointment of a Receiver pursuant to Tex. Civ. Prac. & Rem. Code §64.031. Alternatively, granting the appointment of a Receiver pursuant to Tex. Bus. Organization Code §11.402 and §11.403.

f)    reasonable attorney's fees incurred in the litigation, trial, post-trial motions, successful appeal and enforcement proceedings in this matter, as well as all pre/post judgment interest and contingent interest for all possible appeals;

g)    costs of court against Defendants; and,

h)     such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

**FRIEDMAN & FEIGER, L.L.P.**

*/s/ Larry Friedman*

By: _____

**Lawrence J. Friedman**
State Bar No. 07463900
lfriedman@fflawoffice.com
**Jason H. Friedman**
State Bar No. 24059784
jason@fflawoffice.com
**Richard W. Winn**
State Bar No. 21779700
rwinn@fflawoffice.com

5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

**ATTORNEYS FOR PLAINTIFFS**

Unofficial copy Travis Co. District Clerk Velva L. Price



**EXHIBIT**

**Ex. 1**

Seeking Alpha$^{\alpha}$

**Transcripts | Financial**

# Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Transcript

Feb. 27, 2020 8:32 PM ET  | 1 Like

by: SA Transcripts

Q4: 02-27-20 Earnings Summary

 *Press Release*    SEC *10-K*    *Slides*

EPS of $0.4 beats by $0.01 | Revenue of $84.46M (31.11% Y/Y) beats by $6.03M

---

**Earning Call Audio**                                     ⌐o Subscribers Only

Ladder Capital Corp (NYSE:LADR) Q4 2019 Earnings Conference Call February 27, 2020
5:00 PM ET

**Company Participants**

Michelle Wallach - Chief Compliance Officer and Senior Regulatory Counsel

Pamela McCormack - President

Marc Fox - Chief Financial Officer

Brian Harris - Chief Executive Officer

**Conference Call Participants**

Tim Hayes - B. Riley FBR

Jade Rahmani - KBW

Joel Dryer - LTC Partners

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 2 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 43 of
169

Charlie Arestia - JPMorgan

Chris Muller - JMP Securities

Jason Weaver - Compass Point

**Operator**

Good afternoon, and welcome to the Ladder Capital Corp's Earnings Call for the Fourth
Quarter of 2019. At this time, all participants are in a listen-only mode. A question-and-
answer session will follow the formal presentation. [Operator Instructions]

At this time, I would like to turn the conference call over to Ladder's Chief Compliance
Officer and Senior Regulatory Counsel, Ms. Michelle Wallach. Please go ahead Ms.
Wallach.

**Michelle Wallach**

Thank you, and good afternoon, everyone. I'd like to welcome you to Ladder Capital
Corp's earnings call for the fourth quarter and year ended 2019. With me this afternoon
are Brian Harris, our company's Chief Executive Officer; Pamela McCormack, our
President; and Marc Fox, our Chief Financial Officer. Brian, Pamela and Marc will share
their comments about the fourth quarter and then we will open up the call to questions.

This afternoon, we released our financial results for the fourth quarter and year ended
December 31, 2019. The earnings release is available in the Investor Relations section of
the company's website, and our Annual Report on Form 10-Q will be filed with the SEC
later this week.

Before the call begins, I'd like to remind everyone that this call may include forward-
looking statements. Actual results may differ materially from those expressed or implied
on this call, and we do not undertake any duty to update these statements. I refer you to
our most recent Form 10-K for a description of some of the risks that may affect our
results. We'll also refer to certain non-GAAP measures on this call. Reconciliation of these
non-GAAP financial measures to the most comparable GAAP measures prepared in
accordance with GAAP are contained in our earnings release.

With that, I'll turn the call over to our President, Pamela McCormack.

**DEBTOR EXHIBIT 6**
**Page 2 of 23**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 3 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 44 of
169

**Pamela McCormack**

Thank you, Michelle, and good afternoon, everyone. During the fourth quarter, Ladder produced core earnings of $48.6 million or $0.40 per share, reflecting an after-tax core return on equity of 11.5%. For the full year 2019, Ladder produced core earnings of $190.6 million or $1.60 per share, covering our $1.36 per share annual cash dividend and delivering an 11.6% after tax core return on equity.

In 2019, we focused on identifying attractive investment opportunities in a competitive lending environment and further strengthening our liability structure. Our multi-cylinder business model continues to afford us with the flexibility to quickly pivot to take advantage of attractive opportunities as well as the ability to be patient and identify the best risk-adjusted returns in the market.

In the fourth quarter, we originated $858 million of loans, 54% of which were balance sheet loans and we acquired $446 million of securities. For the full year 2019, we originated $2.5 billion of loans, 61% of which were balance sheet loans and we acquired $1.6 billion of securities.

As Brian and Mark will cover later, we continue to strengthen the right side of our balance sheet by maintaining a diversified liability structure with maturities that are long-dated and well staggered. During 2019, we made meaningful progress on our path to investment grade. As we prepared for our issuance of a $750 million unsecured seven-year corporate bond offering at a coupon of 4.75, a landmark field that closed in January 2020. The issuance was complemented by corporate family rating upgrade from Moody's to Ba1 and Fitch to BB Plus, which also triggered a 25 basis point step down in the interest rate on our unsecured corporate revolving credit facility.

Furthermore, since the end of the third quarter, we extended the maturity dates on all of our secured funding facilities and our $266 million corporate revolving credit facility. We now enjoy an average remaining term of over four years on our secured loan purchase facilities. We continue to maintain a strong and long-standing relationship with our bank partners, several leading back to Ladder founding. Through such efforts coupled with our continued commitment to moderate leverage and a disciplined approach to investing, we are making meaningful progress towards our goal of achieving an investment-grade rating.

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 4 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 45 of
169

As I discuss our products in more detail, I'll begin with our conduit business, which contributed $15 million to Q4 earnings from the securitization of $421 million of loans and a private sale of $34 million of conduit loans.

For the full year 2019, our conduit business contributed $39 million solid core earnings from the sale of $1 billion of loans. For the first quarter of 2020, we sold $186 million of loans, $134 million into securitization and an additional $52 million through our private sales. Both transactions closed in February and generated $6.2 million of core gains.

We do not expect to participate in any further securitizations or sale of loans during the quarter. The gain on sale realized from our conduit loan securitization business continues to complement our recurring net interest margin and net rental income.

Turning to our balance sheet loan origination business. We originated $466 million of balance sheet loans during the fourth quarter almost all of which were floating rate with an average loan size of $23 million, a weighted average spread of 385 basis points over LIBOR and a weighted average LTV of 68%.

During the quarter we received $454 million of payoffs, primarily, comprised of floating rate loans with a weighted average spread of 537 basis points over LIBOR resulting in a $12.3 million of net balance sheet loan originations. For the full year 2019, we originated $1.5 billion of predominantly floating rate balance sheet loans with an average loan size of $21 million, a weighted average spread of 403 basis points over LIBOR and a weighted average LTV of 69%.

During 2019, our real estate equity portfolio continued to provide consistent net rental income from long-dated cash flows that contribute to our recurring earnings. At quarter-end, we had $1.3 billion of real estate investments on an undepreciated basis comprised primarily of net lease properties to credit tenants.

During the fourth quarter, we completed the sale of our last remaining condominium unit at Veer towers in Las Vegas. Our $119 million investment in Veer Towers resulted and a net profit of $52 million and generated a 23.5% IRR by to-date. As we look ahead in 2020, we will continue to manage our real estate equity investments and contemplate the harvesting of embedded value in the portfolio.

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 5 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document   Pg 46 of
169

In our Securities segment during the fourth quarter we acquired $446 million of highly rated securities and for the full year 2019 our acquisitions totaled $1.6 billion. As of December 31, 2019 our securities portfolio totaled $1.7 billion up from $1.4 billion at the end of the fourth quarter of 2018.

In summary, we were pleased to end the year characterized by strong earnings and steady loan origination and investment activity. We are also pleased to start the New Year as a BB+ company with a best-in-class capital structure.

With that, I'll now turn the call over to Marc Fox, our Chief Financial Officer.

**Marc Fox**

Thank you, Pamela. Looking at our financial results more closely. In the fourth quarter, recurring income in the forms of net interest income and net rental income totaled $46.6 million. This income was complemented by $15.2 million of core gains on the sale of loans $1.1 million of core gains on sales of securities and $0.3 million of gains from real estate sales. From this income, we paid $41 million of dividends and distributions equivalent to $0.34 per share on 119.7 million shares resulting in a payout ratio of 85%.

Looking more closely at the balance sheet, it is noteworthy that as of December 31, 2019 97% of our debt investments were senior secured, senior secured assets plus cash comprised 79% of our total asset base reflecting Ladder's continued focus on investments at the top of the capital stack.

During the fourth quarter, we experienced two credit events that had a slightly positive net effect on our income statement. We recorded a $2.25 million gain on foreclosure on a $5.7 million mezzanine loan secured by a San Diego Hotel that was offset by a $2 million loss provision on a $23.6 million land loan in Los Angeles both of which defaulted during the quarter.

Turning to our capital structure. We continue to strengthen and diversify our funding base. Ladder remains committed to a target leverage ratio in the 2 times to 3 times range and to the pursuit of investment-grade credit ratings. Bond investors recognize the progress we have made as evidenced by the pricing of our recent corporate bond issuance. The 4.25% coupon rate was 100 basis points lower than our previous issuance and the credit spread reflected in that rate was 63 basis points tighter than the tightest of prior Ladder issuances.

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 6 of 23
21-01029-tmd   Doc#2   Filed 06/30/21   Entered 06/30/21 12:17:10   Main Document   Pg 47 of
169

The proceeds we used to pay down secured debt to cost approximately 80 basis points less than the corporate bond financing. We view the increased cost as a sound investment in the long-term strength, certainty, and flexibility of the right side of our balance sheet that comes with long-term committed unsecured bond funding.

We closed the year with a debt-to-equity ratio of 2.97 times. Excluding our portfolio of highly liquid and highly rated securities our debt-to-equity ratio would be 1.92 times.

Undepreciated book value per share as of 12/31/2019 was $15.23. Unencumbered assets at year-end stood at $1.9 billion, reflecting a 1.62:1 unencumbered assets to unsecured debt ratio substantially over the 1.2 times requirement included in our corporate bond indentures.

Since the majority of our current unencumbered asset base is comprised of first mortgage loans, securities backed by first mortgage loans and real estate, the excess unencumbered assets represent a potential source of future funding. As of February 27th, we had over $2.7 billion of unencumbered assets and over $800 million of liquidity available to fund new investments.

On the accounting and reporting front, Ladder has calculated the impact of CECL on our consolidated financial statements. We estimate that the initial current expected credit loss reserve to be recorded in the first quarter of 2020 to be approximately $12 million or 36 basis points of our unimpaired balance sheet loan portfolio.

Important factors driving the CECL reserve include the size, composition, and risk profile of our loan portfolio as well as current and projected future macro market conditions. We expect the CECL reserve to vary from quarter-to-quarter reflecting changes in the size and composition of our portfolio.

And with that, I'll now turn you over to our Chief Executive Officer, Brian Harris.

**Brian Harris**

Thanks Mark. Ladder turned in a strong performance in 2019 and we're especially proud of our after-tax ROE of 11.6% for the year. During 2019, we maintained a healthy activity in both our balance sheet and conduit lending programs keeping our portfolio relatively flat

DEBTOR EXHIBIT 6
Page 6 of 23

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 7 of 23
21-01029-tmd Doc#2 Filed 06/30/21 Entered 06/30/21 12:17:10 Main Document Pg 48 of
169

year-over-year, while we also enjoyed a 65% increase in revenue contribution from securities as we continue to build our inventory a floating rate AAA CLO securities which have been offered at relatively wide credit spreads.

Over the last few quarters, we have expressed a relative value preference for liquidity in our investment strategies maintaining short-dated investments across all our products and favoring property types like apartments and warehouses.

We also expressed the preference for AAA securities over forcing marginal volume on loans in our balance sheet loan business. We expect that same theme to continue as we go further into 2020.

Given current volatile market conditions, we expect to continue to focus on our conduit lending program, our acquisition of highly rated securities and investments in owning high-quality real estate. We will do this while maintaining our balance sheet loan portfolio at or near its current size, albeit, we will continue to be very selective.

LIBOR has fallen from 2.52% at the beginning of 2019 to about 1.6% today with a strong likelihood, it will be going even lower. We intend to remain prudent in the face of this environment which is exacerbated by tighter credit spreads and strong competition.

While net interest margin is likely to trend lower in 2020, we expect this to be somewhat offset by harvesting gains on mature real estate assets that are now ready for sale and our increased inventory of securities.

As rates and credit spreads fell, as the new year began, we successfully accessed the unsecured corporate bond market in January issuing $750 million of seven-year bonds at a rate of 4.25%.

While this caused a modest increase in our overall interest expense we feel that the benefits far outweigh the increased cost because as we've told you before Ladder is in this for the long game always trying to increase our use of unsecured longer term debt. This liability construct suits us as it complements our conservative use of leverage and our effort to become an investment-grade company.

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 8 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 49 of
169

We expect to continue our use of unsecured debt as we get later into the year. We have previously issued 5.0875% interest rate bond outstanding that is pre-payable at par in August. And we hope to refinance that obligation with new lower-cost debt lowering our overall cost of funds at that time.

The timing of our recent bond issuance seems to be fortuitous at this point. With volatility picking up, we have lots of liquidity and expect to take advantage of market volatility to opportunistically invest in assets that are being offered at lower prices than we have seen in quite a while.

I'll conclude by saying thank you to all of our shareholders bondholders and our employees at Ladder for their support of our efforts in what was a very successful 2019. I look forward to catching up again with all of you at the end of April. And we can now take some questions.

## Question-and-Answer Session

## Operator

At this time, we will be conducting a question-and-answer session. [Operator Instructions] Our first question is from Tim Hayes, B. Riley FBR. Please proceed with your question.

## Tim Hayes

Hey, good evening guys. Thanks for taking my questions. My first one can you just touch on the $66 million of diversified CRE acquisition this quarter? I don't know if it was one asset or multiple but what type of assets or assets was it? Last quarter you made it sound like you're more likely to a seller than a buyer of real estate. ,So just wondering what was so attractive about this deal or these deals?

## Marc Fox

Yes. So, I'll pick that up. So, what you're seeing is you're seeing the increase in the real estate portfolio and the increase in the real estate portfolio we had a few acquisitions of Dollar General stores which has been a place where we've invested money. And then also we mentioned we had foreclosed on two properties during the quarter. The hotel is worth $42.5 million and the student housing was worth $23.7 million.

## Pamela McCormack

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tran... Page 9 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 50 of
169

And just to clarify one thing the hotel was $5.6 million mezzanine loan that there was a first in front of it that we stepped into. So, that's how you get to the higher basis on that.

**Marc Fox**

That's correct.

**Tim Hayes**

Okay, got it. Thanks for clarifying that. And obviously we don't know what type of impact or any impact at all that coronavirus might have. But just wondering where you see that potentially there being the biggest impact? I know you have the Omaha hotel you have some retail exposure. Do you think that's most likely to be impacted? Or is it more kind of the capital markets volatility? And do you see that being actually a catalyst or an opportunity for you guys to put capital to work accretively?

**Brian Harris**

Yes, it's an interesting day certainly, especially at the end today. But yes, I kind of remember when -- I mean it always comes in a different package at the end of the day. But in -- what I see generally from a U.S. perspective which is really the perspective we take is there's a lot of fear. I can hear it on the trading floor, I can hear it in the building, I can hear it on the train. But yes, what this is ultimately causing is energy prices to fall rapidly.

And there are certainly companies that don't do well when energy prices fall. But by in large I think it's actually a positive for most businesses. And I sense there's going to be less travel certainly as a result of the virus. So, what I see is lower gas prices, people staying at home in the United States and in all likelihood of drive to market.

I think as far what little I know about coronavirus, I would say I think the -- a lot of chatter about like keeping it out of a country as if it's got walls around it, but I don't see that as possible. I think it's very likely we will be dealing with the coronavirus. And I think ultimately it will turn out to be not nearly as scary as it seems today.

**DEBTOR EXHIBIT 6**
**Page 9 of 23**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 10 of 23
21-01029-tmd   Doc#2   Filed 06/30/21   Entered 06/30/21 12:17:10   Main Document   Pg 51 of
169

But, of course, time will tell. But I do believe any kind of volatility -- we have extreme volatility that we're seeing today. Absolutely presents opportunities and that's – if you've heard us over the last few quarters, we've been signaling caution moving from hotel to apartments, the belief that the world was a little bit complacent and our desire to really see more volatility, because we think that we do very well in those kinds of markets.

Having just raised $750 million a few weeks ago, we have plenty of dry powder and we were deploying it today. And so we would never want to wish anything bad on anybody, but if we could see volatility like today for another week or so I think Ladder capital would do very well.

**Tim Hayes**

Got it. That's helpful. Appreciate the color there Brian. And then can you give us an update on the 3M headquarter loan? I saw the investor filed for bankruptcy earlier this year and installed the foreclosure process. What do you think the potential timing of resolution is and how confident are you that you can recover your basis and any accrued interest?

**Brian Harris**

Well, I think it's an interesting phenomenon again, a unique case, because the asset is one of the largest assets in Austin, Texas. It is located on 160 acres of land and has another one million square feet of development rights already associated with it. The reason, the loan is in default, I don't think it's because there's anything wrong with the real estate. The sponsor has a legal problem. And he's got several entities in bankruptcy because he owns many properties. And until his legal situation gets clarified, which has not been yet. We are in Texas and Texas does move through things a little bit faster. But I think our exposure on the loan at $60 million is about $70 a square foot. And near as I can tell in that area of Austin, Texas land is traveling at a price higher than that.

So we're very confident. However, I'd also say timing matters. The loan is currently accruing at a default rate of almost 14%. And so that can become difficult to pay after a few years, but – and when I say accruing, I don't mean accruing at Ladder Capital's Financials. We've got it on non-accrual status. But when it comes to foreclosure, if he wants to avoid it, and he wants to pay us often recapitalize as we think he should be able to, but that will be a pretty big windfall if we collect all that interest.

**Tim Hayes**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...  Page 11 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 52 of
169

Got it. Okay. That's helpful. And just one more for me and then I'll hop back in the queue. Conduit originations and sales are pretty strong. It seems like you're obviously very committed to that business going forward even though this quarter seems to be I guess, the remaining part of the quarter should be pretty absent. But just wondering how you see volumes and gain on sale trending this year? I think gain on sale might have come back a little bit even though it was at very high levels over the past couple of quarters still strong. So just looking for some color around that?

**Brian Harris**

Yeah that business does very well when interest rates are falling and interest rates have certainly been falling. When interest rates are falling like they have been in the last week or so that's kind of the wrong reason, because it's usually accompanied by widening credit spreads. As of tonight, I believe we only have $50 million in loans closed, and for sale in securitization. And so that is very low exposure. And as we close more and more loans, we think most of those will be closing into some attractive floors. So yes, we are very interested in staying in that business.

The margins are acceptable. The properties are performing well. And the backdrop in the economy seems okay too. So we would like to do as much conduit as possible and – but I will say despite the fact that interest rates are quite low volume is not very high. The – I think interest rates have been so low for so long that I just – I think it's going to be a similar year to last year.

**Tim Hayes**

Okay. That's helpful. All right. Thanks again for taking my questions.

**Brian Harris**

You're welcome.

**Operator**

Our next question is from Jade Rahmani, KBW. Please proceed with your question.

**Jade Rahmani**

Thanks very much. Did you give an update of what CMBS securitizations have been thus

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 12 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 53 of
169

far this quarter? I didn't really catch that.

**Pamela McCormack**

Jade, this is Pamela. Hi. Do you mean for 1Q? Or are you going 4Q?

**Jade Rahmani**

Yeah 1Q.

**Pamela McCormack**

We did. We completed so we did a – we sold a couple of loans separately and then we were participated in the Wells Fargo deal that settled today, so we can actually talk about it. The total volume we did this for the first quarter, and I do think this will be it for the first quarter is $133.9 million at around 3%.

**Jade Rahmani**

Okay. Thanks for that. Were there any securities purchases in the quarter? And can you quantify the amount of sales that took place in fourth quarter?

**Marc Fox**

Mark, do you have that? Or you want CMBS securities? Or you want to securitization just to be clear?

**Jade Rahmani**

CMBS securities.

**Marc Fox**

CMBS securities. During the fourth quarter, we sold $317.7 million worth of securities. And during the course of the quarter, we purchased another $446 million. The balance went down because we had a fair amount of amortization and prepayments. We had over $300 million of amortization.

**Jade Rahmani**

Okay.

**DEBTOR EXHIBIT 6**
**Page 12 of 23**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 13 of 23
21-01029-tmd   Doc#2   Filed 06/30/21   Entered 06/30/21 12:17:10   Main Document   Pg 54 of
169

**Brian Harris**

And as you can imagine with the volatility that we've seen in the last couple of weeks here, we've been adding to our inventory.

**Jade Rahmani**

Okay. Can you talk to the company's overall hotel exposure and how you're feeling about that? Also, is there any New York hotel exposure? And might that be one area where you anticipate a notable pickup in foreclosures this year? I've been hearing some pretty scary stories about the New York hotel market?

**Pamela McCormack**

So we have in total, we have about $450 million of hotels broken down by $385 million of loans and then the $60 million owned. As Brian alluded to earlier, first of all, we have an average LTV of 70%. So we have a good equity quotient on them, but most of our hotels are 85% of them are drive to market, so we don't have anything that stands out to us. We have no New York hotels and we don't have anything that stands out to us is problematic at all.

**Brian Harris**

And I would say, TJ, well, we have always -- we've been a little concerned about the New York Hotel market before what happened with coronavirus. We were a little concerned about Airbnb, a little more than that. So -- but then I have heard some stories about a couple of assets here and there, but to tell you the truth, I think we're getting a little more interested in that market.

And as Pamela said, we don't have any right now, which I'm going to shock by that. But -- and so we're pretty comfortable with our exposure. We have taken it down quite a bit. In our loan portfolio, it's only 11%. And I know it was much, much higher than that a few years ago.

**Jade Rahmani**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 14 of 23
21-01029-tmd   Doc#2   Filed 06/30/21   Entered 06/30/21 12:17:10   Main Document   Pg 55 of
169

Okay. In this current volatile fixed income environment widening credit spreads, I'm assuming what's going on in the equity markets and spillover effects. Do you anticipate any mark-to-market or potential hedge losses that might transpire either on the conduit business, you only mentioned $50 million in the pipeline, but just through your overall CMBS strategies?

**Brian Harris**

No, really. I mean, yes, we do have a little bit of that in the $50 million of conduit loans. But as you know, we've been big fans of the CLO space in the AAA category. Those are floating rate assets. We feel that's the right place to be with LIBOR at 160, while the 10-year is at 120. That's an odd optical there too.

But -- so we're not expecting any margin calls or -- and we don't own anything at very high premiums. The only thing I wish that if I could turn it down a little bit would be the $50 million in conduit that we have. But again, we've just done so many conduit deals. We haven't owned them long enough to be hedged into too high of a premium.

**Marc Fox**

Yeah.

**Jade Rahmani**

On the core loan portfolio repayments for the last three quarters have been in the $400 million to $450 million range. I'm wondering if you expect any slowdown in repayment activity perhaps based on the volatility? Or that's a number that we should assume for -- on a quarterly basis?

**Pamela McCormack**

I think safely you can assume at or about that candidly it looks a little lighter at this moment. But in that range I think over the long-term look right.

**Marc Fox**

Yeah. You're right. The last three quarters is between $400 million and $450 million.

**Brian Harris**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 15 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 56 of
169

A lot of that depends on what other lenders are doing also. So I'd imagine the business itself might take a few weeks off here. So things could be delayed. I'd say, it certainly won't accelerate any prepayments.

**Jade Rahmani**

Okay. Thanks for taking the questions.

**Brian Harris**

Okay.

**Operator**

Our next question is from Joel Dryer, LTC Partners. Please proceed with your question.

**Joel Dryer**

Good afternoon everybody. Thank you. I just wonder if you could give a little more color on the loan loss provision on the Los Angeles land.

**Brian Harris**

Okay. Well, let me -- I'll get Marc is going to give you the provision, but I'll just tell you too that this was a land loan to a developer, it's actually located in one of the best areas of Los Angeles, it's located between West Hollywood and Sunset strip. So it's funny when we call that a land loan, it's like a land in the middle of New York City. But in any event, the developer who came to us for a loan probably he was going to get up zoning of three times what it had previously been and we did not think you would we thought it would get two times the upselling. And he got two times the upzoning and he did not get three. So that's what ultimately put the loan into trouble. Sponsor had contributed $10 million in equity prior to our taking the asset. But as market as far as the provision goes what is...

**Marc Fox**

$2 million.

**Brian Harris**

$2 million. And so how big was the loan balance.

**DEBTOR EXHIBIT 6**
**Page 15 of 23**

**Pamela McCormack**

Along with $23.6 million on about three quarters of land.

**Joel Dryer**

Thanks, Pamela. So it goes without saying that you underwrote it to a 2x obviously?

**Brian Harris**

Yes. And we don't build apartments but we will either sell it or bring in a JV partner out there to properly build.

**Joel Dryer**

And then Brian you mentioned something at the very end of your comments which was assets – you're seeing assets at lower prices and we've seen in a long time. And just a little more color on that would be helpful because it's such an important part of your book of business?

**Brian Harris**

Yes, I think whenever – again we've moved a little bit towards higher-quality around here over the last year. And in anticipation of something we just felt it was a little bit too joyous out there and we didn't really see it going quite as well as that. But when I say cheaper assets, for the most part we want to get involved with assets that are short duration, if possible as well as just lower prices. So most of that comment would have been directed towards securities acquisitions.

And so just a quick anecdotal. The high-yield index, the HYG that the ETF of people and many people invest I think they took in about $13 billion last year, which was an extraordinary amount and that's what caused so much pressure on high-yield spreads, which is a surrogate to the corporate bond market.

I think they've had $5 billion in redemptions in the last two days. So when I came in this morning I informed the people out on the desk there to start looking at force selling at the end of the day and we did see that. And so we were participating in acquiring. We're not selling anything.

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 17 of 23
21-01029-tmd   Doc#2   Filed 06/30/21   Entered 06/30/21 12:17:10   Main Document   Pg 58 of
169

And so this does happen once in a while there's a – it's not a credit problem in that market at all. It's a liquidity question. And that problem if oil prices continue to fall that problem will get more exacerbated.

On the other hand to the extent that we're able to acquire longer data things like real estate and we're able to finance it at interest rates for 10 years as low as 3% that creates an extraordinary opportunity also. So if you had asked me in 2015 before the Fed started to raise LIBOR short-term interest rates and LIBOR moved with it. I would – I think I had said, we're going to be investing in LIBOR floaters in anticipation of the Fed moving rates higher and that's what they did.

And with LIBOR having moved from 2.5% down to 160 in the last 14 months, that's probably not going to be at the top of our priority list going forward. However, given how low overall interest rates are, it's a great time to acquire real estate and we also think it's a great time to acquire short-term securities that other people are being forced to liquidate.

**Joel Dryer**

Okay. That's very helpful. So you watch that high-yield bond index. We watched the SJB ourselves. So...

**Brian Harris**

Yes they all kind of mimic each other. But what I – we do is what, we watch flows. Fund flows. And when there's a lot of flows into ETFs that buy bonds you can expect bonds to tighten. When you have a lot of outflows things have to get sold.

**Joel Dryer**

Excellent. Thank you. Appreciate the answers.

**Brian Harris**

Sure.

**Operator**

Our next question is from Charlie Arestia, JPMorgan. Please proceed with your question.

**Charlie Arestia**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 18 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 59 of
169

Hey, everybody. This is Charlie on for Rick today. I was wondering if you could talk a bit about how you mitigate risk in the broader CMBS portfolio that you purchased directly versus what you originate in the conduit business. And if there's any big differences in the collateral there?

**Brian Harris**

Well, yes I mean, the collateral may be similar that underlies the – when you're originating loans for securitization, you're originating loans and you actually synthetically own the AAA through the unrated and until you sell it. Whereas when we buy securities, we almost always buy AAAs and AAs. So, by definition, the subordination level on the securities, they're much safer than the whole loans and the AAA security can be sold in 60 seconds, whereas a whole loan cannot be sold usually inside of them three weeks.

**Charlie Arestia**

Okay.

**Brian Harris**

So we have a preference for more liquid, shorter duration assets and we always do that. That's not unique to us, as a result of coronavirus. Are you asking me about a hedge, by the way, how we mitigate risk there?

**Charlie Arestia**

Yes. I mean, the color on the capital stack is definitely helpful, but if there's anything kind of specific to the broader portfolio, that would be helpful.

**Brian Harris**

Well, I think, if you're asking us if we do take credit hedges, no, we don't use credit default swaps unless it's a particular name. Sometimes we'll buy put options in our portfolio. So, if we have like Joel, who just to went before you here, he knows that we own a lot of dollar generals, that's a credit that we've exposure to and we happen to like it.

**DEBTOR EXHIBIT 6**
**Page 18 of 23**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr... Page 19 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 60 of
169

But there are ways to mitigate exposure to that. But the real risk we do mitigate is, anything longer than three years in duration, we interest rate hedge. But as I said earlier, that's only a little over $50 million, right now, in a $6 billion portfolio. We have a small and interest rate exposure today than I think I've ever seen in my life and in books that I've handled.

**Charlie Arestia**

Got it. Okay. And then, switching gears a little bit. I don't think I heard in the prepared remarks, but could you give an update on LIBOR floors in the lending portfolio?

**Marc Fox**

Sure. As of 12/31 our weighted average LIBOR floor was 170 -- pardon me, it was 184. And at that point in time, LIBOR was 176. The LIBOR floor that we had at that point in time, 59% of them were in the money. So it's about $1.5 billion worth of floating rate loans. And they were on a weighted average basis on a -- $1.5 billion worth of loans, about 41 basis points would be the amount that we are earning. So you're talking about a little over $6 million of floor income per year on that basis.

**Charlie Arestia**

Okay, great. And then last question for me. Some of your peers have been particularly active in Europe over the last two quarters. Are you guys seeing any opportunities there that look compelling? Or are you mostly staying domestic?

**Brian Harris**

We're 100% domestic. You could see us that we have a lot of experience in Europe, most of us worked in Credit Suisse or UBS, where we were the heads of real estate at that time. But I'm not seeing anything compelling. However, I believe, if we were to go into Europe, I don't think it would be on the loan side. I think it would be on the equity side, where we would be a borrower.

**Charlie Arestia**

Okay. Thanks for taking the questions.

**Operator**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr... Page 20 of 23
21-01029-tmd Doc#2 Filed 06/30/21 Entered 06/30/21 12:17:10 Main Document Pg 61 of
169

[Operator Instructions] Our next question is from Chris Muller, JMP Securities. Please proceed with your question.

**Chris Muller**

Hey, guys. Thanks for taking the question. Most of them have been asked already. But, I guess, the last one here is, can you guys estimate the positive impact on book value from the securities portfolio in the fourth quarter? And then, is it fair to assume that there is further appreciation there in the first quarter? Thanks.

**Marc Fox**

Yes. In terms of the impact on the securities portfolio in the fourth quarter, it was not substantial at all. We have a -- one thing to always recall is that we have a very short duration on the portfolio. The weighted average duration is 20 months. And so, we don't see a massive amount of fluctuation there.

**Brian Harris**

And most of it is floating rate.

**Marc Fox**

Yes. And most of it's floating rate, exactly. We can direct you to the other comprehensive income portion of our, what you call it, equity reconciliation statement in the financial statements and you'll be able to see the exact amount.

**Brian Harris**

I also want to point out, if you remember we tend to use our securities portfolio during special time. So volatility is high, then it becomes a profit center. But for the most part we use it to allow us to be very patient in our loan origination process because we -- because of the way we're funded, we're able to buy very short AAA securities and lever them into a 7% or 8% or 9% yield.

So we'll just sit there for a while until something better comes along in the loan book. So we don't usually use it for price appreciation, although given what's gone on, certainly, in interest rates, yes, they're probably up a little bit, but a two-year AAA does not have a lot of price volatility.

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr...   Page 21 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 62 of
169

**Chris Muller**

Got it. That's helpful. Thank you.

**Brian Harris**

Sure.

**Operator**

Our next question is from Jason Weaver, Compass Point. Please proceed with your question.

**Jason Weaver**

Hi, good evening. First, I wonder if you can speak to what you're seeing in new loan spreads in this quarter versus the 385 for originations in 4Q?

**Brian Harris**

I'll let Pamela answer that -- answer that because he handles it, but I will cut her off in the beginning of this and just tell you that as -- up until this week, Pamela will give you some of those answers, but I'll tell you today spreads mean nothing. Because with a 120, 10 year typical spreads a month ago were 160 or 170 over the 10 year 160 over the 10-year today would be were 280. And I think most of the street is not closing loans anyway right now. I think many market max are being exercised. And however, we're somewhat protected because we've been closing loans with floors and if interest rates have fallen that's been a phenomenon we saw throughout 2019, seeing it again in 2020. So with that, I'll let Pamela describe what we have closed, but anything in the pipeline if something is under application at 210 over the 10-year, the real rate today if we were to rate lock it is 250 over.

**Pamela McCormack**

I think he asked about balance sheet loans. Are you looking for me to give you more...

**Jason Weaver**

Yes, balance sheet loans is what I was...

**Pamela McCormack**

https://seekingalpha.com/article/4327973-ladder-capital-corp-ladr-ceo-brian-harris-on-q4-20...   3/6/2020

Okay. Right so we are weighted average for 4Q was 3.85 and I would say, that it's trended up a little bit, but don't want to be too optimistic there because we have -- we're early in the quarter. And I would say to think about it similarly for now.

**Jason Weaver**

And most of the floaters that I've seen come through for approval. They're in the floor also at this point.

**Brian Harris**

So, I mean it's a floating rate instrument, but LIBOR plus 350 loan that was asked a couple of months ago was probably LIBOR plus 400 now because of the floor.

**Jason Weaver**

Got it. And just one clarification on a previous question, where you addressed as of 12/31, the weighted average for was at 184. You mentioned a $1.5 billion figure, $1.5 billion out of your existing portfolio loans are the ones that feature cores, correct?

**Marc Fox**

No. The all the floating rate loans is about $2.5 billion of loans at floating rate in our balance sheet loan portfolio, $1.5 billion were in the money, okay.

**Brian Harris**

They're at the floor now.

**Marc Fox**

Yes, they're in the money 41 basis points. So that's how you get to that.

**Jason Weaver**

Got it. And then one on almost the same subject, given the fixed rate senior unsecured. Are you using comparatively more hedging versus the overall floating rate portfolio there?

**Brian Harris**

No. We did not -- I did not.

**DEBTOR EXHIBIT 6**
**Page 22 of 23**

Ladder Capital Corp (LADR) CEO Brian Harris on Q4 2019 Results - Earnings Call Tr... Page 23 of 23
21-01029-tmd  Doc#2  Filed 06/30/21  Entered 06/30/21 12:17:10  Main Document  Pg 64 of
169

**Jason Weaver**

Got it. Okay. Well, thank you for taking my questions.

**Brian Harris**

We think it functions as a hedge against -- so for instance I mean high-yield is widening right now. And that is a BB bonds. So it is outstanding and we're very fortunate to have gotten it done in early January, but we did not swap out.

**Jason Weaver**

All right. Well, thank you for taking my questions.

**Operator**

That concludes our question-and-answer session. I'll now return the call to Brian Harris, the company's Chief Executive Officer.

**Brian Harris**

Well, at the end of a long day for all of us I'm sure. So, thank you for hanging around after work here and listening to us. The audit always takes a little bit longer. So, we were a little bit later announcing here. So, we won't be done for too long. We'll be right back to talk to you again about the first quarter I think at the end of April. All right. So, thanks everybody.

**Operator**

This concludes today's conference. You may disconnect your lines at this time. Thank you for your participation and have a great day.

---

**See how LADR is rated by three different measures**

Go Premium to access Seeking Alpha author, quant, and sell-side ratings.

See LADR ratings now »

---

Comments (0)

**DEBTOR EXHIBIT 6**
**Page 23 of 23**





**EXHIBIT**

**Ex. 2**

Transcripts    Financial

# Ladder Capital Corp. (LADR) CEO Brian Harris on Q4 2020 Results - Earnings Call Transcript

Feb. 26, 2021 1:25 AM ET | **Ladder Capital Corp (LADR)**

Ladder Capital Corp. (NYSE:LADR) Q4 2020 Earnings Conference Call February 25, 2021 5:00 PM ET

**Company Participants**

Michelle Wallach - Senior Regulatory Counsel

Brian Harris - Chief Executive Officer

Pamela McCormack - President

Marc Fox - Chief Financial Officer

Paul Miceli - Director of Finance and Chief Financial Officer

**Conference Call Participants**

Tim Hayes - BTIG

Randy Binner - B. Riley

Charlie Arestia - JPMorgan

Jade Rahmani - KBW

**Operator**

Greetings. Welcome to Ladder Capital Corp. Fourth Quarter 2020 Earnings Call. At this time all participants are in a listen only mode. A question-and-answer session will follow

the formal presentation. [Operator Instructions] Please note this conference is being recorded.

I will now turn the conference over to your host, Ladder's Chief Compliance Officer - I'm sorry, Senior Regulatory Counsel, Ms. Michelle Wallach. Please go ahead, Ms. Wattach.

**Michelle Wallach**

Thank you. And good afternoon, everyone. I'd like to welcome you to Ladder Capital Corp. earnings call for the fourth quarter and year ended December 31, 2020. With me this afternoon are Brian Harris, the company's Chief Executive Officer, Pamela McCormack, the company's President, Marc Fox, the company's Chief Financial Officer, and Paul Miceli, the company's Director of Finance and Chief Financial Officer commencing on March 1 2021.

This afternoon, we released our financial results for the quarter and year ended December 31, 2020. The earnings release is available in the investors section of the company's website. And our annual report on form 10-K will be filed this week with the FCC. Before the call begins, I'd like to remind everyone that certain statements made in the course of this call are not based on historical information, and may constitute forward looking statements. These statements are based on management's current expectations and beliefs and are subject to a number of trends and uncertainties that could cause actual results to differ materially from those described in these forward-looking statements. I refer you to Ladder Capital Corp. 2020 form 10 k for more detailed discussion of the risk factors that could cause actual results to differ materially from those expressed or implied in any forward-looking statements made today. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements. The company undertakes no duty to update any forward-looking statements that may be made during the course of this call.

Additionally, certain non-GAAP financial measures will be discussed on this conference call. The company's presentation of this information is not intended to be considered in isolation, or as a substitute for financial information presented in accordance with GAAP. Reconciliation these non-GAAP financial measures for most comparable measures preparing according to GAAP are contained in our earnings release.

With that, I'll turn the call over to our President, Pamela McCormack.

Thank you, Michelle. And good afternoon, everyone. 2020 was an unforgettable year. All of us including those in the financial markets, faced unprecedented challenges, met those challenges with quick and decisive actions. And the company is now well positioned to the opportunities we expect 2021 to bring.

My remarks today will focus on the key actions we have taken since the onset of COVID. First, we quickly raised liquidity and reduced leverage. Next, we turned our attention to proactively managing our balance sheet in order to protect book value. And finally, we went back to originating new business and are pleased to share that we currently have over $200 million of new loans, both conduit and balance sheet under application and indeed with due diligence.

Our deep enhanced origination team is fully engaged in actively pursuing compelling opportunities. And our multi-cylinder business model allows us to pivot quickly to take advantage of the best available risk adjusted returns.

Before I begin, I'm excited to confirm our appointment of Paul J. Miceli, as Chief Financial Officer effective March 1 2021. Paul will succeed Marc Fox who have to 12.5 years we'll be moving on but will remain with us through the beginning of May to help ensure an orderly transition.

As many of you know, Paul joined Ladder nearly 3two years ago and is currently Ladder's Director of Finance. Since then, post and working closely with Marc and the senior management team as part of Ladder's long term succession plan, on a personal note, I want to thank Marc for being a great partner and a great friend to both Ladder and me personally and let him know how much we all value the contributions he has made for Ladder's success.

Looking back at 2020, I'll start with a look at liquidity, leverage and liability management. We increased our unrestricted cash balance to $1.25 billion as of December 31, 2020. Our ability to increase liquidity by monetizing assets was driven by strong asset performance, healthy repayments and vigorous asset management efforts.

Since the onset of COVID, we achieved a 99% collection rate of interest and rents across our entire portfolio of loan and real estate assets, including 100% collections from our net lease portfolio. Our focus on a highly diversified and granular mid market

origination strategy enhanced the pace of our balance sheet loan repayments with a much larger base of capital available to refinance our smaller average loan sizes.

Since the onset of COVID, we've reduced our balance sheet loan portfolio by $1.4 billion to just 37% of our assets as of February 19, 2021. More importantly, we are now in a strong position to reset our basis in this portfolio, as we rebuild it with the origination of new loans reflecting current market conditions.

In conjunction with these repayments, our hotel exposure decreased approximately 30% in 2020. As of February 19, 2021, hotel collateral represents only 14.5% of our significantly smaller balance sheet loan portfolio.

Our approach to security investments was also validated during the pandemic. Our focus has always been on highly rated short duration liquid investments. The market for the super senior securities recovered quickly, and they are now regularly trading at or above par value as we expected.

Since March, we reduce that securities portfolio by approximately $1.1 billion to a total of approximately $800 million outstanding as of February 19, 2021. In total, we reduced our securities repo by over $800 million, or 68% since March. As a result, securities repo now only represents about 10% of our total debt outstanding as of February 19, 2021.

We entered the New Year with exceptional liquidity and a strong portfolio of loans, securities and investments. We had over $2.8 billion of unencumbered assets, which is nearly half of our asset base. These assets are also a very high quality with over 80% comprised of cash and first mortgages.

A substantial unencumbered asset pool contributed greatly to our financial flexibility during this pandemic. These assets played a key role in our ability to raise liquidity quickly in disrupted market conditions and enabled us to reduce mark to market debt by raising a $0.5 billion of non-recourse, non-mark to market debt.

As of today, and after paying off an additional $390 million of debt since the end of the fourth quarter, we still have over $1.3 billion in unrestricted cash on hand. And over 80% of our capital base is now comprised of unsecured bonds, non-recourse and non-mark to market debt and book equity.

As of February 19 2021, our adjusted leverage ratio net of cash is 1.4: times after further excluding a predominantly AAA rated short duration securities holdings, our leverage ratio was only 0.8 times and our total mark to market debt is now less than a quarter of our total debt.

We recently redeemed all the remaining five and seven eight unsecured corporate bonds in advance of their due date this August. We see the unsecured market as a safe and prudent way to finance our business. And we expect to continue to be an active issue in that market.

While we are pleased that our stock price has recovered significantly from the lower levels, we saw earlier last year, we remain committed to reclaiming the pricing on both our outstanding bonds and stocks that better reflect the intrinsic value of Ladder's platform. In the meantime, we are very happy to be back to the business of writing new loans at attractive risk adjusted returns.

With that, I'll turn the call over to Marc.

**Marc Fox**

Thank you, Pamela. Before turning this presentation over to Paul, I want to thank Brian, Pamela, the Board of Directors, the investment community and most of all my colleagues at Ladder for their support over the past 12.5 years. I felt very fortunate to be offered the opportunity to serve as Ladder CFO in 2008.

Accepting the role was a major step in my career, taking in the most uncertain of times with no guarantees from anyone. Together, we encountered a lot of challenges. And the results indicate a record of success along the way. I'd like to believe that those who decided I deserved this chance more than a decade ago now look back on that decision with satisfaction and pride, as that was always my goal.

Based on my personal observations, going forward, I am competency the investment community, will see at least the same level of commitment, skill and professionalism from Paul Miceli as they have seen from the rest of the l Ladder team from day one. I too will miss working with the most talented team of professionals in this industry, and leave confident that despite all of our achievements to date, Ladder's best days lie ahead.

With that, I will turn the discussion over to Ladder's new Chief Financial Officer, Paul Miceli.

**Paul Miceli**

Thanks, Marc. As noted in today's earnings released Ladder's replaced its two primary non-GAAP measures of earnings. Based on informal guidance from the SEC staff, core earnings has been replaced by distributable earnings and core EPS has been replaced by distributable EPS. The definitions of distributable earnings and distributable EPS at Ladder are very similar to those of core earnings and core EPS. The one exception is related to the timing of asset impairment recognition.

Going forward in computing distributable earnings, Ladder will recognize assets specific loan and real estate impairment charges upon realization, which will occur at the time an impairment is determined to be non-recoverable. With the change to distributable earnings or non-GAAP performance measurable more closely aligned with the computation of non-GAAP performance measures used by a public company commercial mortgage rate peers.

For the fourth quarter Ladder produced distributable earnings of $4.9 million or $0.05 per share. For the full year 2020, Ladder produced distributable earnings of $68.3 million or $0.60 per share. Continuing with a measured approach to risk management in the fourth quarter Ladder did not newly originate or securitize any loans and only acquired one small net leased property.

Loan repayments continued at a strong pace during the quarter with $286 million of loan payoffs at par. In addition, Ladder reduced its balance of non-accrual loans by 35%, mainly by selling forward defaulted loans at near par value. We sold two defaulted loans in bankruptcy in Austin, Texas, with an outstanding principal balance of $101 million. We also contemporaneously foreclosed on and sold a residence in South Bend, Indiana [ph] and a hotel in Miami, Florida, with an outstanding principal - with outstanding principal balances of $4.1 million and $45 million respectively.

These sales resulted in the disposition of $150 million of defaulted loans and generated net impairment charge in the aggregate of $4.0 million recorded in the fourth quarter.

Our CECL reserve decreased overall by $5.6 million to $42 million in the fourth quarter, as a result of loan payoffs and sales executed during the quarter and to a lesser extent a moderately improved macro-economic outlook. The net decrease included a $1.2

million specific loan provision related to the $48 million hotel loan, we've foreclosed on and sold in Q1 as previously referenced.

Also during the fourth quarter, Ladder redeemed $100 million of its five and seven eighths corporate bonds scheduled to mature and August 2021. The remaining $147 million of that issuance was redeemed in January 2021. Market pricing of Ladders outstanding corporate bonds has improved substantially, reflecting more favorable market conditions in recognition of the progress made in strengthening Ladders liquidity and capital base.

Also in December 2020, Koch Real Estate Investments exercise option to acquire 4 million shares of Ladders Class A common stock, thereby increasing equity by $32 million and demonstrating their long-term commitment to Ladder.

Additionally, in an effort to reduce cash costs and further align interest to Ladders employees and shareholders, Ladder elected to distribute 97% of annual incentive compensation awards for the 2020 calendar year in the form of stock instead of cash to all employees, including senior management. A portion of those shares were awarded in December, the remainder in January.

With regards to shareholders equity, in addition to the 32 million contributed by Koch, the value of our securities portfolio increased by $18 million. We declared a $0.20 per share dividend in Q4 which was paid in January and repurchased 50,000 shares of stock and an average price at $9.05. We expect our dividend to remain unchanged in the first quarter of 2021.

Under appreciated book value per share was $13.94 at year end, our GAAP book value per share was $12.21 based on 126.4 million shares outstanding as of December 31 2020.

As 2021 begins, we do so with over $1.3 billion of unrestricted cash, representing over 24% of our total balance sheet with corporate leverage by any measure at historically low levels. Our three segments reflect the same strong credit metrics to which Ladder shareholders have grown accustomed to over the years. Our $2.3 billion balance sheet loan portfolio is primarily first mortgage loans diverse in terms of collateral type, with a 67%, LTV, an average loan size of $19 million and a short 1.2 year weighted average duration, with only $149 million of future funding commitments.

Our $1.2 billion real estate portfolio was diverse and granular, and includes 164 net lease properties with strong tenants that include major [indiscernible] chains, warehouse clubs, dollar stores, and supermarket chains. The portfolio is the result of Ladders long standing strategy of focusing on net leased real estate Investments on necessity-based retail properties occupied by solid credit tenants.

Finally, Ladders $1.1 billion securities portfolio remains 89% AAA rated almost entirely investment grade, with a weighted average duration of two years as of December 31. As noted, values of the senior first mortgage-backed securities with significant credit subordination have recovered and are again trading at or above par with financing costs improving to pre-pandemic levels.

Overall, our loan and securities portfolios have decreased in size due to strong levels of natural amortization, healthy levels of payoffs. Our strengthened capital base and solid liquidity position provide a strong foundation for Ladder as we ramp up our investing activity in the New Year. And for more details on our fourth quarter and year end 2020 operating results, please refer to our quarterly earnings supplement which is available on our website, as well as our 10-K which we expect to fall this week.

I'll now turn over the call to our Chief Executive Officer, Brian Harris.

**Brian Harris**

Thanks, Paul. 2020 delta is a very different type of market disruption at the end of the first quarter, while we've never seen such a rapid and severe downturn in the economy. Our decades of experience managing through harsh recessions and strong recoveries provided us with the template we've learned to follow in times of extreme volatility.

Job number one in the spring of 2020 was to ensure we had enough liquidity to weather what looked to be some very rough times ahead, as 33 million jobs were lost in the United States in just 30 days, as the government essentially turned off the economy to stem the spread of the virus.

I won't repeat the details of the steps we took. But as with most negative surprises, it helps to be prepared, and we were having just issued 750 million of corporate bonds only six weeks prior to the pandemic beginning.

Fast forwarding to today we presently have over $1.3 billion of unrestricted cash. And keep in mind that after we reduce debt by $1.9 billion over the last 11 months. Building

up a liquidity cushion of that size was made possible by our ownership of high quality investments going into the downturn. We were very pleased to see that many of our loans coming due over the last year were able to pay us off at maturity in full.

When we sold some of our investments at what was probably not the best time to do so in order to raise additional liquidity, we were still able to achieve sales prices near our basis during the worst of market times, while de leveraging the company overall.

We took appropriate steps to conserve cash during the remainder of 2020, always anticipating that in 2021, the health emergency the country was dealing with would begin to subside. We said in a prior call that we were anticipating a deep recession that would probably last about one year. And while we're not out of the woods, yet, that position has not changed.

The second step we took to defend book value of our stock would take time, patience, and a hell of a lot of hours and asset management. By staying on top of our inventory and working with our borrowers, we were able to monetize many of our investments during the year.

When underwriting loans, we obsessively concern ourselves with asset values first and foremost. Since the start of the pandemic in March and into 2021, we were able to monetize over $2.8 billion of assets at nearly 100% of our investment amount. In the last four and a half months alone, we have sold over $680 million of securities at an average price above par.

I'll now move to the go forward planet Ladder and start by saying that I am very pleased to report that we began issuing new loan applications in January and business has been brisk with over 200 million in new loans under application at this time. I've waited a long time to say those words. We were repeatedly asked about when we plan to deploy our large cash position and achieve the operating leverage, we see returning us to increase earnings, and that answer is now.

We are not restarting our lending operations solely because we see adequate demand, but mostly because we are seeing the attractive investment opportunities that invariably come about after a deep downturn in the economy. We still think the economy has some serious challenges ahead. But the relationship between risk and reward seems to be producing the kinds of situations we've been waiting for.

We turned a corner at Ladder, and I'm very happy with the way our team reacted to some pretty horrible market conditions in 2020. We made the necessary sacrifices to have the liquidity needed to navigate the shutdown of the economy, which has had some devastating effects on parts of the commercial real estate sector.

We then made sure our management of our existing investments preserved book value. And now we finally get to the third step we've been waiting for, we now move ahead in an offensive manner to create durable and growing earnings in the quarters ahead.

We still have some housekeeping to do with the liability side of our balance sheet. But in starting from a very low leverage position today, we feel this can all be accomplished rather easily over the next year or so. Since we paid down over $450 million of our corporate bonds in advance of their due dates, we hope to return to the capital markets with another bond offering if acceptable conditions prevail.

There's no immediate need to access additional capital at this time. And we can continue to sell down our securities portfolio to provide additional capital if needed to avail ourselves of the high yielding opportunities we're now seeing in the equity and debt markets.

It's nice to sign off today by saying we look forward to building our earnings in the quarters ahead, with the future looking much brighter these days, we're looking forward to it and referring to the next chapter of our growth as the post-pandemic period at Ladder. In the meantime, we're very happy to be back in business and writing new loans at attractive risk adjusted returns.

With that, I'll open up the call to questions.

## Question-and-Answer Session

### Operator

[Operator instructions] Our first question is from Tim Hayes, BTIG. Please proceed with your question.

### Tim Hayes

Hey, good evening, everyone. Hope you're doing well. My first question, you know, glad happy to see that you guys hit that inflection point where you're starting to play some offense now. If we could just touch on the pipeline here, what are the levered returns

that you're seeing across your asset classes? You know, what's - where do you expect most of your capital deployment to go? And if you could just touch on the asset types and any other color from the pipeline that can be helpful?

**Brian Harris**

Sure, happy to help with that. We opened up really applications just a few weeks ago. And already I think Pamela mentioned we're a little over $200 million, I actually think we're approaching $300 million. As a check this right before we got on the phone. I'd imagine most of our allocation for new investments is going to come in the form of bridge loans, and conduit loans.

The conduit, I probably would have answered that with a little bit more of a 50-50 attach to it, you know, five hours ago, but with the 10-year moving up rather briskly today, then, you know, I think that there will be a very attractive conduit business, but I have to suspect we're going to see a little pause here. And in all likelihood, because a lot of people who were refinancing have done the pull forward.

So sometimes that takes a few, you know, 60, 90 days to for it to really set in, although I certainly wouldn't call a 1.6% 10 year a high rate either. So, you know, we'll see, but I think - we'll we're always on the lookout for equity investments. We've seen a few that we like, we haven't gone under contract with any of them yet. But I think the lion share of what we're going to do is going to be involved with the bridge loan portfolio of the balance sheet, and securities will continue to come down.

**Tim Hayes**

Okay. So securities will be a provider of capital then to you guys going forward. So, on the bridge portfolio, can you just again, talk about the types of assets that are in the pipeline? How that has, I guess compares to how the pipeline has fared in the past? And maybe however returns? Because Brian, you mentioned that the shift to offense, somewhat, or largely is because of the returns you're now seeing there. And, you know, your liquidity position has been pretty strong for a couple quarters now.

So I'm just wondering if, if you've seen returns, and I guess, spreads widen on certain loans that even from six months ago, or, you know, what, what does cause the shift?

**Brian Harris**

Sure, well, I think it's really come about because I think you've had a situation here where the Fed has been on TV, I think the banks are, you know, cleaning up their balance sheets, I think that everybody was all lenders, I think we're pretty much tolerant of the need for forbearance agreements, you know, when the initial pandemic hit, and some of the some of the borrowers are now in their second, you know, forbearance agreement, I think it's hitting the point where, you know, it's either going to get straightened out, or they'll sell the note. And then we have seen that too.

So we've seen definitely seen some bank sales of notes where people are acquiring things or where the sponsor finally woke up and said, Wow, my bank sold my note, the guy who bought it probably wants to take it over. So I need to refinance this quickly and pay all the penalty interest.

When a sponsor is in that mode, that's usually a great place to step in, because you're no longer competing with your competitors, you're competing with his default interest. And you have to try to close as quickly as possible.

So there's definitely been a shift, I would say it's in the last 30 days. And it's a little bifurcated, I would say, I think that the market because the CLO market has kind of rebounded, and there have been a few new CLOs issued. And, you know, just a few weeks ago, there was no alternative for any yield at all. So, you know, new CLO, AAA's, were trading well inside of 100 over.

I think the weighted average financing cost of a call it a 90 over AAA deal was probably about 120, 125 over LIBOW. So you can get a lot of things done there. You can get a lot of business done. But I think that the market because of that is overbidding multifamily. And I think it's kind of a bifurcated opportunity set. And the multifamily sector is LIBOR plus 350, to 400. And it doesn't matter if it's a Class C, or you know, rehab, you know, just coming back online in two years after they put in new kitchens. Or else if it's a brand new apartment building and coming off a construction loan and just going into lease up. When you see the same price on every single thing that usually means it's a bit of a dislocated market, or else a one-way market.

The once you get past apartments at LIBOR plus 350 to say 400, it's kind of a gap. There's very little in the LIBOR plus 500 or LIBOR plus 600. I would say that people that are in a hurry, you know, LIBOR 600 is not at all out of the question. And if you have a hotel, I don't even think it's LIBOR plus anything, I think it's a nine or a 10. And, you know, those are just rates that they're looking at that point.

So we are seeing I you know, it's one of these markets, where there's a lot coming due in the next couple of years. And a lot of it is in the CMBS business, but also there's a lot of it in the insurance companies and the banks too. So I think we're going to be going through an enormous amount of opportunities, and we'll be selecting a few but if the last 30 days are any indicator, I think that it'll probably be about a 6% yield unlevered. And then, you know, given that we have almost a billion for in cash at this point, I think we'll probably you know, either just go through the first 500 to a $1 billion unlevered and then just possibly do a CLO or else take it to the banks at that point. Because we have a country club problem of too much liquidity right now.

**Tim Hayes**

Yeah, that's a good way of putting it. But, yeah, that was going to be the part B that question was going to be on the financing side. So it sounds like you're interested in maybe testing the waters with CREs, CLO. Is there any timing around that? I mean, do you need to kind of build the portfolio back a little bit before you look to do that or, you know, any color on that would be helpful.

**Brian Harris**

We could one rather quickly, we have over $2 billion worth of loans. But I think it you know, if I had to fast forward and think what's the best way to do this, I suspect probably out around June or July, we'll probably do a, I think a CLO is so far looks a little bit easier than bank repo lines. So let's assume nothing changes there will probably stick to the CLO. And my suspicion is it'll work better if we go with all loans that are originated after the pandemic.

**Tim Hayes**

Okay, got it. That's helpful. And just one follow up to that, I'll hop back in the queue, but just in terms of your funding costs, you know, have you seen costs come down on your warehouse lines with your repo counterparties? You know, our banks - are they and we've heard this anecdotally, are they feeling kind of pressure to compete with the CLO market now that it's so hot, and you're seeing issuance pick up there and just curious if that in the form of cost or leverage is benefited you guys?

**Brian Harris**

Well, the securities repo market has fully recovered to where it was pre-pandemic, in fact, it might even be through where it was. So there's plenty of leverage if you want to be in the securities business. However, the yield is quite low. So even levered returns are 3%. So that's one of the reasons we've drastically cut down in our holdings of securities at this point, I suspect, we'll continue to do that even though very attractive financing terms, at the end of the day, we'd rather have the capital deliver the company through the repo line, and then get unlevered 6% returns and then, you know, use the CLO market to amp that number up a little bit.

The banks are not, I wouldn't say they're very comfortable yet, because we are still in, you know, a difficult time in the economy. And there's plenty of headwinds, that you certainly don't want to look at too many hotels, apartments, you can do, and I think the healthier banks, and we won't get into who they are, but the healthier banks are more apt to be reasonable about financing. You know, their rates haven't gone up necessarily from before.

But the - what they will accept has gotten narrower. And the advanced rate has maybe dropped about 10%, which is fine. Yeah, I think that's an appropriate situation. I think that you know, real estate in general has been pushed a little here. And the CLO market keeps the risk in the hands of the originators. And that's probably the way it should be handled.

So, you know, and you can do a managed CLO deal or you can do a static CLO deal. We have the luxury of probably doing either, but I suspect we'll wait until we get about $6 or $800 million of new loan originations.

**Tim Hayes**

Got it. No, that's good color. Appreciate it. Brian. I'll hop in the queue. But again, thanks for taking my questions.

**Brian Harris**

Sure.

**Operator**

And our next question is from Randy Binner with B. Riley. Please proceed with your question.

Good evening. Thanks. Thanks. That was really interesting. I guess. I'd like to go back, though. You mentioned $2 to 300 million of new loans, you know, under application this year post pandemic, and I heard in there, multifamily is a little tight for your preference on spread, which makes sense.

But then it was all the way back out to hotels again, and I know that you've gotten smaller and hospitality. So I just - I guess I'd like to maybe ask the question, you know, of the 2 to 300, can you give us rough buckets of where you're actually writing it.

And if it is, hotels, again, you know, maybe a little bit more color on how those make sense, you know, occupancy, location, that sort of thing?

**Brian Harris**

Of the - I'm going to say closer to $300 million at this point, because I've got a pretty good sense of what came in even in the last day, very little that is hotel, I think there is one on there for about $18 million. And the one that is on there, the sponsor of the hotel has, it's a very brand new hotel, and he's putting in more capital to refinance his construction loan. So he's going pay down that principal. And while we know, we're operating on a dollars per unit basis, because there really is no underwriting for the new hotel, I suspect that, you know, we're going to be able to generate that we're comfortable enough, given the rest of the hotels, we know in the area there, densely populated area.

And so I don't know if we'll get there either, by the way, these are just under wrap at this point. And - but I wouldn't want you to think that because they said we're going to get about a 6% unlevered return that we're loading up hotels, that would be the furthest thing from the truth.

**Randy Binner**

That's why I wanted to clarify it….

**Brian Harris**

For all hotels it would be 9% or 10%.

**Randy Binner**

That's fair enough. But yeah, I just wanted to clarify that so what are the categories that you're mostly looking to go into if it's not apartments, and it's not as much hotels?

**Brian Harris**

Well, we have some apartments, and most of ours are north of 400 over, but we're losing plenty of them at 350. We have some offers, and we have some conversion, you know, industrial is changing into something else. Some of it is land, you know, land deals or are traveling at a fraction of the basis, they were traveling at, you know, two years ago, and most land loans, you're right alone with a double-digit rate with a 50% of acquisition cost. And oftentimes with recourse.

So, again, we don't want to make a career out of writing land loans, but, you know, if you're pretty comfortable with the basis, that's another place you can get a good deal. And what I like in particular about it is if we're concerned about our ability to finance a bridge loan, say, an office building with one of our line lenders, try to imagine how a land loan is getting financed with the same banks. It's, it's very difficult.

So well, you know, I would say there is a little bit of a bifurcation going on, you know, there are some cash flowing assets that are simply coming off construction loans, and they're going to be out for a year. And then there's others that, you know, they're just being acquired.

But the one thing, we're spending more time on is acquisitions of new assets now, and oftentimes, there's a seller selling because he has to, not because he wants to. And that's always helpful. And typically, people who are acquiring assets at this point with no real history, they're usually very deep with capital and have been waiting for these opportunities.

So we're pretty comfortable with that. If there is a situation where there's a bridge loan coming due, and it's CLO, and somebody asks us to refinance that that's, that's what we look at as a bridge-to-bridge financing. That's kind of a dangerous animal, because you have to think that the previous lender probably could keep it if he wants to do and he's decided not to. So we understand that they know more about that loan than we do. So we're trying to avoid that in many ways.

**Randy Binner**

The only follow up I have is just on the on the size of the loans and this new batch of nearly 300. Does it conform to your normal distribution of loan sizes that average around $20 million? Or is there is there a change?

## Brian Harris

I'm going to let - Pamela has the list in front of her.

## Pamela McCormack

Yeah, I can jump in just by way of just to go back, the answer is it's the same business plan and the same strategy with an average loan size of about $20 million or so. And we're focused on all the asset groups, most of what signed up is a combination of multi asset and a lot of multi with some office necessity-based products. So it does not look very different from what we've done historically, both in terms of product type and asset size.

## Randy Binner

All right, great. I'll leave it there. Thanks a lot.

## Operator

And our next question is from Charlie Arestia with JPMorgan. Please proceed with your question.

## Charlie Arestia

Hey, good evening, everyone. Thanks for taking the questions. Marc, by the way, I just want to say it's been a pleasure working with you best of luck in your new chapter. And, Paul, I look forward to, you know, continuing our discussion.

You guys have built up, obviously, a sizable pool of capital here. Tremendous amount of cash on the balance sheets, you know $1.3 billion or more? How do you think about the cadence of deploying that throughout the year? And how should we really think about, you know, the economics of those new investments flowing through to, you know, generating distributable earnings growth above the dividend?

## Marc Fox

It's really a several part question there. Because we also have to gauge if you notice that we actually take quite a few payoffs every quarter also. So the good part is as it's a pretty good statement as to what our portfolio of underwriting - underwritten loans look like. I think, you know, we mentioned that we sold some non-performing loans this quarter and got almost par for all of them.

So we're pretty comfortable that our underwriting has withheld and held its mud throughout the pandemic. The question is, what is the pace at which we're going to originate loans? Versus what is the pace at which we're going to get payoffs and, in the portfolio, which tend to be pretty high rate anyway, I think we had I don't know what our floor is now, but I'm sure it's in one of our documents, but it probably begins with a six anyway.

And what is the pace at which we decide to delever our securities portfolio so and this dispose of that, as I mentioned, in the call, I think we sold $680 million of securities in the last couple of months. And we didn't do that because they weren't making money. We do that because we saw this pipeline building. And rather than go to repo lenders, and hang on to assets that were only yielding 3%. We decided let's get rid of the 3% yield. Let's get the leverage down. And I think Pamela mentioned I think we're at 0.8 leverage if you get rid of our securities and cash.

So we do use corporate bonds on secured would probably use them more than most in the business that we're going to try to do another corporate bond deal, hopefully will be welcomed in that area, we paid off 450 million of those before scheduled due date this year.

So the real question is, well, how quickly does it translate through? And, Charlie, I can't really tell you, I can't - based on what I saw in the last 30 days, I think we could put a billion dollars out in 90 days if we wanted to. We will not do that, though, I assure you, we and we could go to larger loans. But it is a bit of a flea market right now, we are seeing a lot of transactions come in that you know it rarely do you see us internally having discussions that don't agree with each other. But we do have some disagreement here occasionally, where we think well, maybe we shouldn't do that, even though that's a pretty high rate. And it looks like a pretty good loan. And it's somebody gave me the reference. If it's like when you go fishing, and you're allowed to catch two fish, if you catch them both in the first half hour, do you get in your car and go home? Or do you throw a couple of them back and hope for bigger ones.

And I think right now, we believe the opportunity set is expanding, because the patience of the financial institutions that are holding these loans is waning. And in a rising interest rate environment, I think that that patience will get shorter and shorter as time goes on.

So we are - this is as good as it can look, going forward. This reminds us so much of how it looked in 2008 when we opened the doors of the company and you know, love not having to rely on repo, love not having to rely on being able to borrow money in a world where you know, the only problem here is rates are pretty low. And I think I said in one of our previous calls, just didn't like the idea of lending 10-year money at 280 to 3%, which is where a lot of it was, well, in 90 days, that one straighten itself out. And of course, there'll be some demand destruction as a result of higher rates.

But I still think the lending apparatus in the United States is dramatically smaller than it was last year. The banks are open. There's a lot of competition for apartment buildings, but there's not a lot of competition for other things. And that that is so symptomatic of a recovery after a deep recession that, you know, this is, what we've been waiting for. This is why we've been holding our capital.

**Charlie Arestia**

Appreciate, Brian, thanks so much.

**Operator**

Our next question is from Jade Rahmani with KBW. Please proceed with your question.

**Jade Rahmani**

Thank you very much good to speak with everyone, wanted to start off by asking if there's any credit items of note that took place during the quarter. Noting the remarks he made about the forward defaulted loans that were sold. So hopefully you could give the dollar amount and percentage of loans that are either in defaults or on non-accrual at this point.

**Brian Harris**

I think Pamela probably has a better handle on that than anybody. If you have that Pamela available?

**Pamela McCormack**

Unofficial copy from Travis Co. District Clerk Velva L. Price

I can do that. Our non-accrual, I think Paul mentioned in the script was at $201 million is now down to $130 million as of today, and the end of - Paul, that's 2Q 4. But I think it's accurate as of today.

### Paul Miceli

Correct. Yeah, with the resolution of the hotel loan that we exited in 2021 our non-accrual loan book is down to $131 million.

### Pamela McCormack

And when you ask about the credit, quality Jade, I think we feel really good. I think that's one of the things that justice distinguishes us. You know, we have short duration loans that turn very quickly, we have not kicked the can on anything at all. I don't know how others are treating their books. But I can tell you, we've been really proactive. And we've moved literally almost every large problematic loan off our balance sheet to free up liquidity, as Brian said, we're excited about the opportunity ahead of us. And we wanted to free up more capital to do that. And we feel like we have a really strong balance sheet right now. And that's reflected both in our CECL reserve and in our non-accrual status.

### Jade Rahmani

Thanks, that's good to hear. And $131 million is a pretty low statistic relative to total assets of close to $6 billion, and even the loan portfolio at around $2.3 billion at 12/31. I think there is a myth about Ladder that the reason you're sitting on such a high liquidity position is that there's some you know, some outside risks some things you're worrying about in the loan portfolio that could cause issues from a credit perspective.

So I guess when you think of Ladder versus peers, why is it that the company has such an outsized currency cash position of $1.3 billion I mean, Star Woods got a market cap of close to $7 billion and they, you know, they have about liquidity of $700 million at this point. So how would you answer that?

### Brian Harris

Well, I try not to figure out what other people are doing. But I know internally at our end of things, it's not a surprise I think we're probably getting more payoffs than anybody else. And one of the - there's two reasons for that. One is we have very high floors, and

we deal with smaller loans. And so our loans are readily financeable by lots of people, as opposed to people who can write $100 million loans.

Secondly, we have short maturity dates, you know, we don't usually use the CLO market, which tends to default to a three plus one plus one, you know, with a LIBOR floor, you know, we write two-year loans with a one-year extension. And if you're not doing well, after two years, then one year extension isn't there. So as a result, we get right on top of, you know, problems very quickly.

And I learned a long time ago, it's better to get on top of things when there's a lot of liquidity around. And banks are not taking losses. And you know, of course, you always want to pressure test your portfolio, and by being able to move $100 million loan in bankruptcy in Texas for $100 million, and moving a hotel in Miami, I think it was a $45 million loan, we sold it for just under $44 million, you know, slight loss there. And probably we could have done something with that asset. But given the damage, I think we can do right now with a lot of capital, I think it's much easier, it's we're trying to run a low friction business, we're not trying to run a big real estate operation.

But we are seeing, you know, some pretty good opportunities here. And I would say that, you know, some of these assets that we're selling, in many ways, it's similar to when we sold securities back in April we, you know, that probably wasn't the best idea to sell those at 96.

But first of all, we were able to prove to ourselves, we could sell them at 96, when the world was thinking maybe we were down 20 points, which was crazy. So you know, that all came back. But I think you know, the opportunity set that we see here, and just holding capital, we held capital for liquidity purposes, because one I had a high rate bond outstanding five and seven eighths, we have raised our interest costs temporarily. And we're aware of that. We do have some maturity dates coming up. So I know for instance, we have about $450 million coming due in a year from now.

Now most people don't even think about that a year from now. We think about that two years from before it's due date. So we're going to try to get that refinanced. And so I think we have a lot of cash around so that we can't really get pushed around by lenders and, and also have the ability to pick and choose our spots. We don't have to worry about if it's securitized bubble or whether a BP sky [ph] will buy it or whether a rating agency likes it. You know, we handle our own credit. And you know, we always talk to the rating agencies, and they said, well, we're going to see how you guys do in a

recession. All right, well, they're going see how we did in this recession. And we're not out of it yet. So we're not we're not doing any premature victory laps, but it sure looks pretty good to me.

I think if you've got rate floors, that sick, low 6% yields and rates on the 10, year were below 1%, and your loans are not paying off, you ought to be getting ready for a couple of problems. And I don't know how it gets handled elsewhere in the world. But I would expect to see a lot of payoffs, if the credit underwriting is tight, and lots of pay off creates lots of liquidity, and especially when you're not riding alone.

So I think the post mortem on this whole pandemic, hopefully at Lander will be we shut off the earnings column, you know, and just wrote earnings for 10 or 11 months. And then we turned it back on, and hopefully, it'll be just like the health emergency that we all experienced here.

Pamela is bucking here, say something. So I'm going let her get in. But, you know, I think the difference is, you know, we, we there isn't, there's only four assets in the company, right? We have real estate, we have securities, we have loans, and we have cash. We were trading at 50% of book value six months ago. This is the first time we've been on a call where our cash holdings are lower than our market value.

And so despite the fact that the stock went up about 60%, in the last quarter, our cash rose faster than the stock. And so this, this company hasn't begun to stretch yet. And the fact that we're holding a lot of cash, I don't know why it scares people. It shouldn't. It should. I would think that's pretty prudent. But if we're going to go out and face bondholders for unsecured debt, we better look them in the eye and say when the pandemic hit, here's what we did a, b and c we bought back bonds. We paid you off early. You know, we're looking to come back to an unsecured market again, and here we are walking through the door at point eight times leverage and you know, the market. You know, one thing we see on the residential mortgage resize, they don't give it sorry, they don't care if the companies are levered 10 to one. And I personally think it's a very dangerous situation, if you're levered like that. And, you know, we've preached lack of leverage for years now on these calls. And in April, people thought we were over leveraged.

Okay. I can't I can't explain to the stock market, why they think what they think I it is baffling to me. And I missed the days of being a private company badly. Because, you know, you walk in and you talk to people who understand what you're talking about. But,

you know, we have been issued cell recommendations because people think we're going to cut our dividends. Or we said, we weren't going to, I don't know why that didn't count.

We have a billion dollars in cash, and we have a clear path to growing into our dividends. And we raised our dividend five times when LIBOR went up, we cut it once. You know, when we said we're doing this one time, so I must tell you, I'm a little baffled by what people are looking at when they think we're going to cut our dividends.

### Pamela McCormack

I'm not talking of lapping. Because Brian, you covered a lot of it. But at the end there, but I think what I was going to say is just at the end of the day, I watched this same movie back when we opened the doors in 2008. We exercise led by Brian enormous patience. Yes, we have a lot of capital, yes, we could deploy quickly. Yes, our originators were out there looking and anxious to redeploy months ago, and you heard what happened, you know, to returns in the last 90 days, we waited because we thought there would be a better opportunity and there was, and when any, you know, I just I'm laughing because people speculating about cash, if you just listen, we have $2.7 billion of unencumbered assets, half of lattice assets are unencumbered, we have a securities portfolio of $800 million, with very little leverage against it, it could be it could be sold with selling it at par as opportunities come in, we could sell it all tomorrow, at the end of the day, our balance sheet loan, we have $2 billion dollars of loans, we've turned the portfolio with almost no losses. When we have low maturities coming up, I think we've probably taken more payoffs than anyone, especially if you look at our size.

And when you look at, we have like $240 million of loan repo on our balance sheet. So if we needed to raise liquidity, notwithstanding everything Brian just said, I just gave you buckets of liquidity across the board. And our triple net lease portfolio is outperforming the market, it's 100% collections. It's a necessity base. And it's, you know, one of the strongest assets on the street that I just think is overlooked.

So I just, as Brian said, we can't help what people think. But we've been as transparent as we can be through this process. And I think the thing that gets overlooked a little bit, is we turned our balance sheet and took off. And I hope over time this will be seen, really all the problem assets. And we are moving into this new origination opportunity with a very strong clean balance sheet, and tons of capital to deploy.

**Jade Rahmani**

Thank you for that. Two follow ups. Firstly, share repurchases, does that fit into your capital deployment plan? How much of the $1.3 billion in cash would you allocate to share purchases, it just stands to reason that as an internally managed commercial mortgage REIT is the value of control of these entities is worth about 15%. So just apples to apples, Ladders retrieved 15% higher than a [indiscernible] mortgage REIT that would suggest relative to 80% of book value, you know, more than 30% upside versus unlevered yield at 6%. So how does have the share repurchase factor into your calculation?

**Marc Fox**

You know, we - I said last time, I thought our stock was very, very cheap. And I thought we'd go out and buy and as soon as we got off the phone, you know, I let the period go by that has to go by before you can buy stock. And we went right into the market and began buying it. And I think the stock was down around 695 or seven. And it very quickly went to eight and I can give for all the credit I get as a trader. Let me tell you I was pretty off on this one. I thought the stock would come back to me It never did. It just kept going up. So it went from eight then I went to nine then it went to 10 then it went to 11.

So I was slow. And so I wouldn't hire me to be a stock repurchases If I were you but because I've been a little bit slow on that I do a little better on the bonds when it when they're really low. But I think if that is the next the best alternative investment we've got, then that's what we'll do, but to separate us from capital in this kind of a market is going to be difficult although I certainly can understand the benefits of buying our stock at 80% of book value.

**Jade Rahmani**

Okay, and then last question and I get this from a lot investors in my view, there's probably a decent cohort of very high quality institutional investors, evaluating Ladder, but they look at the dividend. And that keeps them on the sidelines because you could buy the S&P [indiscernible] even, you know, something like ARI at a much higher dividend yield. And those companies seem to have convinced the market for now that their dividends are not going to be cut, they're sustainable, look at Ladders, $0.80 cent dividend, relative to its undepreciated book value of 1394, acknowledging book value

did take a hit a little bit of a hit due to the CDGS [ph] exercise their option, nevertheless, the current dividend is a 5.75% yield on that book value, historically, Ladder generated and 11% to 12% ROE and I remember Brian, you saying you don't go to work every day to generate, you know, a 10% to 12% ROI, you'd shoot for something much higher.

So that would suggest if you can just get back to the 11% ROE and do an 80% payout ratio. Yeah, there should be about 50% potential upside to the dividend. It's just about the timing of deploying this capital. So you validate the idea that the dividend is going to be once capital gets deployed on a growth path, Ladder, we'll be back to raising the dividend, you know, at a measured pace. But that's basically what investors should be expecting.

**Brian Harris**

A whole lot of forecasting, but a lot of what you said there is kind of the business plan. And it gets a lot easier in a rising rate environment. And I am hoping I know that most mortgage guys don't say that, but I kind of like bright, smart rising. And - they, you know, will be as patient as we need to be. And we're kind of at that part of the juncture. I think we're - the recession isn't over. I mean, there's still high unemployment. Yeah, 33 million jobs got lost. And maybe now it's only 10 million, but that's how many jobs were lost in the great recession or so.

So we're not done here. And I wouldn't tell you we're done, you know, having discussions, you know, with borrowers that are having a tough time. But I think what we've proven out now, by getting to some of our larger, most illiquid, and like most elastic, non-performers, like hotels and land loans and loans in bankruptcy, is it's kind of proven to us all that we do know how to underwrite and this pandemic has been a shock to the system. And in the teeth of the worst recession I've ever seen in my life, we've been able to sell securities, home loans, hotels, land, you know, defaulted loans, bankrupt loans, and all of them with a 98-ish type number, you know, across the board.

So I don't think that's going to change with the next roster of loans that are coming due at ladder. So I'm going speculate a little bit there that, you know, we have some, some legacy that's coming due that we think is fine, we're getting paid off on a lot of loans, but we still have some wood to chop, and some of that transition that took place and not a lot of transition went well in the in 2020, unless you own Zoom or, you know, one of the delivery companies, but you know, so we are now what we're looking at is this new class, and we're going to reset the inventory here. And we're going to set the reset the

inventory with very little in the way of competition with an extremely supportive Federal Reserve Bank.

I think if you're going to shoot for what gets done in the bank market, you know, you're going to struggle at LIBOR plus 350. But if you just expand that target just a little bit, and maybe you go to 75%, instead of 65%, I oftentimes find when you come out of these recessions, it's the year - it's almost like you should have done every loan you looked at. And because it's five years later, you realize with all the stimulus, every damn thing you look, that worked out just fine.

But we're still pretty particular about it, we're still dealing with the possibility of who knows what could happen. You know, this has been a lot to deal with, as far as the election goes, the election that we thought would end in November ended in January, by the way, if you hear those dogs, those are mine, and I have no control over them. So I'm just going to party through this.

And so the way I look at it, it's like it's a great opportunity set. You can't get overly cocky here. Like I said, we could probably push a $1 billion out the door in 90 days. But that would be insane because you could have another leg down here. And we're going to be cautious about it. But will we grow into that dividend? Yes, easily? Do we have any plans to cut it? No. Let me say it again? No. One more time? So for the people who keep writing that we're expecting to cut it. I wish they'd call my phone number.

But we don't think that's going to be difficult at all. We don't think we're going to be there next quarter. But we do think any year we're going to be there and hopefully even getting to the good news that you talked about there as a possibility.

**Jade Rahmani**

Great. Well hope hopefully that happens and maybe even faster than you anticipate considering Ladders high ROE track record. And thanks so much for taking the questions.

**Operator**

We have reached the end of the question-and-answer session. And I'll now turn the call over to CEO, Brian Harris for closing remarks.

**Brian Harris**

All right. Well, thank you everybody for listening. And sorry about my dogs. They have a few questions too. But I guess as we end here, I want to welcome Paul as our new CFO and Marc, I can't grab you on a zoom call, but he knows I'll kiss him right in front of anyone. So I if I were around, I'd give you a hug right now. So thank you for all your help. And I appreciate all your time with our investors and our patients. I know it's been a difficult year but we look - we look forward to better times ahead. So thank you.

**Operator**

This concludes today's conference and you may disconnect your line. Thank you for your participation.

This article was written by

**SA Transcripts**    Follow

111.59K Followers  |  Message

Seeking Alpha's transcripts team is responsible for the development of all of our transcript-related projec... **more**

👍 **Like This Article**          ◁ **Share**          🖶 **Print**          💬 **Comment**



EXHIBIT

Ex. 3

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

IN RE:                    )   CASE NO: 20-10251-TMD
                          )   CHAPTER 11
                          )
WC HIRSHFELD MOORE, LLC,  )   Austin, Texas
                          )
                          )   Thursday, April 1, 2021
          Debtor.         )   9:00 a.m. to 11:30 a.m.
                          )   1:30 p.m. to  1:35 p.m.

HEARING RE:

CONFIRMATION OF CHAPTER 11 PLAN

BEFORE THE HONORABLE TONY M. DAVIS,
UNITED STATES BANKRUPTCY JUDGE

**APPEARANCES:**        See page 2

Courtroom Deputy:       Jennifer Lopez

Court Reporter [ECRO]:  Laurie Boyd

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

---

3

| | INDEX | | | |
|---|---|---|---|---|
| DEBTORS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
| NATE PAUL | | 6 | 46 | -- |
| NAVID MOSHTAGHI | 67 | -- | -- | -- |
| | | | | |
| CREDITORS' WITNESS | | | | |
| DUSTIN LOUDERBACK | | 7 /74 | 82 | -- |
| JEREMY STOLER | 87 | 9 | -- | -- |
| | | | | |
| DEBTORS' EXHIBITS | | | | RECEIVED |
| 27 through 29, 31 throug? | | | | 5 |
| 10 | | | | 6 |
| 1 through 9, 11 thro..h 26, 32 | | | | 66 |
| | | | | |
| LENDERS' EX?... | | | | |
| A through ? | | | | 5 |
| | | | | |
| | | | | |
| CO?R?? RULING    102 | | | | |

EXCEPTIONAL REPORTING SERVICES, INC

---

APPEARANCES FOR:

Debtor:         ALBERT A. CIARDI, ESQ.
                Ciardi Ciardi & Astin
                2005 Market Street
                Suite 3500
                Philadelphia, PA 1?.?3

                WALTER W. GOULD?BURI, ESQ.
                Ciardi Ciar?i & A?tin
                2005 Marke? S?reet
                Suite 3500
                Philadelphia, PA 19103

Creditor:       ELIZABET?. BOYDSTON, ESQ.
                Polsi.?.?i
                2950 ? ?arwood Street
                S?.?? 00
                D.?l?.?, TX 75201

                T?INITEE G. GREEN, ESQ.
                ?00 Louisiana Street
                Suite 6400
                Houston, TX 77002

EXCEPTIONAL REPORTING SERVICES, INC

---

4

**Austin, Texas; Thursday, April 1, 2021; 9:00 a.m.**

**(Appearances via Zoom Web Conference)**

**(Call to Order)**

        THE COURT:  Okay, *In Re:  WC Hirshfeld Moore* and

seven other cases administratively consolidated under 20-10251.

        Mr. Ciardi, are you representing the Debtors?

        MR. CIARDI:  Yes, Your Honor, I represent all of the

Debtors.

        THE COURT:  Okay.

        MR. CIARDI:  With me is Mr. Walter Gouldsbury.

        THE COURT:  And given the late breaking developments

on both sides yesterday I assume we have no announcements?

        MR. CIARDI:  We have no announcements, Your Honor.

        THE COURT:  Okay, Ms. Boydston, are you on?

        MS. BOYDSTON:  Yes, Your Honor, this is Liz Boydston

of Polsinelli on behalf of the Secured Lender and with me I

have Ms. Trinity Green, also on behalf of the Secured Lender.

        THE COURT:  Okay, Mr. Ciardi, who is your first

witness?

        MR. CIARDI:  Our first witness, Your Honor, would be

Mr. Nate Paul, and we have filed his Declaration for Mr. Paul.

        THE COURT:  Yeah, I saw it.

        Mr. Paul, can you hear me?  Mr. Paul, you haven't

sufficiently unmuted yourself?

        MS. BOYDSTON:  Your Honor, this is Liz Boydston,

EXCEPTIONAL REPORTING SERVICES, INC

**5**

```
1    Should we go over our exhibits objection?
2         THE COURT:  Yeah, let's do that, that's a good idea.
3         Do you have objection to any of the Debtors exhibits?
4         MS. BOYDSTON:  I do, yes, Your Honor.  I object --
5    well, obviously, Number 10, Exhibit 10, the Declaration, since
6    he's here to testify, but until he testifies --
7         And then Exhibits 27 through 30, and 32 and 33.
8         THE COURT:  Okay, Debtors Exhibits -- how many there
9    are here, 1 through 9, 11 through 26 and 31 are admitted.
10        (Debtors' Exhibit Numbers 1 through 9, 11 through 26 and
11   32 were received in evidence)
12        THE COURT:  Mr. Ciardi, how about the Lenders'
13   Exhibits?
14        MR. CIARDI:  Your Honor, the Debtor doesn't have any
15   objections to the Lenders' Exhibits as they are.  I assume --
16   you know, we may have exhibits -- we may have objections as
17   they move them -- I'm sorry, as they testify regarding what
18   they may or may not say, but the exhibits themselves we are
19   okay with.
20        THE COURT:  Okay, then Lenders' Exhibits A through U
21   are admitted.
22        (Lenders' Exhibits A through U were received in evidence)
23        THE COURT:  Mr. Paul?
24        MR. PAUL:  Yes, Your Honor?
25        THE COURT:  I saw you -- there, okay, I see you and
```
EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    **7**

```
1    the Stay Relief hearing, didn't you?
2    A    Yes, I sure did.
3    Q    And at that hearing I asked you a series of questions
4    about each of the properties, do you recall that?
5    A    I do.
6    Q    And I also asked you towards the end of the hearing if you
7    felt it would be more fair to say, you the Debtors hoped,
8    rather than expected, to enter into these transactions that you
9    described in your testimony, do you remember that question?
10   A    I do.
11   Q    Does your answer stay the same, that you believe the
12   Debtors hopes or expectations are reasonable?
13   A    I do.
14   Q    So in hindsight you think that it's still fair to say that
15   the Debtors expectations that those transactions you described
16   were grounded in fact?
17   A    Yeah, I believe so, you know, above and beyond -- I believe
18   that obviously if you look through a series of different
19   transactions that (indisc.) the position we'd be able to pay
20   off the Lender on a, you know, on a full basis and any other
21   creditors by June 30th, the answer is yes.
22   Q    So aside from the 90-day short term License Agreement with
23   respect to a parking lot the Debtors haven't entered into any
24   other binding contractual agreements, have they?
25   A    Well, yeah, I have an updated Declaration, but I think
```
EXCEPTIONAL REPORTING SERVICES, INC

---

**6**

```
1    hear you.  Could you please raise your right hand?
2         NATHAN PAUL, DEBTORS' WITNESS, SWORN
3         THE COURT:  And have you read I guess it's Debtors
4    Exhibit 10, have you read the Declaration of Nathan Paul that's
5    been submitted in this case on your behalf?
6         THE WITNESS:  Yes, Your Honor.
7         THE COURT:  Are the statements in that Declaration
8    true and correct?
9         THE WITNESS:  Yes.
10        THE COURT:  Okay.  All, I'm going to go ahead and
11   admit Exhibit 10.
12        (Debtors' Exhibit Number 10 was received in evidence)
13        Go ahead, Ms. Boydston.
14        MS. BOYDSTON:  Your Honor, Ms. Green will be handling
15   Mr. Paul.
16        THE COURT:  Okay.
17        MS. GREEN:  Okay, can everyone hear me okay?
18        THE COURT:  Yes.
19        MR. CIARDI:  Yes.
20        THE WITNESS:  Yes.
21             CROSS EXAMINATION
22   BY MS. GREEN:
23   Q    Okay.  Good morning, Mr. Paul?
24   A    Good morning.
25   Q    You testified about the Debtors' properties in December at
```
EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    **8**

```
1    you're talking about the December one, there's an updated
2    Declaration we submitted for this hearing which approximately
3    where we are as of today.
4    Q    I'm sorry, maybe my question was unclear so I'll try it
5    again.
6         Other than the 90-day short term License Agreement
7    with (audio glitch) the Debtor actually entered into any
8    binding contractual agreement, have they?
9    A    We didn't bind ourself to an agreement, that's correct.
10   Q    You have not?
11   A    We have not binded ourself into an agreement.
12   Q    Okay, thank you.  So talk with me about the Plan, how the
13   Plan provided for interest initially if the loan wasn't paid
14   off in full by October 2020, do you recall that version of the
15   Plan?
16   A    I don't recall the previous variations of the Plan.  I
17   know what the Plan -- currently the status but, you know, we
18   have been through multiple variations.
19   Q    So do you recall that those initial Plans provided for
20   monthly interest payments to the Secured Lender?
21   A    I don't recall the specifics of the Plan as I sit here
22   today.
23   Q    As the Plan has been amended in its current form does it
24   provide for interest to the Secured Lender?
25   A    I'm sorry, did you say does the Plan provide for interest
```
EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green                    9

```
1   for the Secured Lender?  Your question?
2   Q    In its current form -- sure.
3        In its current form does the amended Plan provide for
4   monthly interest payments to the Secured Lender?
5   A    Yes.  As it currently stands right now with cash on hand
6   pay interest and we pay in full beginning with the first
7   closing on 04/30.
8   Q    Can you point me to the provision in the Plan that
9   provides for these monthly interest payments?
10  A    Yeah, I didn't -- I'm sorry, you asked if there was
11  monthly interest payments going on.  We have a -- if there's
12  cash on hand to make payments and before the end of this month,
13  April 30th, there will be a refinance that closes that pays
14  back approximately 85 percent of the claim to the Secured
15  Lender.
16  Q    Okay.  I don't know that I asked for all of that and I
17  want the record to be clear, so as it stands the Plan right now
18  does not provide for monthly interest payments to the Secured
19  Lender as provided for under the loan documents, is that right?
20  A    I don't recall if it states it would pay monthly interest
21  payments, I do not know the answer to that.
22  Q    Okay, well, we'll move on.
23       Taxes were due in January 2021 of about $800,000, is
24  that correct?
25  A    I believe so.
```

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    11

```
1   refinance the debt on this property to repay the indebtedness
2   to the Secured Lender?
3   A    Yes, there's three properties that have all been
4   refinanced regardless of any new leases.
5   Q    And it's your testimony that 85 percent of Secured
6   Lenders' claim will be repaid by these refinancing proceeds?
7   A    Yes.
8   Q    Who's your lender?
9   A    Well, our lender was -- we were going to have them appear
10  today, we are -- you know, there's a little bit of a delay on
11  their side to be able to do that year.  You know, I can defer to our
12  counsel, but they had asked to maintain confidentiality which
13  we were happy to disclose, we have their agreement to disclose.
14  As you know lender identity is an important aspect and it's
15  something that's been very significant in light of this current
16  situation.
17  Q    So do you have a redacted copy of this Confidentiality
18  Agreement?
19  A    I'd have to defer to counsel, but I believe we do.  I
20  don't know if we have a redacted version of the Agreement, but
21  I know there is Confidentiality in place.
22  Q    Uh-huh (yes.)  So is this lender listed on your Witness
23  and Exhibit list if they were going to testify today?
24  A    We were waiting for a sign off from them to be willing to,
25  you know, come on there and in view of the current situation
```

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    10

```
1   Q    And these taxes, were they paid?
2   A    I believe the Lender asked for a protected advance to pay
3   them which we consented and allowed them to do.
4   Q    So the Debtors didn't find or pay for the taxes, correct?
5   A    The Lender offered to pay for them which we accepted.
6   Q    Okay.  Let's go into the properties, and I'll start with
7   103 East 5th.
8        You testified at the Stay Relief hearing that this
9   property was 100 percent vacant and produced no income.  Is it
10  still a non-income producing property?
11  A    Yes, in between the previous Declaration in December and
12  now we obviously had the first freeze I've ever experienced in
13  the State of Texas which happened February 17th, so about
14  halfway through, yeah, I'd say that did change certain, you
15  know, specific dates, but it is 100 percent vacant today, yes,
16  that's where we're at.
17  Q    Okay.  And it was your expectation in December that this
18  property would be leased by March 31st, 2021, do you recall
19  stating that?
20  A    Yes, I do.
21  Q    The Debtors didn't have a form of lease at the Stay Relief
22  hearing, do they have one now?
23  A    We have a term sheet, you know, and a loan being finalized
24  that refinances that property out without a lease.
25  Q    Okay.  And now it's your testimony that the Debtors will
```

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    12

```
1   with Lender identify it's been tough, I mean, it's been very,
2   very tough, it's because we had previous lenders harassed in
3   other cases almost every other single case.
4   Q    Okay, so I apologize if I misheard your answer, but I'm
5   just trying to understand, did you designate this potential
6   lender on your Witness and Exhibit list to testify today?
7   A    We do not have them on the list.  I did confirm with them
8   this morning, they are willing to come to Court, but it's
9   actually subject to us being able to work through some of the
10  confidentiality aspects.
11  Q    Okay, we may come back to that, but I'll move on for now.
12       Your testimony is the refinancing will close by the
13  end of April?
14  A    That's correct.
15  Q    So that's within 29 days?
16  A    Yes.
17  Q    And so if you now know that this debt will be refinanced
18  and that the property will no longer be leased for purposes of
19  funding the Plan, you didn't amend your Plan or provide enough
20  data to the Disclosure Statement, did you?
21  A    Well, what you said is not correct to my testimony.  It's
22  not that it won't be leased, it's not required to be leased.
23  We are still working to lease the properties every single day,
24  it's not a requisite of the loan for it to be leased or not
25  leased.
```

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green    13

1  Q  Yeah, and I think my question was really confusing, it
2  wasn't a great one so I'll try again.
3         With respect to funding the Plan you are no longer
4  relying on the lease, you're relying on refinancing and that's
5  correct, right?
6  A  That is correct.
7  Q  But you didn't amend the Plan to make that clear, did you?
8  A  Our Plan has always been that it would be paid in full by
9  June 30th, so even though this Lender is in a position to close
10  by April 30th our Plan would still be accurate, that it would
11  be paid in full by June 30th.
12  Q  Other than your testimony in your Declaration and right
13  now on the stand, do you have any other actual written evidence
14  with respect to the refinancing?
15  A  Yes, we do.  We've been in kind of around the clock
16  discussions on what we can present to the Court without
17  breaching confidentiality or compromising candidly this
18  financing just based on what we have experienced to-date.
19  Q  And -- okay.  320 Congress, you testified at the Stay
20  Relief hearing that this property was about 41 percent
21  occupied.  Is that still true?
22  A  Yes, that's correct.
23  Q  Okay.  On this property it looks like the Debtors offered
24  Exhibit 28, which is a ground floor lease with Austin Dees
25  (phonetic).  That lease pre-existed the bankruptcy, yes?

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green    15

1  did we are happy to provide it, but I never received an email
2  request for a redacted Confidentiality Agreement.
3  Q  Okay.  Do you recall testifying that the Debtors expect to
4  lease the second floor of 320 Congress on March 31st, 2021?
5  A  I do.
6  Q  In fact, you actually testified that you were negotiating
7  with a potential tenant, and you name that tenant, Home Story;
8  is that right?
9  A  That's correct.
10  Q  And you described this particular opportunity as more than
11  speculative, do you recall that?
12  A  I do remember that
13  Q  And I asked you what stage you were in with respect to
14  negotiating this deal with Home Story, and you testified that
15  you weren't sure that the Debtors may have started working on
16  an LOI, but you just weren't sure, it could have been in the
17  discussion phase, does that sound right to you?  Do you recall
18  that?
19  A  I don't recall that specifically, I do -- I can, you
20  know, recall where it stands today is that it's very close to
21  finalized lease, there was a too big bump in the road with the
22  freeze, but I fully expect the same tenant to take the space.
23  But this is similarly -- this is one of the three properties
24  that's in that refinance, and it's not required that we have
25  the leased in order to obtain 35 million to pay off the secured

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green    14

1  A  Yeah, it was after our acquisition and pre-bankruptcy,
2  that's correct.
3  Q  Okay.  In the Disclosure Statement the Debtors state that
4  the Debtor has an LOI being finalized with a tenant for
5  the second floor.  Who is the tech tenant?
6  A  Could I have you say that one more time, who's the tech
7  tenant?
8  Q  Yeah, yeah.
9  A  So similarly on that I need to defer to counsel as far as
10  the confidentiality of this.  If I'm allowed to disclose the
11  tenant I'm happy to, I just -- I'm very concerned and
12  particular on this, I mean a lot has been hiding because of
13  the Lender still hiding the identity.
14  Q  Do you recall the December hearing when we talked about
15  a potential transaction and you were concerned about
16  confidentiality and actually stated that you could provide a
17  redacted copy of a Confidentiality Agreement, do you recall
18  that?
19  A  I don't know the specifics of that, but that would not
20  surprise me.
21  Q  All right.  Well, we certainly have a transcript of the
22  hearing if we needed to pull it up, but my question is we never
23  saw any version of a redacted Confidentiality Agreement with
24  respect to any of these properties, have we?
25  A  I don't remember ever receiving a request for that, if I

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green    16

1  debt.
2  Q  Okay.  You didn't bring in a representative from Home
3  Story today to testify about their interest in this property,
4  did you?
5  A  No.
6  Q  And you didn't submit a Letter of Interest, did you?
7  A  No, see, the final lease is not signed.
8  Q  Your testimony at the Stay Relief hearing was that you had
9  a lease agreement with Home Story that would be ready to submit
10  by the first quarter of 2021.  We're now in the second quarter
11  of 2021.  Do you think your expectations may have been off?
12  A  I -- in respect to the (indisc.) lease so probably my
13  expectations were off.  If I would have known there would be an
14  event that would basically knock out 30 days of a quarter I may
15  have rethought that differently, but my expectations did not
16  change.
17  Q  Okay.  And now your testimony is that this property, like
18  103 East 5th, the debt on this property would be refinanced, is
19  that correct?
20  A  Yes.
21  Q  And can you please remind the Court what percentage of the
22  Secured Lenders' claim you expect to pay off with the
23  refinancing proceeds?
24  A  Approximately 85 percent.
25  Q  Okay.  And who is your lender on this deal?

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green                    17

1  A    It's the same lender for all three.

2  Q    Your testimony, though, is that the refinancing is going

3  to close by the end of the month on all three properties and

4  pay off 85 percent of Secured Lenders' claims, yes?

5  A    That's correct, yes.

6  Q    How much is the Secured Lenders' claim?

7  A    Approximately -- I believe it's in the range of 40 million

8  900,000, more or less.

9  Q    And are you including post-Petition attorneys interest and

10  fees in the amount of that claim?

11  A    I don't have every detail of the claim as I'm sitting

12  here, I defer to our -- you know, the people we have engaged to

13  help from that standpoint, I'm giving you an approximate range.

14  Q    So 85 percent is an approximation?

15  A    That's correct -- that's what I stated, correct.

16  Q    It could be less, it could be 75 percent?

17  A    It could be 95 percent, I don't know the exact number as I

18  sit here today.

19  Q    So how about the terms of the refinancing?  I understand

20  that you can't identify the lender, but what are the closing

21  costs on this deal?

22  A    I mean, going through -- 35 million is what we were

23  expecting in that proceeds of the refinancing, so we'd pay the

24  lender.

25  Q    So you expect net proceeds to be 35 million.  So what are

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    19

1  Q    Okay.  And they ran a credit check for these Debtors?

2  A    I believe so.

3  Q    Okay.  So what about 422 Congress.  This property is -- is

4  this property being refinanced as well?

5  A    Yes.

6  Q    Okay.  So then the Disclosure Statement talked about an

7  extension of a month-to-month lease with the burn pile, is that

8  extended agreement, has that been entered into?

9  A    We have another -- one of the reasons we didn't bring all

10  of these aspects where that lease currently stands in the new

11  lease is because that one's not being refinanced, and an

12  extension of that lease or a new lease is not requisite for

13  this refinance.  We actually do have as Letter of Intent for a

14  new tenant to take the entire building at a rate that's much

15  higher.  We offer out the burn pile first, you know, to

16  extend their lease, and we have a tenant willing to take all of

17  those space, or that space as well.

18  Q    Okay.  And I believe you submitted a Letter of Interest

19  for that particular tenant, is that right?

20     (Talkovers)

21  A    That's correct.

22  Q    Okay.  Have you received any complaints from your current

23  tenant with respect to this property?

24  A    Yes, I believe so.

25  Q    So you're aware of the safety concerns of the property?

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    [18]

1  the closing costs and fees involved?

2  A    I mean, I'd have to defer to -- you know, reviewing where

3  that stands, what it will end up being.  You know, that's

4  really, at the end of the day, would not play into how it changes

5  proceeds or what -- our ability to repay it, so it's what my

6  Declaration stated.

7  Q    Actually, I have your Declaration in front of me, and it

8  says in Paragraph 3, it says:

9          "Subject to court approval with proceeds to Debtors

10          in the amount of $30 million which will repay over 85

11          percent of the Secured Lenders' Proof of Claim."

12          It doesn't say "approximately 85 percent," it

13  actually says it "will repay over 85 percent."  So is your

14  testimony different than your Declaration?

15  A    My Declaration -- my calculation I did was that it came

16  out to over 85.  It could be slightly different, it might be 84

17  or 86, so maybe it should probably say "approximately" rather

18  than "over."

19  Q    Okay.  So just a couple more questions about the

20  financing, and then I'm going to move on.

21          Did the DIP lender appraise the property or come out

22  and look at it?

23  A    Yeah, the lender has been to all properties.  I can't

24  speak for which appraisals I have received or not received but,

25  yes, they have been to all properties.

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    20

1  A    Yes, I'm aware of some of the issues that have taken place

2  at the property.

3  Q    So you know that the roof is leaking like really bad?

4  A    I'm aware of the issues of the property, yes, and the

5  ongoing work to remedy it.  The option was, you know, more

6  damage that occurred during the freeze is something that is

7  still being addressed to this day.

8  Q    Uh-huh (yes.)  So are the fire hazards also being

9  addressed?

10  A    Yes.

11  Q    Who's doing the work?

12  A    Impact Fire.

13  Q    And who is working on the roof?

14  A    There's various venders.  We couldn't finalize the repairs

15  until the insurance adjuster came to the property, and I

16  believe he was there yesterday.  They have asked us not to

17  complete all of the work until it was signed off, and obviously

18  we didn't want to go commit the funds to go do so until we were

19  sure we were going to get reimbursed.

20  Q    So have you requested a work permit from the city for any

21  of these --

22  A    Well, there's not work -- there's not work happening on

23  the roof yet until we have the insurance claim approved.

24  Q    Okay.  Do you know that there's black mold growing at the

25  property?

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green      21

```
1  A    I don't know that.
2  Q    When's the last time that you visited this property?
3  A    Probably about a few weeks ago.
4  Q    And isn't it true that these problems that you think about
5  have been going on for years which is why you have actually
6  been involved with litigation with the burn pile?
7  A    I would not say that's correct.
8  Q    Would you say that it would cost more to fix the property
9  than the property is worth, and that's why you have done
10 nothing with these issues?
11 A    Definitely not.
12 Q    Okay.  So I may come back to the safety issues at 422
13 Congress, but I wanted to ask you about the exhibit list you
14 submitted in support of the Plan Confirmation which appears to
15 be a potential transaction with Vuse Storage LLC, are you
16 familiar with that?
17 A    Which -- say what now?
18 Q    Vuse, V-U-S-E, Vuse Storage, LLC?
19 A    I don't recall -- is that a new exhibit or one of the
20 previous exhibits?
21 Q    Well, it is -- it was previously submitted in support of
22 this Disclosure Statement, but it's also an exhibit for today's
23 hearing?
24 A    Yes, I am familiar with that offer.
25 Q    Okay.  So it is, in fact, an offer and not a contract,
```

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green      23

```
1  Q    Okay, would it be May?
2  A    I don't have the exact date.  There was a build out period
3  they were going to need, you know, I believe the rent would
4  most likely start around the end of the year, you know, that's
5  been an ongoing discussion.  It also depends on if they take
6  the burn pile space or not, so there's a lot --
7  he's an employee there, they want once folks to be in and open
8  as fast as possible which, you know, then they open for
9  business we expect rent to be starting.
10 Q    Okay.  Would you -- I mean we can obviously pull up the
11 exhibit if we need to refresh your recollection, but the terms
12 of the LOI as it's drafted say that the delivery date on this
13 property would be January 2022.  Does that sound right to you?
14 A    No, that is correct.
15 Q    And then the rent would commence for a period thereafter
16 of up to at least 120 days, right?
17 A    Well, that was based on depending on what space they get
18 delivered that was agreed to deliver the burn pile or not.
19 So obviously it's a moving target and it's something
20 that's a constant on our discussion and plays into the burn
21 pile discussion as well.
22 Q    The same focus on when rent would be collected, it looks
23 to me like it would be about April 2022 based on the terms of
24 the LOI if you were to accept it as drafted, can you agree with
25 that?
```

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green      22

```
1  correct?
2  A    That's correct, we have not signed that one.  The Parker
3  Restaurant Group one was subsequent to that.
4  Q    Do you recall that the time on that offer and that it was
5  no good if it wasn't accepted by January 10th, 2021?
6  A    Yes, I do.
7  Q    Okay.  So it is it is just --
8       THE COURT:  Which exhibit is that?
9       MS. GREEN:  I'm sorry, did it -- 29 --
10      MR. SPEAKER:  29, Your Honor.
11      THE COURT:  Thank you.
12 BY MS. GREEN:
13 Q    So this is just an expired LOI, correct?
14 A    As far as that disclosure, yes, yes, that's correct.
15 Q    Okay.  So you mentioned the Parker Restaurant Group being
16 interested in leasing the property, so that's Exhibit 32, that
17 LOI.
18 A    That's correct.
19 Q    So when would you expect to receive rent from Parker
20 Restaurant?
21 A    It would be after we have closed the refinance and that
22 property is no longer part of the estate.
23 Q    Do you have a date when you expect to collect rent?
24 A    It would be -- I mean, we would close that refinance
25 before April 30th, so it would not be before April 30th.
```

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green      24

```
1  A    That may be correct, you know, based on as drafted.
2  Q    And it also asked for a $750,000 TI allowance to be
3  deposited into escrow, doesn't it?
4  A    That -- yes, it does.
5  Q    The Debtor can't sign this TI contribution, can it?
6  A    It should -- it definitely can because the property will
7  be refinanced by April 30th.
8  Q    Okay, so sitting here today the $750,000 has not been
9  deposited into escrow?
10 A    Of course not, it hasn't been -- there's not a lease
11 signed, we wouldn't deposit funds based on an LOI.
12 Q    Okay.  But does this really matter since the LOI expired
13 yesterday?
14 A    Yeah, and the way it works in commercial real estate is,
15 you know, there's end dates for LOIs and these are ongoing
16 discussions that have happened, so if I'm giving you the most
17 clear picture of where it stands it's an ongoing discussion,
18 it's not, you know, "this expires tomorrow, this expires the
19 next day," this is a tenant that is working in earnest with us
20 towards being able to get into the property to alleviate any
21 concerns or issues on, you know, the TI or when the lease
22 commences, this property is being refinanced.  This is one of
23 the three properties where we are able to refinance by April
24 30th.
25 Q    Okay, but there's no amended or revised LOI?  You're still
```

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green                                      25

1  relying on the one that expired yesterday?

2  A    Yes --

3  Q    Right?

4  A    Yeah, but that's not how it works in commercial real

5  estate, correct?

6         MS. GREEN:  Your Honor, I'm going to object as

7  nonresponsive.

8       (Talkovers)

9         MR. SPEAKER:  Well, Your Honor, I believe --

10        THE COURT:  The question --

11        MS. GREEN:  What?  I'm sorry?

12        THE COURT:  What was the question?

13        MS. GREEN:  Oh, I said -- so the question was he

14  doesn't have an amended LOI, and he's still relying on the one

15  that expired yesterday.

16        THE COURT:  I think his response was responsive.

17        MS. GREEN:  Okay.

18  BY MS. GREEN:

19  Q    Well, with respect to the proceeds from the refinancing,

20  you stated that 100 percent of the proceeds would go to

21  repaying the Secured Lenders' claim earlier, correct?

22  A    One hundred percent of the net proceeds would go to repay

23  the Secured Lenders' claim, yes.

24  Q    Okay, so correct me if I'm wrong, but didn't you just say

25  that the refinancing proceeds would also be used to pay the TI

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                                      27

1  the refinancing that you can provide today in support of the

2  Plan?

3  A    There is, we are working around the clock to try and

4  accommodate how to do so without prejudicing the new lender.

5  It became more difficult with the current noteholder continuing

6  to withhold identity, candidly, just speaking as everyone has a

7  clear picture what it is, they are uniformly concerned because

8  they have no idea who the new lender and we are, too,

9  because we don't want it to be derailed.

10  Q    So at this time it's your testimony for these properties

11  that the lender is going to find more than 35 million dollars

12  for just these three properties and the debt owed on those?

13  A    That is correct.

14  Q    Okay.  So for 805-809 East 6th you testified that the

15  Debtors were about to finalize a PSA -- actually were two to

16  four weeks away from finalizing that PSA, do you recall that

17  testimony?

18  A    Yes, I recall I expected that to happen.

19  Q    Okay.  And that was in December of 2020, correct?

20  A    That is correct.

21  Q    And as we sit here today you don't have a finalized PSA on

22  this property, do you?

23  A    We do not have it finalized yet.

24  Q    But you were so confident that you would have it finalized

25  that you put in your Disclosure Statement that the purchase

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                                      26

1  contribution of 750,000?

2  A    If that was a lease we entered into and if this was

3  required it would be funded by the new lender, the net proceeds

4  being net true lender payoff not, you know, net but also would

5  hold that back, right?  If there's additional proceeds above

6  and beyond for any of those costs, that would be part of our

7  loan agreement with the new lender and that wouldn't affect the

8  payoff of the existing loan.

9  Q    So what would total proceeds be?  You have been giving us

10  net proceeds, what are the total proceeds in the refinancing

11  deal?

12  A    I mean, that's to be finalized with our new lender.

13  Q    Okay.

14  A    It's -- the amount that we paid off is more than, you

15  know, following discussions we have had with the current

16  noteholder as far as, you know, any release prices or obviously

17  what the value of the properties is.

18  Q    I'm sorry, can you repeat that?

19  A    We've -- that may not be responsive to what your question

20  [is]

21  Q    Okay, we'll move on.  Just to be clear I think we have

22  already talked about all of the properties that would be

23  subject to refinancing, is that right?

24  A    Correct.

25  Q    Okay.  And there's no term sheet or no written evidence of

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                                      28

1  price on this P -- Purchase and Sales Transaction would be

2  3 million dollars, didn't you?

3  A    That's correct.

4  Q    You don't think that an amendment to the Disclosure

5  Statement is in order?

6  A    No, but we still believe that that deal will happen.  It

7  hasn't happened yet, but we do believe that will happen.

8  Q    Okay.  But you didn't submit a redacted copy of the PSA or

9  a redacted copy of the Confidentiality Agreement on this

10  transaction either, did you?

11  A    No, no, we didn't because of the refinance of the three

12  other properties since it comprised of such a large part of it,

13  you know, from our timing standpoint we're focused on

14  completing that one first, you know, as it relates to an order

15  of priority.

16  Q    So is that why your Declaration from yesterday doesn't

17  provide any testimony whatsoever with respect to this property?

18  A    Yes, the Declaration we provided addresses the refinance

19  that we expect to clear approximately 85 percent of the Secured

20  Lenders' claim, but we didn't provide an update on that

21  particular sale until we have a finalized signed PSA.

22  Q    Okay, so your focus is on refinancing debt on these three

23  properties and until you get that done you really can't do

24  anything with the other properties, is that what I'm hearing?

25  A    No, I never stated that.

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green                    29

1   Q    Okay.  But we have no actual evidence of a transaction
2   with respect to this property as we sit here today, correct?
3   A    Well, it's a deal we expect will happen and we'll be able
4   to -- obviously one of the delays was what happened when we
5   filed as a PSA, this was a temporary hit,
6   it threw everything off, it's something that's completely out
7   of my control, we thought it would be done maybe a little bit
8   before then, you know, probably two to four weeks from the
9   Declaration we were marching towards that date and it's been
10  pushed back, but that's -- I'm having conversations on that
11  sale myself so I can speak for --
12       (Talkovers)
13  Q    My question was so simple, we don't have any actual
14  written evidence with respect to a transaction on this property
15  today, do we?
16  A    I don't believe we submitted anything -- any new exhibits.
17  Q    Okay, thank you.
18       And then we have 901 East Cesar Chavez.  Are you
19  still close to a transaction on this property?
20  A    Yes.
21  Q    So you testified at the Stay Relief hearing in December
22  that you had or you would have a finalized PSA on this property
23  before January 1st, 2021.
24  A    That's correct.
25  Q    Okay.  So you can't blame the storm for not having

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    31

1   that's helpful for you.
2   Q    I'm sure your attorney will give you the opportunity to do
3   that on Redirect.
4        But are you aware that this offer from BN Chavez
5   became null and void on January 29th, 2019?
6   A    That must have been a typo, I am not familiar with that.
7   Q    Well, the contract or the put out al contract, the offer,
8   is dated January 2019 and it says this would expire if not
9   accepted by January 29th, 2019.  So even if it was a typo and
10  even if it said January 29th, 2020 it's expired nonetheless.
11  A    Sure.
12  Q    So is it still your testimony that BN Chavez is interested
13  in purchasing this property?
14  A    Yes.
15  Q    What do you believe the purchase price would be?  What do
16  you -- I'll leave it at that.  I'm sorry, let me --
17       What do you believe the purchase price will be on
18  this transaction?
19  A    I believe the purchase price will be in the neighborhood
20  of around 6 million.
21  Q    And you think that that would be a fair price for this
22  property?
23  A    Yeah, I think it's fair.  I believe it's 6 or 6 and a half
24  million, I don't have it in front of me right now.
25  Q    Are you aware that the Debtors can't sell this property

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    30

1   completed this transaction by January 1st, 2021, can you
2   A    I'm not sure if that's a question or -- I guess I couldn't
3   blame them if that's your question, I'm not attempting to blame
4   them, but could I have -- I'm sure I could blame them.
5   Q    The storm?
6   A    Yes, could I blame the storm, was that the question?
7   Q    Well, I'm sorry, I said you can't blame the storm that
8   happened in Texas and kind of three everything off with respect
9   to this property since you were expecting to close by January
10  1st, right?
11  A    I'm not really sure how to answer that question about
12  blaming, that's -- I don't really understand about choosing to
13  blame something, I don't follow what you're saying there.
14  Q    Okay, I'll say it differently.  This storm happened after
15  January 1st, correct?
16  A    Yes, it did.
17  Q    Okay.  So the delay wasn't caused by the storm, was it?
18  A    No, it was not caused by the storm.
19  Q    Okay.  So you submitted an exhibit that describes a
20  potential sale on this property, it's Exhibit 27, but you
21  didn't offer any witness source from BN Chavez #2, did you?
22  A    No, we did not.
23  Q    And you didn't offer a Confidentiality Agreement from BN
24  Chavez, did you?
25  A    No, we did not, but I'm happy to speak towards it if

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    32

1   without a Court Order?
2   A    Yes, of course, yeah, that's why we haven't signed an
3   agreement yet.
4   Q    And other than Bankruptcy Court approval are there any
5   other obligations that the Debtors owe with respect to this
6   property?
7   A    Any other financial obligations we owe on this property?
8   Q    Any legal, financial or legal?
9   A    I'm not sure -- I can't speak towards every financial or
10  legal obligation.  I defer to counsel for that specific answer
11  to that and a broad question.
12  Q    Okay, you're right, it is a broad question so I'll be a
13  little more specific.
14       Isn't it true that a case was opened on this property
15  with the building's substandard condition in the City of Austin
16  in May 2019?
17  A    I don't know what date it was opened.  I know there was a
18  meeting this morning to address issues related to the homeless
19  setting the property on fire.
20  Q    In fact there have been three fires since May 2019, is
21  that correct?
22  A    Actually I've heard that, I read that in the building code
23  thing but I don't think that's correct.
24  Q    Well, isn't it correct that the BSC Board found, on March
25  24th, 2021, that the property was a public nuisance and it's

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green                    33

1  unsafe in its substandard condition?
2  A    I don't know what the determination or what they cited
3  was, the buyer of the property is going to tear down the
4  building anyway, the value is the land, no one cares about the
5  old pawn shop building, even though we have worked to try to,
6  you know, we're working with the city right now to get the
7  property in the right condition.  The property is based on
8  land, anyone buying the property is going to tear down the
9  building.
10 Q    The BSC Order, have you received a copy of the BSC Order?
11 A    I have not.
12 Q    So, it's actually an exhibit and I can pull it up and we
13 can walk through it now.
14 A    Sure.
15 Q    And I'm referring to Secured Lenders' Exhibit B.
16 A    Okay.
17 Q    One moment.
18     **(Pause)**
19         All right.
20     **(Pause)**
21         Can everyone see Exhibit B?
22 A    It's small.
23 Q    It's small?  Okay, how about now?  Is that better?
24 A    Yes.
25 Q    Okay.  So, this is the Order.  Let me scroll down to the

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    35

1  can read what it says.  I don't have any unique interpretation
2  of it other than what it says on the screen.
3  Q    So, the document, the Order says that you have 45 days to
4  make the property co-compliant, correct?
5  A    No.  It says, "The Commission orders that the owner
6  ordinarily will complete the following within 45 days.  Obtain
7  and finalize all necessary permits, repair all cited violations
8  of the commercial structure, and request inspection from Austin
9  Code to verify compliance."
10     So, --
11 Q    Okay.
12 A    --I want to be clear here because my testimony is like --
13 Q    Understood.
14 A    If you want to read it, I'm -- I want to give clear
15 testimony that to what it states.  I can't say anything more or
16 not than what it states here.
17 Q    Thank you, Mr. Paul.  I appreciate that.
18     Can you also then read 4, Paragraph 4?
19     **THE COURT:**  Let's -- so, Mr. Paul, do you agree that
20 this Order was issued and applies to that particular property?
21     **THE WITNESS:**  Yes, Your Honor.
22     **THE COURT:**  Okay, let's move on.
23     **MS. GREEN:**  No problem, Your Honor.  It may take me a
24 second to -- oh, well.
25     **(Pause)**

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    34

1  bottom to show you.  It's a three-page Order.  But it was just
2  entered yesterday --
3  A    Okay.
4  Q    -- by the Buildings and Standards Commission.  So, we're
5  going to walk through a few things for the Court and we can
6  start with this property referenced in the intro paragraph.
7  It's 901 East Cesar Chavez, correct?
8  A    Yes.
9  Q    And then you were referring to working with the City to
10 remedy the violations that have occurred.  Can you agree that
11 you've got 45 days to make all of the repairs and comply with
12 violations?
13 A    Are you asking me to read what Number 2 says on there?
14 Q    You don't have to read it.  I was just saying do you
15 agree, based on Paragraph 2 of the Order, that you've got
16 45 days to make corrections and comply with the violations --
17     **(Voices overlap)**
18 A    I can see that.
19 Q    What did you say?  I'm so sorry.
20 A    Yes, I do, I do see --
21 Q    Okay.
22 A    -- Number 2, yes.
23 Q    And so yes or no, do you agree that you've got 45 days to
24 fix the property and make it compliant?
25 A    Are you asking about -- the document speaks for itself.  I

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                    36

1      **THE WITNESS:**  And I believe the City is on site today
2  with our team addressing these issues.
3      **MS. GREEN:**  I am having technical difficulties.
4  Okay, here we go.
5  **BY MS. GREEN:**
6  Q    Okay, so one of the violations at the property is that
7  there's a missing roof, is that right?
8  A    I don't recall every violation that's on that, on that
9  document.
10 Q    Are you aware that the building is missing the roof?
11 A    The entire building's not missing the roof.  A portion of
12 the roof has been damaged, but not the entire building.
13 Q    Okay.  So, are you familiar with who testified at the BSC
14 hearing on behalf of this Debtor?
15 A    I don't recall who testified, but -- I don't recall who
16 specifically testified at the hearing.
17 Q    Okay.  Would it sound correct to you if I told you that
18 Mr. Stoler testified?
19 A    Yes, he may have been Mr. Stoler.
20 Q    Okay.  And at his testimony he represented that this
21 Debtor intends to repair the roof.  Is that true?
22 A    If that's -- you know, if the City requires us to repair
23 it, then the answer would be yes.
24 Q    How will the Debtor repair the roof?
25     **(Voices overlap)**

EXCEPTIONAL REPORTING SERVICES, INC

Unofficial copy Travis Co. District Clerk Velva L. Price

Paul - Cross / By Ms. Green    37

1 A   We do have an insurance claim out for the arson.  So, the
2 reason for the damage that caused this last hearing was a
3 homeless person had broken into the building through the
4 secured access and set it on fire and so we have filed a claim
5 with our insurance for that.
6 Q   And by the secured access, are you referring to the fence
7 that the City asked you to put up and repair?
8 A   The City never asked us to put up a fence.  We chose to do
9 that with our own funds in our own account.
10 Q   I may come back to that.
11    Did the Debtors amend or update their Disclosure
12 Statement to inform creditors about the problems at the
13 property?
14 A   Well, I don't think any of the problems are material to
15 the property.
16 Q   You don't think they're material?
17 A   No.
18 Q   The property has been deemed a nuisance and unsafe to the
19 community, but you don't think that these problems are
20 material?
21 A   I don't that that's technically accurate of what it's been
22 deemed based on the Order you just showed me.  I didn't see
23 those words in there.  If it is, I'm happy to address that.
24 But the property and the potential sale is based on the land,
25 not on the existing building.  And actually, Ladder knew that

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green    39

1 his testimony was that we are -- you know, we will make any
2 repairs necessary and look to lease or redevelop the property,
3 which is what the plan would be.
4 Q   Mr. Stoler actually testified that the property was --
5 that the Debtors were always intending to re-tenant this
6 property and when asked if the missing roof might be part of
7 the problem, are you aware of what his response was?
8 A   No.
9 Q   So your statement and testimony here today is the Debtors'
10 intention and plan is then to sell the property and Mr. Stoler
11 represented to the Board of Standards Commission that the
12 Debtors' intention is to re-tenant the property, so which is
13 it?
14 A   It's both.  As the Debtor and as the property owner, our
15 plan is to maximize the value, whether that be by leasing or
16 re-tenanting or by a sale.  I mean that's obviously the goal as
17 we expect.
18 Q   And you have no evidence of either a lease or a sale as we
19 sit here today, correct?
20 A   We shared previously a copy of a -- you know, a contract
21 that's in state of reform.  The buyer is ready, willing, and
22 able to perform.  They have funds in escrow for an adjoining
23 property and we are waiting for sign up on that and they'll be
24 ready to close on this property instantly.
25 Q   You're talking about the BN Chavez transaction that

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green    41

1 all along from when they financed the deal, that this was
2 always a land play.
3 Q   Going back to the Order, I obviously had it pulled up, we
4 didn't review the whole thing.  So, you're saying that you
5 don't know that the City concluded that the property is a
6 nuisance and unsafe?
7 A   I don't know the exact terms of what they concluded.  You
8 know, we -- I think I've testified on this a lot on this
9 specific aspect of what will be non-issue towards exiting
10 this bankruptcy.
11 Q   So, do you think that this property can be leased out in
12 the current condition that it's in?
13 A   I mean I think anything can get leased out depending on
14 what the economic terms would be.  Our plan is going to be to
15 sell this property, not to try to lease it in its current
16 condition.  I have worked to lease it.  We do show the space.
17 We do have it marketed to weigh all options.  But we also do
18 believe the most likely exit will be a sale to the buyer we
19 have identified.
20 Q   Are you aware that Mr. Stoler was asked what the Debtors'
21 intentions are with respect to this property and he didn't
22 mention selling the property at all?
23 A   Okay.
24 Q   Are you aware of what his testimony was?
25 A   Yeah, I'm sure his testimony would be that -- I believe

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green    40

1 expired in 2019, correct?
2 A   Yeah, correct.
3 Q   Okay.
4 A   As I've stated, I believe that was a typo.  But sure.
5 Q   But this transaction isn't included in your declaration,
6 that's right?
7 A   No, we are -- it's not.
8 Q   Okay.  So, your new declaration, it also doesn't provide
9 any information about 1212 East 6th, does it?
10 A   No, it does not.
11 Q   But the Disclosure Statement states that the Debtors have
12 an LOI for the entire building on this property.  Did the
13 Debtor submit this LOI in support of Plan confirmation?
14 A   I don't believe we did.  We have multiple groups who are
15 interested in the whole building and, you know, we had a slight
16 delay from the freeze.  There was some damage, but nothing, you
17 know, to -- prohibitive there.  It's already been addressed.
18 And right now our focus is on hopefully now finishing that,
19 according to what the plan was.
20 Q   Okay.  Mr. Paul, I want to like speed this process up and
21 so when I ask you yes or no questions and maybe you don't know
22 the answer, just say yes if you can or no --
23 A   Okay.
24 Q   -- and I don't know and then rely on your attorney to let
25 you testify as to anything else that you have to say.  Can we

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green                                    41

1  agree to that?

2  A   Yes.

3  Q   Thank you.

4      So, is it safe to say then with 1212 nothing new has

5  developed and nothing's changed since I was asking about the

6  property in December?

7  A   No.

8  Q   Okay, but we don't have any written evidence before the

9  Court to show us what's changed, isn't that true?

10 A   Yes.

11 Q   Okay.  So, 9005 Mountain Ridge, in your Disclosure

12 Statement you provided -- you stated that the Debtors expected

13 to sell this property for 6.5 million or something close to

14 that.  Does that sound right?

15 A   Yes.

16 Q   The Debtors still have not submitted a form of PSA on this

17 property either, correct?

18 A   Yes.

19 Q   Can you disclose for us the identity of the purchaser?

20 A   No.

21 Q   Okay.  At the stay relief hearing do you recall testifying

22 that you were negotiating a sale transaction with a user

23 purchaser that was represented by John Collins (phonetic)?

24 A   Yes.

25 Q   You also testified that you expected to receive an LOI

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                                    43

1  early first quarter or at the latest March 2021, isn't that

2  correct?

3  A   Yes.

4  Q   Do you recall me asking at the stay relief hearing if the

5  Debtors would include refinancing proceeds on this property in

6  their Amended Plan?

7  A   No.

8  Q   Okay.  I have the transcript and can pull it up.  You did

9  testify that the Plan would, and I'm quoting, "Outline every

10 single aspect of that from the release date and prices with

11 proceeds and you name it.  Does that sound like your

12 testimony?

13 A   Yes.

14 Q   But you can't point me to a place in the Amended Plan

15 where I have an outline of every single aspect of that from the

16 release dates and prices with proceeds and you name it, can

17 you?

18 A   .

19 Q   And you didn't mention the refinancing on this property in

20 your declaration dated March 31st, did you?

21 A   No.

22 Q   Isn't that because there are no refinancing proceeds on

23 this property?

24 A   No.

25 Q   So, how much in refinancing proceeds are you going to

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                                    42

1  shortly --

2  A   Yes.

3  Q   -- do you recall that?

4  A   Yes.

5  Q   So, would you say that three months is shortly?

6  A   I don't know.

7  Q   You still don't have an LOI, correct?

8  A   I guess I can address that with my attorney because I

9  can't answer that with a yes, no, I don't know.

10 Q   Do you have an LOI on this property?

11 A   There is an LOI that's been in the works that's not

12 finalized.

13 Q   Okay.  But you submitted other LOIs that weren't finalized

14 and had even expired, so why didn't you submit this one?

15 A   It wasn't in a position to submit yet where I felt

16 comfortable -- was towards -- if it was in a position of being

17 ready to close or being ready to be finalized, so we don't want

18 to -- I felt it was too speculative at this point.

19 Q   Okay.  The Hirshfeld Moore property, does the Amended

20 Disclosure Statement, or the Plan for that matter, include or

21 outline the refinancing proceeds that you expect to receive on

22 this property?

23 A   No.

24 Q   But your Disclosure Statement provided that the Debtors

25 were expecting to close on refinancing on this property by

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Cross / By Ms. Green                                    44

1  bring in?

2  A   That doesn't fit it one of the three you want me to answer

3  that in.

4  Q   Fair enough.  If you don't mind answering the question.

5  How much in refinancing proceeds do you expect from this

6  property?

7  A   We expect to be north of five million in proceeds.

8  Q   Okay, thank you.

9      All right, we're almost done, Mr. Paul.  I appreciate

10 your patience.  Do you recall testifying about tenant

11 improvement demands and how the Debtor is intending to fund

12 these tenant improvement demands?

13 A   Yes.

14 Q   So, is this more or less, are all tenant improvement

15 allowances that are requested or demanded, is that dependent on

16 refinancing on the three properties?

17 A   No.

18 Q   From what other proceeds will the Debtors pay the tenant

19 improvement allowances?

20 A   There are no tenant improvement allowances that are due

21 currently.

22 Q   But to the extent that they are required, where would that

23 money come from?

24 A   Do you want me to give an -- that's not a yes, no, I don't

25 know.

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Cross / By Ms. Green                    45

1 Q   Okay, so I -- when I asked for yes, no, or I don't know
2 questions it was because when I'm asking yes, no, or I don't
3 know questions I was hoping not to get narratives.  It didn't
4 mean that I would never expect another answer other than yes,
5 no, or I don't know.  Sorry if I wasn't clear.  Yeah, yeah,
6 that's my bad.
7        So, on the off chance that one of your future tenants
8 wants a TI contribution from the Debtors, where would the
9 proceeds come from?
10 A   That will be evaluated on a case-by-case basis, depending
11 on what the proposal states.
12 Q   Well, they won't care where the money comes from, will
13 they?
14 A   No, they won't.
15 Q   So, you've got to find the funds, so where would you look?
16 A   We'd look towards a myriad of options of whatever made
17 sense based on that specific situation.
18 Q   Okay.  So, the Plan right now is to pay Secured Lender in
19 full by June 30th?
20 A   That's correct.
21 Q   And you're expecting 35 million in net proceeds from
22 refinancing which you believe will be 85 percent of the total
23 indebtedness?
24 A   That's correct.
25 Q   And I believe the secured claim, the Secured Lenders'

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    47

1 A   The plan is to pay them in full, you know, for their
2 allowed claim before June 30th, 2021.
3 Q   And what happens if you don't do that, sir?
4 A   If we don't, if we don't execute the Plan, obviously then
5 I believe the Lenders' allowed to take the revenues to which
6 their entitled to.
7 Q   And can you interfere in that process --
8 A   I don't believe so.
9 Q   -- at that point?
10 A   I don't believe so.
11 Q   Okay.  Now, let's say that you have paid off or you've
12 somehow satisfied four of the properties by June 30th.  What
13 happens to the four that you haven't?
14 A   I believe that the Lender will be able to exercise their
15 remedies accordingly.
16 Q   Okay.  And June 30th comes in how many days from today,
17 sir?
18 A   Actually I believe it's 91 days.
19 Q   Ninety-one days.  And what is your confidence that you
20 will hit that time period and the numbers?
21 A   In or to achieve within the 91 days?  I'm 98 percent
22 confident.
23 Q   Okay.  So now you went through each one of the properties
24 or you were asked to go through each one of the properties in
25 your cross examination.  So, I want to start with the 901 East

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    

1 claim is 49 million.  Does that sound right to you?
2 A   That doesn't sound right.  I'm sure we're going to object
3 to that claim.
4 Q   Okay.  So, as we sit here today, though, the Debtors have
5 not objected to the Secured Lenders' claim.
6 A   I don't know if we've submitted our claim objection or not
7 yet.  I know we will be, but I don't believe -- I don't know if
8 we have or have not yet.
9 Q   Isn't it true that your calculations of the percentage of
10 indebtedness that's being paid is based purely on prepetition
11 amounts that are owed to the Secured Lender?
12 A   I don't recall the specifics.
13       MS. GREEN:  Okay.  I don't believe that I have
14 anything else, Your Honor.
15       THE COURT:  Okay.  Mr. Ciardi?
16       MR. CIARDI:  Thank you, Your Honor.  Am I coming
17 through okay?
18       THE COURT:  Yes, I can hear you.
19       MR. CIARDI:  Okay.
20              REDIRECT EXAMINATION
21 BY MR. CIARDI:
22 Q   Mr. Paul, let's start back at the Plan.  Now, you've gone
23 through each of the properties with Ms. Green but what is the
24 plan as it relates to the Noteholder, as it relates to the
25 Secured Creditor here?  What's the plan?

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    48

1 Cesar Chavez property.
2 A   Okay.
3 Q   Is that the one -- that is the one I believe there was a
4 bit of discussion about an agreement of sale?
5 A   That's correct.
6 Q   When was the last time you had a discussion with that
7 potential purchaser?
8 A   Two days ago.
9 Q   Okay.  And before that when was the last time you had a
10 discussion before that?
11 A   I've talked to him probably 20 times this year.
12 Q   Okay.  And were those discussions regarding the property
13 at 901 East Cesar Chavez or something else?  What were you guys
14 discussing?  And I don't want to get the actual --
15 A   Sure
16 Q   -- words used, but just the subjects.
17 A   The question has been around -- generally around 901 and
18 there's a -- we have an agreement to sell them 905 and 907 East
19 Cesar Chavez next door to the same group behind the entity and
20 that's a purchase that that buyer has put in escrow about three
21 and a half months ago that we were just waiting for that
22 process to hopefully make it through the system to be able to
23 consummate.
24 Q   When you say "make it through the system," those
25 properties aren't in this group of Debtors, correct?

EXCEPTIONAL REPORTING SERVICES, INC

**Paul - Redirect / By Mr. Ciardi**     49

1  A   That's correct.
2  Q   Okay, so what needs to happen over there so those
3  properties can go forward to sale?
4  A   We are waiting on a State Court ruling or potentially, you
5  know, might be coming through, a new ruling or coming for a new
6  approval in this Court for a non-Debtor in this case.
7  Q   All right.  Is 901 East Cesar Chavez adjacent to,
8  contiguous with those two properties?
9  A   Yes, it's contiguous -- it's adjacent, yeah.
10  Q   And it is the same buyer that is looking to purchase all
11  three?
12  A   That's correct.
13  Q   The agreement of sale that was presented at some point in
14  time called for a purchase price of how much?
15  A   I don't have that number in front of me right now, but the
16  current price that's been discussed is in the 66-1/2 million
17  range.
18  Q   And when would that property close?
19  A   It would be very imminently.  You know, we're hopeful the
20  other transaction would close hopefully very soon.  I don't
21  have an exact date, but hopefully in the coming weeks.  And
22  this would be able to close really simultaneously or as soon as
23  that's approved.  There is no further diligence or delay from
24  that buyer that we'd expect.
25  Q   And I believe you testified that this is essentially a

EXCEPTIONAL REPORTING SERVICES, INC

**Paul - Redirect / By Mr. Ciardi**     51

1  Q   Okay.  Any range?  More than a hundred thousand, less than
2  a hundred thousand, more than fifty, less than fifty?
3  A   I think it be less than a hundred thousand for sure,
4  probably less than fifty, but I don't have an exact number.
5  Q   Okay.  And the Debtor or you would have the ability to
6  fund that construction?
7  A   Yes.
8  Q   Okay.
9  A   We actually just generated another 27,000 in income at the
10  property in the last 90 days, just as an aside.
11  Q   Okay.  And the source of that income was?
12  A   We leased the parking lot for a COVID testing group.
13  Q   Okay.  All right, now with regard to 901 East Cesar
14  Chavez, is that -- so out of the refinance that you were
15  discussing in the cross examination?
16  A   That's outside.
17  Q   Okay, so that would be in addition to the $35 million?
18  A   Correct.  Yeah, so the 35 million that was mentioned
19  earlier when I was speaking with Ms. Green is the refinance
20  proceeds we expect to achieve from three of the other
21  properties.  If you tally up the potential sale of 901, the
22  potential sale of 805, 809, East 6th, that three, and the
23  potential sale of 9005 Mountain Ridge at six and a half, you
24  have in addition to 35, when you kind of tally up all those
25  other potential additions will be, it's almost an additional

EXCEPTIONAL REPORTING SERVICES, INC

**Paul - Redirect / By Mr. Ciardi**     50

1  tear-down land sale?
2  A   That's correct.
3  Q   Are you -- and just sticking with 901 East Cesar Chavez,
4  are you familiar with the current condition of property?
5  A   Yes, I am.
6  Q   Okay.  Does the Debtor have the ability over the next
7  91 days or let's say the next 45 days to satisfy the conditions
8  of the Board of Standards Order?
9  A   Yes.
10  Q   And what's the source of the funds, if you could
11  identify them, or how would you (a) quantify what you would
12  need to spend and (b) how you're going to then go about and
13  implement that spending?
14  A   Sure.  So, I don't know the exact dollar amount that will
15  be required yet.  There's a meeting actually at the property
16  right now between the City and with folks from our team that
17  have been allocated to this property, so once we identify what
18  that cost would be it can be addressed.  But that's something
19  that I'm fully expect we will be able to satisfy, whether the
20  Debtor needs to or if I need to write a check, as I won't let
21  that get in the way of the deal being done.
22  Q   Okay.  Has there been any sort of ballpark of what the
23  budget would be to satisfy the City's concerns with regard to
24  this property?
25  A   I don't have that number yet.

EXCEPTIONAL REPORTING SERVICES, INC

**Paul - Redirect / By Mr. Ciardi**     52

1  almost 30 million.  So, you've got well in excess of the loan
2  amounts.  And, you know, my strategy and plan has been to push
3  the gas on all of them, so that way if something happens
4  sooner, it happens sooner, but that's all being done towards
5  our plan of being able to fully exit prior to June 30th.
6  Q   Okay.  So, let's now take a look at the three -- okay,
7  what are the three refinance properties, sir?
8  A   103-105 East 5th, 422 Congress, and 320 Congress.
9  Q   Okay.  With regard to 422 Congress, you were -- that again
10  is a property that has some construction or inspection issues?
11  A   That's correct.
12  Q   Okay.  Are you familiar with the extent of those issues?
13  A   Yes, I am generally aware.
14  Q   Okay.  Are you aware that the Secured Lender obtained an
15  inspection report regarding certain what they would consider
16  defects at that property?
17  A   Yes, I did see that.
18  Q   Okay.
19      **THE COURT:**  Okay, Mr. Ciardi, the three properties
20  are 105 East 5th, 422 Congress, and 320 Congress?
21      **MR. CIARDI:**  I believe that's correct, Your Honor.
22  Those were the three in the refinance.
23      Is that right, Mr. Paul?
24      **THE COURT:**  Okay, and then -- and which property is
25  associated with the inspection report?

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Redirect / By Mr. Ciardi                53

1    **MR. CIARDI:**  There are two, Your Honor.  The 901 East
2    Cesar Chavez was the --
3    **THE COURT:**  Yeah.
4    **MR. CIARDI:**  -- Building Standards Order and 422 --
5    **THE COURT:**  Right.
6    **MR. CIARDI:**  -- East Congress was the inspection
7    report.
8    **THE COURT:**  Okay, thank you.
9    **MR. CIARDI:**  I believe that's Lenders' Exhibit O.
10   **THE COURT:**  Okay, thank you.  Go ahead.
11   **BY MR. CIARDI:**
12   Q    So, Mr. Paul, did you -- were you or anybody from your
13   company present when the Secured Creditor did the inspection at
14   the property?
15   A    No.  We weren't aware that was happening.
16   Q    Okay.  Are you -- have you since seen the report which is
17   dated March 29?
18   A    Yes.
19   Q    Okay.  Have you looked at the report and are you aware of
20   the issues that have been identified?
21   A    Yes.
22   Q    Okay.  Is there a reason these issues -- first of all, is
23   the property currently occupied?
24   A    You have the second floor is occupied.
25   Q    Okay.  And is that tenant paying rent?

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                55

1    that it's not affecting other tenant space.
2    Q    Okay.  The other two properties, 103-105 and 320 Congress,
3    those -- are there any inspection or construction-related
4    issues on either of those two properties?
5    A    Well, one of the -- the answer is "No" to that.  One other
6    thing, Mr. Ciardi, I wanted to mention -- I did instruct our
7    team yesterday to follow up on the report that the secured
8    lender did submit with the goal that I instructed them, whether
9    the Court required it or not, that -- to provide an update to
10   those asterisks that we would -- to the secured lender within
11   the next ten days.
12   Q    Okay.  With regard to all three of the refinanced
13   properties -- and as opposed to using numbers and addresses,
14   let's just call it's the "refinanced properties."  With regard
15   to those, when was the last time your potential lender
16   inspected any or all of the three properties?
17   A    Last week.
18   Q    Okay.  And before that?
19   A    Multiple times since then.  I don't know the exact total
20   number but I was -- personally visited the properties with the
21   lender last week.
22   Q    Okay.  So last week you were on site at the property, the
23   lender was on site at the property?
24   A    That's correct.
25   Q    In the -- when did discussions begin with this potential

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                54

1    A    I believe so.
2    Q    Okay.  What is the plan with regard to either -- repair
3    of the property or the remedying of the situation that's laid
4    out in either the Louderback report or any of the City or
5    other related inspection issues related to 6
6    422 Congress?
7    A    So Impact Fire is on site today to remedy any of the
8    outstanding fire system issues with the fire marshal with the
9    City of Austin's Fire Department.  It's my understanding that's
10   going to be completed today.
11        A lot of the other issues I saw that were listed in
12   that report relate to any debris or certain repairs that were
13   kind of -- that had started or damage that was started that was
14   held off at the request of our insurer.  They said keep that
15   stuff on site until we can get an adjuster there.  Candidly,
16   it's been 45 days since the freeze started, they're all running
17   behind.  I believe he did get to the property yesterday and so
18   the vast majority of that stuff has been removed so it's no
19   longer there.  We had to keep it there in order to have the
20   insurance company see the issues.  If we have it all fixed and
21   done, they'll say, well, it's already fixed and completed, we
22   won't be able to, you know, finalize our claim there.
23        There are still some other issues I saw in that
24   report that I'm having our team address and it's our goal to
25   make sure that the building is, you know, fully compliant and

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                56

1    lender?
2    A    It's been maybe a month or so before.  It's been at least
3    a month.
4    Q    Okay.  Have you provided -- well, let me rephrase that.
5    What have you provided in the nature of valuations, appraisals
6    or other similar value data to the lender?
7    A    We've provided a full suite of due diligence, property-
8    related data, any valuation data, anything they've requested.
9    We've fully provided everything.
10   Q    Okay.  And assuming this refinance goes through, what is
11   the Debtors' ultimate intentions with each of these three
12   properties and how will that impact your ability to repay that
13   lender?
14   A    Well, the properties when leased produced more than
15   sufficient cash flow.  For example, the Parker Restaurant Group
16   LOI that we discussed earlier produces about 1.275 million
17   annually in net income just for 422 Congress.  As leased, 320
18   Congress would produce about 750,000 in net income when we
19   finalized that last space with Home Story.  And for the
20   Phillips building as leased, it'll produce, let's say, 850,000
21   in net income.  So collectively between the three properties on
22   an as-lease basis, you're approaching 3 million in net income.
23   Q    Okay.  Now, you were asked -- or you testified that you
24   believed net proceeds would be approximately $35 million.  Do
25   you remember testifying to that on cross examination?

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Redirect / By Mr. Ciardi                    57

1   A    That is correct.

2   Q    Okay.  Is gross proceeds a somewhat higher number?

3   A    Yes.

4   Q    Okay.  And what number have you been using as gross

5   proceeds?

6   A    Well, that number has fluctuated a little bit depending on

7   if we're including certain TI or you name it.  The way we've

8   looked at doing it is a future funding so that it would be

9   added on to the loan as, yes, you have a successful lease.  So

10  that way, that gives us as the Debtor on a go-forward basis

11  after this bankruptcy the flexibility to flex it up because,

12  obviously, the value will increase as those are achieved.

13  Q    Let me rephrase the question.  If you exclude future

14  fundings in PI work, that never is going to --

15  A    Okay.

16  Q    -- let's assume that doesn't happen.  You just go to a

17  closing April 30th.  What are you using in your mind as gross

18  proceeds to get to net proceeds?

19  A    Sure.  Probably about -- probably maybe 2 percent above

20  that 35.7 or so.

21  Q    Okay.  And has there been a loan-to-value or some other

22  mechanism that has been discussed to create this gross or net

23  proceeds number?

24  A    There's not a stip on there as far as a stipulation.

25  That's obviously where the lender, in their own value, feels

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    59

1   A    Yes, that's a potential lease on that property, correct.

2   Q    A lease on that property, okay.  So is that lease still

3   being negotiated?

4   A    There's multiple groups who we've been negotiating.  It's

5   not been finalized yet.

6   Q    Okay.  When is the plan to finalize that lease?

7   A    As soon as possible.

8   Q    All right.  Now, that lease -- will that lease -- is there

9   an intention to use that lease to generate some other form of

10  funding so that by June 30th, proceeds can be paid to the

11  lender?

12  A    Yes, the plan would be -- upon that lease, it would the

13  sale or refi of that asset.  That would -- we'd expect based on

14  where the NOI flips shake out, that one would produce at least

15  probably 5 to 6 million in proceeds on a refinance and

16  probably even more on a sale.

17  Q    Okay.  And when you say that you've looked at that for a

18  refi or sale, is the existing -- is the potential refi lender

19  on the three refi properties looking at that property or is it

20  somebody else?

21  A    We have several people who we've had looking and exploring

22  that.  I mean, that refi lender may be.  I wouldn't want to

23  tell the Court that that one is part of that same or at that

24  same stage because it's not, candidly.  Do I believe we can get

25  that sold or refinanced by June 30th?  Absolutely.  By April

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    58

1   comfortable where their position would be.

2   Q    Okay.  So those three properties, it is your testimony,

3   would generate net proceeds for this lender of approximately 35

4   million?

5   A    That's correct.

6   Q    Okay.  And your level of confidence that closing by

7   April 30th is what?

8   A    Very, very high.  I feel extremely confident that will

9   close on or before April 30th.

10  Q    Okay.

11  A    We are incentivized to get it done sooner.

12  Q    Okay.  All right.  Let's now go down the list of some

13  of the other property and what will happen under the plan and

14  also where that all fits into this by-June-30th deadline.  So

15  let's talk about 1212.

16  A    Okay.

17  Q    What is the plan as it sits right now with 1212?  You were

18  asked questions regarding, I believe, a sale of that property

19  by your cross examination.

20       I'm sorry.  Could you say it one more time?

21  Q    1212.

22  A    Yes.

23  Q    You were asked questions regarding a potential sale of

24  that property, I believe, in your cross examination; is that

25  correct?

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    60

1   30th, probably not.  We haven't pushed that one further enough

2   along yet.  But, look, it's an incredibly located property with

3   whatever route we went on that.  If we -- we're able to close

4   four or five of these -- of the eight as we've outlined,

5   that'll more than pay the entire claim.

6   Q    Okay.  805-809 East Sixth, what is the plan for those --

7   that property?

8   A    The plan on that one will be to complete the sale that

9   we've been working on --

10  Q    Okay.

11  A    -- as I've mentioned in cross.

12  Q    And who is that with?

13  A    That's with the neighboring property owner and that goal

14  would be to hopefully have that closed as soon as possible but

15  definitely before June 30th.

16  Q    Okay.  And this -- the gross sale -- or the net sale

17  proceeds from that sale would be?

18  A    It's -- the sale price is 3 million.  So your net would be

19  probably right around 2.9.  There's no broker.

20  Q    And would that close before June 30th?

21  A    Yes.

22  Q    Okay.  And the adjacent property owner owns how much of

23  the adjacent property?  Is it one parcel, parcels around it --

24  A    One parcel --

25  Q    -- what is their situation?

EXCEPTIONAL REPORTING SERVICES, INC

Paul - Redirect / By Mr. Ciardi                    61

1 A    We've been in active discussion with them.

2 Q    Okay.  And is this property one that will be rehabbed by

3 somebody, torn down?  Is it a land sale, is it -- what is the

4 end game with this?

5 A    I'd have to defer to the buyer on what they want to do.  I

6 guess they'll redevelop it.

7 Q    Okay.  So then taking a look at 9005 Mountain Ridge --

8 A    Yes.

9 Q    -- what is the plan with that?

10 A    That's a -- most likely will be a sale.  We've -- as we've

11 -- as I testified to Ms. Green, there's a user we've been

12 working with but that's just one.  We've had -- after our

13 December hearing, we've had a significant number of showings

14 and interest in that property and I fully expect we'll be in a

15 position to close that one prior to June 30th.

16 Q    Okay.  And do you believe the sale will be at or close to

17 the appraised value?

18 A    Yes.

19 Q    Okay.  Do you have an idea of what the appraised value was

20 of that?

21 A    Well, I think it'll be similar to what we disclosed where

22 we thought the purchase price would be in our last hearing.

23 But I want to make sure just to -- everyone is kind of clear on

24 that.  These are all in tow but they're not all necessary to

25 repay the debt because if we had just closed the other ones, we

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    63

1 Q    And will you anticipate that closing by June 30th or would

2 that be outside of the -- that window?

3 A    That'll be before June 30th.

4 Q    Okay.  Now, you had a -- I think you've referenced this,

5 that there is a letter of intent with regard to the Parker

6 Restaurant Group?

7 A    Yes.

8 Q    Okay.  How long has that been pending or negotiated?

9 A    We've been negotiating with them for the last couple

10 months.

11 Q    Okay.  And there was and who is handling those

12 negotiations, you or somebody else?

13 A    From -- I mean, from -- we have multiple people on our

14 team who work with multiple people on their team depending on

15 what the need is whether it's for access to the space or

16 through the different options of the different suites they

17 would occupy but the end decision-maker and negotiator is

18 myself.

19 Q    Sir, if you reach your goal of getting this

20 refinance concluded -- strike that.

21        Sir, you're well aware of the conditions that were

22 put in your plan, the timing and the amounts that need to be

23 paid?

24 A    Yes, I'm well aware.

25 Q    Okay, and you're well aware of what happens if you don't

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    62

1 would already be there but if this one happens during that

2 timeframe, that's great as well.

3 Q    Okay.  So what did you think this one will be in

4 generating of proceeds?

5 A    Six and a half million.

6 Q    Sir, if you did the refinance transaction, 901 East Cesar

7 Chavez and 9005, do you have enough funding to pay all of the

8 amounts due to the lender?

9 A    I believe so.

10 Q    Okay.  Now, there was a question regarding the amount of

11 the lenders' claim.  If the lenders' claim is as high as

12 $49 million, do you have enough with these three properties to

13 satisfy that debt?

14 A    Seventy-five plus six and a half is forty-one and a half

15 plus six and a half is forty-eight plus the three -- fifty-one,

16 yes.

17 Q    Okay.  And that would be --

18 A    And we'd still -- with -- and we'd still own 1212 East

19 Sixth, Hirshfeld and one of the other properties as well.

20 Q    Okay.  Now, we haven't gotten to Hirshfeld yet.  What is

21 the plan with regard to Hirshfeld?

22 A    The plan is still to close the refinancing on that one.

23 With proceeds, that'll be north of 5 million.  It's not signed

24 yet which is why I didn't include it.  But I would say that is

25 pretty far along.

EXCEPTIONAL REPORTING SERVICES, INC

---

Paul - Redirect / By Mr. Ciardi                    64

1 meet those deadlines, correct?

2 A    Absolutely.

3 Q    All right.  And your confidence on the ability to do that

4 given the things that we've discussed today is what?

5 A    It's very high.  I do not want to be in front of Judge

6 Davis telling him I didn't accomplish what I was going to do.

7 So I will -- this will get done, yes.

8 Q    Okay.  And if you are able to satisfy the secured lender

9 by June 30th, what happens with the other unsecured creditors

10 of the Debtor?

11 A    We -- our plan would call for them all being paid in full.

12 Q    Okay.  And how about the claims of the taxing authorities?

13 A    That as well.  That's addressed in our plan.

14 Q    Okay.  And if you are unable to -- or if the plan is not

15 confirmed and the lender is able to take these properties to

16 sell in the next 30 days, what will happen to the unsecured

17 creditors and/or the taxing authorities?

18 A    They would not be paid.

19 Q    Okay.

20        MR. CIARDI:  Your Honor, I have no further questions

21 of Mr. Paul.

22        THE COURT:  Okay.  Let's take a less-than-10-minute

23 recess.  Let's try to get back on at 10:35.

24        MR. SPEAKER:  Understood, Your Honor.

25        (A recess is taken from 10:26 a.m. to 10:36 a.m.)

EXCEPTIONAL REPORTING SERVICES, INC

**Page 65**

```
1        THE COURT:  Okay.  Mr. Ciardi, who's your next
2   witness?
3        (No audible response)
4        We're not hearing you.
5        MR. CIARDI:  Can you hear me now, Your Honor?
6        THE COURT:  Yes.
7        MR. CIARDI:  I apologize.
8        The -- I would like to move in the exhibits that were
9   excluded as they have now all been testified to and
10  authenticated.  And I'm not saying you excluded them, Your
11  Honor, but they were not admitted early on, as now Mr. Paul has
12  testified with regard to each one of those and authenticated
13  them.
14       THE COURT:  Yeah, I think I admitted 10.  What are
15  the other exhibits?
16       MR. CIARDI:  I believe it were the term sheets, Your
17  Honor.  That would have been 27 through 32.  I don't think I
18  wrote down all the numbers.  Your Honor admitted all but about
19  five or six of the exhibits.
20       MS. BOYDSTON:  Your Honor, this is Liz Boydston.  It
21  was Exhibits 27 through 30 and 32 through 33.
22       MR. CIARDI:  So it would be those which I believe we
23  had testimony on, on each of those, Your Honor.
24       THE COURT:  Twenty seven through 30 and --
25       MS. BOYDSTON:  Thirty was not testified to.
```
EXCEPTIONAL REPORTING SERVICES, INC

**Page 67**

Moshtaghi - Direct / By Mr. Ciardi

```
1              DIRECT EXAMINATION
2   BY MR. CIARDI:
3   Q   Mr. Moshtaghi, isn't it true that you are the principal or
4   the manager of the lender in this case, ATX Debt Fund?
5   A   Correct, I'm the asset manager.
6   Q   Isn't it also true that ATX Debt Fund purchased this debt
7   at or around the par amount of the debt from Ladder Financial
8   -- Ladder Capital?
9   A   I don't know.
10  Q   You don't know what your company purchased the debt for?
11  A   No.
12  Q   Who in the company would know that, sir?
13  A   In my company, nobody.
14  Q   Who do you talk to, sir?
15  A   I was retained by Gibson Dunn Law Firm to asset manage the
16  position on behalf of ATX Debt Fund.
17  Q   Who do you communicate with at ATX Debt Fund?
18       MS. BOYDSTON:  Objection, Your Honor.  This is yet
19  just another way for the debtors to ask one again what this
20  Court has already said does not have to be disclosed.  It's
21  come up three times already.
22       MR. CIARDI:  Your Honor, if I could respond?
23       THE COURT:  Please do.
24       MR. CIARDI:  Okay.  Your Honor, Mr. Moshtaghi is
25  allegedly the party in charge of the lenders' positions here
```
EXCEPTIONAL REPORTING SERVICES, INC

**Page 66**

```
1        THE COURT:  -- thirty one -- I'm sorry?
2        MS. BOYDSTON:  Thirty is the one that hasn't been
3   testified to yet.
4        THE COURT:  Okay, 31 -- okay so 27, 28 and 29 are
5   admitted, as are -- I'm going to admit 31 if I haven't already
6   and 32 and 33 are admitted.
7        (Debtors' Exhibits Number 27 through 29 and 31 through 33
8   were received in evidence)
9        MR. CIARDI:  And so then would just leave I think 30
10  then, Your Honor.
11       THE COURT:  Correct.
12       MR. CIARDI:  And Your Honor, our next witness would
13  be Mr. Moshtaghi.
14       THE COURT:  Is Mr. Moshtaghi on?
15       MR. CIARDI:  Yes.
16       MR. MOSHTAGHI:  I'm on.
17       THE COURT:  There you are.
18       MR. MOSHTAGHI:  Hi.
19       THE COURT:  Would you please raise your right hand.
20       NAVID MOSHTAGHI, DEBTORS' WITNESS, SWORN
21       THE COURT:  Okay.  Go ahead, Mr. Ciardi.
22       MR. CIARDI:  Thank you, Your Honor.
23  //
24  //
25  //
```
EXCEPTIONAL REPORTING SERVICES, INC

**Page 68**

Moshtaghi - Direct / By Mr. Ciardi

```
1   today.  This debt was publicly stated to have been purchased
2   for par value by ATX Debt Fund by the people at Ladder Capital.
3   While at the same time, Ladder Capital and now ATX Debt Fund is
4   saying that the lender is under secured by almost 15 million
5   dollars.  That is a contradiction and that isn't in good faith.
6   And I think we're entitled to explore that, especially since
7   Your Honor hasn't finally ruled on valuation and it would go
8   towards that value.  No rational person would pay 49 million
9   dollars or par for something worth 33 and --
10       MS. BOYDSTON:  Your Honor, may I respond?
11       MR. CIARDI:  -- the manager should know that.
12       THE COURT:  Yeah, I don't know what "par" means but
13  the objection is overruled.
14       MS. BOYDSTON:  Your Honor, I would like to respond,
15  please, which is there is no public statement that the debt was
16  purchased at par.  That is an exaggeration; that is a
17  misreading, a mischaracterization of Ladder's financial
18  statement, and that is not the truth.
19       THE COURT:  Again, I don't know what "par" means and
20  I overruled the objection.
21       The witness can answer the question.
22  BY MR. CIARDI:
23  Q   Sir, who do you speak with at ATX Debt Fund 2?
24  A   I interact with Ms. Boydston, I interact with Gibson Dunn
25  Law Firm.
```
EXCEPTIONAL REPORTING SERVICES, INC

Moshtaghi – Direct / By Mr. Ciardi                69

1  Q    Sir, do you ever speak with somebody that's not an
2  attorney but a principal of ATX Debt Fund?
3  A    No, I don't -- I don't -- I'm not even -- I'm not clear on
4  who the principals are.
5  Q    Do you have any position on the value of the properties
6  that secure the loan that you're managing?
7  A    No, I do not.
8  Q    Do you have any position on how much the company, ATX Debt
9  Fund, is currently owed?
10 A    No.
11 Q    Do you have any information at all on anything with regard
12 to the company for which you are the asset manager?
13 A    No.
14 Q    So why are you here today, sir, if you don't have any of
15 this information?
16 A    I was asked to be here.
17 Q    What do you do for ATX Debt Fund?
18 A    I was subpoenaed.
19 Q    What do you do?  What are your services that you do for
20 ATX Debt Fund 2?
21 A    Asset manager.
22 Q    So as asset manager, are you aware of what properties
23 secure the loan?
24 A    Only as it relates to hearing what I'm hearing today, yes.
25 Q    Before today, you weren't aware of the properties that

EXCEPTIONAL REPORTING SERVICES, INC

---

Moshtaghi – Direct / By Mr. Ciardi                71

1  Q    So do you have any position that you can state on behalf
2  of the secured creditor today with regard to any of the factual
3  statements of the secured creditor?  It's underscored, the
4  values of the property, or the amount of the debt.
5  A    I'm aware that there are guarantees outstanding and that's
6  a big part of the claim.
7  Q    Sir, do you have the authority to give the Court today a
8  itemization of the outstanding amount owed to ATX Debt Fund 2?
9  A    No.
10 Q    Do you have any facts that would allow you to give that
11 sort of information to the Court?
12 A    I don't have that with me.
13 Q    So there is nobody present from the secured creditor today
14 that could testify as to the amount that is allegedly owed the
15 secured creditor?
16 A    Well, I can't speak to that but I'm not in a position to
17 do that.
18 Q    Okay.  And are you in any way in a position to testify
19 before the Court as to the lenders' position that it is
20 under-secured?
21 A    No, I'm not in a position to do that.
22        MR. CIARDI:  Your Honor, I have no further questions
23 of witness.
24        MS. BOYDSTON:  Your Honor, this is Liz Boydston for
25 the noteholder.

EXCEPTIONAL REPORTING SERVICES, INC

---

Moshtaghi – Direct / By Mr. Ciardi                70

1  secure the loan to ATX Debt Fund?
2  A    Prior to today, I do have some high level but, you know,
3  getting up to speed on the details, frankly.
4  Q    So you've had this -- you've been the manager of this
5  property for the last 90 days.  You're not up to speed on the
6  properties that secure the debt?
7  A    Not entirely.
8  Q    And you speak with nobody that is a principal of ATX Debt
9  Fund 2 with regard to the position being expressed today by
10 that entity of the lender?
11 A    That's correct.
12 Q    And are you -- do you have a contract with ATX Debt Fund?
13 A    I do.
14 Q    Okay.  And who signed that contract on behalf of ATX Debt
15 Fund?
16 A    I'm the King.  I did.
17 Q    On behalf of the person you work for, who hired you?
18 A    Again, I was engaged by Gibson Dunn and I executed the
19 contract on behalf of ATX (glitch in audio) authorized agent.
20 Q    So are you the person on behalf of ATX Debt Fund that
21 gives instructions to counsel about positions to take in court
22 or is that somebody else?
23 A    That's certainly not me.
24 Q    That's not you.
25 A    No.

EXCEPTIONAL REPORTING SERVICES, INC

---

72

1        THE COURT:  You have questions?
2        MS. BOYDSTON:  No, Your Honor, I don't.
3        THE COURT:  Okay.  Well, how did this witness come to
4  be?
5        MS. BOYDSTON:  He was subpoenaed, Your Honor, by
6  Mr. Ciardi.
7        THE COURT:  Why was he subpoenaed?
8        MR. CIARDI:  Your Honor, we subpoenaed him, Your
9  Honor, for the issue of valuation versus debt.  He's been the
10 only person at ATX Debt, at the lender, that we've been made
11 aware of that could testify as to any facts.  So that's all --
12 that's the only person we've ever been able to -- I want to say
13 -- "latch on to" is not the right word but that's the only
14 identified person that allegedly had knowledge or the ability
15 to speak on behalf of the secured creditor and now we know he
16 has nothing.
17        THE COURT:  Okay (glitch in audio) know that.  Who's
18 your next witness?
19        MR. CIARDI:  Your Honor, that would be our last
20 witness.
21        THE COURT:  Okay.  Ms. Boydston, who's your first
22 witness?
23        MS. BOYDSTON:  My first witness, Your Honor, is
24 Dustin Louderback.
25        THE COURT:  How much testimony do you have from this

EXCEPTIONAL REPORTING SERVICES, INC

Unofficial copy Travis Co. District Clerk Velva L. Price

---

Louderback - Cross / By Mr. Ciardi                    73

1  witness?

2          MS. BOYDSTON:  Well, Your Honor, if Mr. Louderback is

3  willing to testify about the inspection that he did on Monday

4  of 422 Congress.  That is the extent of his testimony.  He can

5  testify to everything that's in his inspection and all the

6  photos.  He can walk us through that and that would be the

7  extent because that's the only reason that he went to the

8  property was to do an inspection.

9          THE COURT:  Has he produced a report?  Is this

10  Exhibit O?

11          MS. BOYDSTON:  Yes, Your Honor, it is.

12          THE COURT:  Okay.  Well, then, Mr. Ciardi, you can

13  begin examining Mr. Louderback on Exhibit O.

14          MR. CIARDI:  Thank you, Your Honor.

15                    CROSS EXAMINATION

16  BY MR. CIARDI:

17  Q    Mr. Louderback, what brought you, if you can to --

18          THE COURT:  Oh, hang on, hang on.  Sorry.

19          Mr. Louderback, can you hear me?

20      (No audible response)

21          MS. BOYDSTON:  Mr. Louderback, you may need to click

22  on the unmute on your screen as well, even though you're on the

23  phone.

24          MR. LOUDERBACK:  Got it.  Is that better?

25          MS. BOYDSTON:  Yes.

EXCEPTIONAL REPORTING SERVICES, INC

---

Louderback - Cross / By Mr. Ciardi                    75

1  A    I personally did not.

2  Q    Okay.  Who do you understand reached out to the owner for

3  access to the property?

4  A    I assume Polsinelli.

5  Q    Okay.  And when you were at the property, when you were

6  not in the public area, in the Shiner's Saloon, who escorted

7  you around the building?

8  A    It was the current tenant of Shiner's Saloon, David -- and

9  I'm forgetting his last name.

10  Q    Okay.  And how did you identify yourself to David?

11  A    I was introduced via text, I believe, from Liz.

12  Q    From whom?

13  A    Liz with Polsinelli.

14  Q    To -- directly to the tenant?

15  A    Correct.

16  Q    Okay.  And what was the nature of the text message to --

17  from Ms. Boydston to the individual at Shiner's Saloon?

18  A    I don't recollect exactly what the conversation was; it

19  may have been an email.  It happened late last week was when I

20  was introduced and I just met him outside the building.

21  Q    Okay.  And did you understand who he was representing or

22  involved with?

23  A    He -- I was just introduced to him to get access to the

24  building and discuss some of the issues.

25  Q    Okay.  And did you have discussions with him?

EXCEPTIONAL REPORTING SERVICES, INC

---

Louderback - Cross / By Mr. Ciardi                    74

1          THE COURT:  We can hear and see you.

2          Please raise your right hand.

3      DUSTIN LOUDERBACK, CREDITORS' WITNESS, SWORN

4          THE COURT:  Okay.  And does the Inspection Report

5  that appears as Lenders' Exhibit O with your name at the top,

6  reflect your findings based on an inspection of the property

7  indicated?

8          THE WITNESS:  Yes.

9          THE COURT:  Is it accurate?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  Go ahead, Mr. Ciardi.

12                CROSS EXAMINATION (RESUMED)

13  BY MR. CIARDI:

14  Q    Mr. Louderback, how were you contacted and by whom to

15  perform this report, Exhibit O?

16  A    I was contacted by Polsinelli, Liz was the one that

17  reached out to me.

18  Q    Okay.  And what were your duties to be, sir?

19  A    She asked me to go in and inspect the building and no

20  other, really, direction, just to go in and inspect the current

21  state of the building.

22  Q    Okay.  And did you know on whose behalf you were doing

23  that, other than Ms. Boydston's?

24  A    No, I did not.

25  Q    Did you reach out to the owner for access to the property?

EXCEPTIONAL REPORTING SERVICES, INC

---

Louderback - Cross / By Mr. Ciardi                    76

1  A    I did.

2  Q    Are those discussions in this report?

3  A    Some of them are.  He was, I believe, is also part of this

4  so I took notes based on what I saw and some of our discussions

5  about what led to the maintenance issues.

6  Q    When you say he's "part of this," what do you mean by

7  that?

8  A    I think he's going to be testifying.  I'm not sure

9  exactly.

10  Q    And how would you know that he might be testifying?

11  A    Just in talking to him on the property.

12  Q    Okay.  And what did he say to you?

13  A    He said that he -- I think he said he had been asked

14  to testify.

15  Q    By whom?

16  A    By Polsinelli.

17  Q    Okay.  And did he say why he was being asked to testify?

18  A    He's been a tenant there -- and I can't speak for him but

19  he's been a tenant there since -- for 13 years now.  So he's

20  been living with the maintenance issues of the building.

21  Q    Okay.  And in your report -- how long were you at the

22  property?

23  A    I was at the property for approximately an hour and a

24  half, 9:00 a.m. on Monday the 29th.

25  Q    Okay.  And at any point in time did you think it would

EXCEPTIONAL REPORTING SERVICES, INC

### Panel 1 (Page 77)

Louderback - Cross / By Mr. Ciardi                77

1  have been appropriate to reach out to the owner of the property
2  to tell them that you would be present?
3  A   I did not.  I was just acting on behalf of my client.
4  Q   At any point in time did you think it would have been
5  appropriate to get permission to go to areas that were not
6  Shiner's Saloon?
7  A   I was just going -- I was just doing an inspection based
8  on what my client told me to do.
9  Q   Okay.  Did your client own the property, sir?  Did you
10 know that before you went in there?
11 A   No.  I knew that they represented a specific client but
12 I've just been dealing with Polsinelli.
13 Q   Okay.  So you didn't know under what authority you were
14 given to walk through non-public areas of a building?
15 A   Correct.
16 Q   But you did it anyway.
17 A   Because I was hired to do so and let in by the tenant.
18 Q   And did the tenant -- does the tenant lease all of the
19 areas that you were in?  Did you know that?
20 A   I don't -- I don't have an answer for that.
21 Q   Did you have a copy of the lease before you made an
22 understanding in your head that this person was actually the
23 tenant?
24 A   Did not.
25 Q   Do you know that this person that you met there was

EXCEPTIONAL REPORTING SERVICES, INC

### Panel 2 (Page 79)

Louderback - Cross / By Mr. Ciardi                79

1  the reader know that the roof or the plexiglass issues occurred
2  before or after the February storm?
3  A   I do not know when that happened.  I wasn't in the
4  building prior to the storm so I do not know.
5  Q   Okay.  So you don't have any ability to affirmatively say
6  yes or no that any of these things were in existence before the
7  date of your inspection.
8  A   This -- you would have to go through item by item.  This
9  issue I can't.  There are several other issues in the building
10 that I can say from experience and knowledge that have been
11 ongoing for several years?
12 Q   Okay.
13 A   And I can point to those if you like.
14 Q   Okay.  My question again though, sir, is, you don't have
15 any other -- mean, you don't have any pictures that you can
16 compare these pictures to, to see what conditions were in the
17 past, correct?
18 A   That's correct.
19 Q   Okay.  And to the extent there was an insurance claim as a
20 result of damage, the adjuster would want to see all the
21 damage, correct?
22 A   I can't answer that.
23 Q   Have you done inspections, sir, for insurance companies?
24 A   I've done inspections before, not for insurance companies
25 though.

EXCEPTIONAL REPORTING SERVICES, INC

### Panel 3 (Page 78)

Louderback - Cross / By Mr. Ciardi                78

1  actually the tenant?
2  A   I assume he was since he had access to the building.
3  Q   But you also had access to the building, sir, correct?
4  A   Well I did because he had keys to get in.
5  Q   Okay.  And at any point in time did --
6         MS. BOYDSTON:  Your Honor, I'm going to object.  What
7  is the relevance of this?  I mean --
8         THE COURT:  Yeah, sustained.
9  BY MR. CIARDI:
10 Q   Sir, at any point in time --
11        THE COURT:  I can't see the problem (glitch in
12 audio), Mr. Ciardi, the client let him in.
13 Q   Mr. Louderback, any point in time did you get to an
14 understanding of whether there was any insurance or other claim
15 issues related to this property?
16 A   No, I was strictly asked to do an inspection.
17 Q   Okay.  Were you given any information as to what may have
18 been the cause of any of the problems at the property?
19 A   It was initially discussed that there were -- with the
20 winter storm that happened in February, that some of the
21 maintenance issues were caused by that.  But in doing the
22 inspection, these issues had been ongoing for years.
23 Q   Okay.  So looking at your report right now, I am at the
24 pages on the roof and I see the first pictures of the roof.
25        Tell me what facts are in your report that would let

EXCEPTIONAL REPORTING SERVICES, INC

### Panel 4 (Page 80)

Louderback - Cross / By Mr. Ciardi                80

1  Q   Okay.  And you at no point in time asked any of the owners
2  why some of the repairs had not been made.
3  A   No.  I wasn't in contact with the owner that day.
4  Q   Okay.  And you do not include a budget for what it would
5  cost to make any of the repairs, correct?
6  A   I do not.
7  Q   Okay.  And you don't include a timeline on how long it
8  would take to make the repairs that were identified in your
9  report?
10 A   No, I did not.  And I was, again, just asked to inspect
11 and provide a report.
12 Q   Okay.  Are you a licensed fire alarm inspector, sir?
13 A   I am not; I'm a licensed architect.
14 Q   Okay.  Are you an engineer?
15 A   I am not.
16 Q   Okay.  So your experience is as an architect.  You are not
17 somebody that can or has been qualified by the City or any
18 licensing agency to speak as to the defects or lack of defects
19 of a fire alarm.
20 A   I don't think you need to be an expert to know that there
21 are troubles on the fire alarm panel and the main part of an
22 alarm panel is open with dust and debris on it.
23 Q   Okay.  Sir, but you've never installed a fire alarm,
24 correct, in a commercial building?
25 A   Myself, no, I have not.

EXCEPTIONAL REPORTING SERVICES, INC

---

**Louderback - Cross / By Mr. Ciardi**                               81

1  Q   Okay.  You've never inspected one on behalf of the City,
2  correct?
3  A   Correct.
4  Q   You've never inspected one on behalf of any insuring
5  agency, correct?
6  A   Correct.
7  Q   None of your experience is that of somebody that would
8  either install, manage, or inspect fire alarms or sprinkler
9  systems, correct?
10  A   Correct.
11  Q   So your observations are those of somebody walking through
12  the property, but not as a fire alarm and/or sprinkler expert;
13  is that also correct?
14  A   That's correct.  However, I am a licensed architect, which
15  is, in this particular case -- again, I don't think it needs an
16  ex -- fire alarm expert or sprinkler expert to comment on
17  corrosion of pipe.
18       MR. CIARDI:  Your Honor, I have no further questions
19  of the witness.
20       THE COURT:  Okay.
21       MS. BOYDSTON:  Your Honor, redirect?
22       THE COURT:  Sure, briefly.
23       MS. BOYDSTON:  Briefly.
24  //
25  //

EXCEPTIONAL REPORTING SERVICES, INC

---

**Louderback - Redirect / By Ms. Boydston**                          83

1  A   -- answered your question exactly or not.
2  Q   And did you learn, from Mr. (Indisc.) -- I'm probably
3  going to pronounce his name wrong -- that the Fire Marshal had
4  been there and had given a report?
5  A   Yes.
6       MR. CIARDI:  Objection; hearsay.
7       THE COURT:  Sustained.
8  BY MS. BOYDSTON:
9  Q   In your experience and your -- how many years of
10  experience do you have in construction and architecture?
11  A   Sixteen years.
12  Q   In your 16 years of experience, have you inspected fire
13  alarm systems as part of you inspection?
14  A   I have inspected on a high level, yes.
15  Q   Was this high level?
16  A   Yes.
17  Q   And the ceiling leaks that you inspected, were those
18  caused by the storm?
19       MR. CIARDI:  Objection, Your Honor.  No foundation.
20       THE COURT:  I think he could probably answer that.
21       THE WITNESS:  In my experience, the winter condition
22  -- the winter event probably made the matters worse.  But this
23  is -- and in seeing the flooring and ceiling system, this has
24  been an ongoing maintenance problem for years.
25  //

EXCEPTIONAL REPORTING SERVICES, INC

---

**Louderback - Redirect / By Ms. Boydston**                          

1            REDIRECT EXAMINATION
2  BY MS. BOYDSTON:
3  Q   Mr. Louderback, on cross-examination, you were asked about
4  your discussions with the tenant.
5      Can you describe for the Court what those discussions were
6  about his experience with the roof leaking and the fire alarm
7  system?
8       MR. CIARDI:  Objection; hearsay, Your Honor.
9       THE COURT:  Sustained.
10       MS. BOYDSTON:  He asked about it on cross-
11  examination.  It's exactly what he asked about.  He literally
12  asked about what the conversation was.
13       MR. CIARDI:  I asked about access, Your Honor.  I did
14  not ask about what they were talking about.
15       MS. BOYDSTON:  You absolutely did ask about what they
16  were -- they were talking about.
17       THE COURT:  Sustained.
18  BY MS. BOYDSTON:
19  Q   Mr. Louderback, when you went to the building, was the --
20  did you know about the fire -- excuse me.  From your
21  conversations with the tenant, did you learn about the fire
22  alarm issues through this -- with the City Fire Marshal?
23  A   I learned about the fire alarm issues by him showing me
24  the physical panels.  I don't know if that --
25  Q   And did --

EXCEPTIONAL REPORTING SERVICES, INC

---

**Louderback - Redirect / By Ms. Boydston**                          84

1  BY MS. BOYDSTON:
2  Q   What do you mean by "the ceiling system"?
3  A   So the top level is an outdoor bar.  And it's exposed to,
4  essentially, the elements.  But it also serves as a ceiling
5  system for the space underneath; the occupied space beneath.
6      So if water -- when the water hits that roof and goes to
7  the visible cracks, it goes into that ceiling and has destroyed
8  the ceiling below.
9  Q   And what did you observe that is being due -- is being
10  done to remedy those leaks?
11  A   There are approximately 20 buckets that are hanging from
12  the ceiling that collect water.
13      There's also been some type of panning system where they
14  literally attach pans to the ceiling to collect the water.  And
15  then someone piped it to a floor drain behind a bar.  I've
16  never seen anything like that.
17  Q   And did you take photos of those buckets?
18  A   I did.
19  Q   And do you know how long those buckets have been there?
20  A   I do not.
21  Q   Did you take photos of the panning system?
22  A   I did.
23  Q   Do you know how long the panning system has been there?
24  A   I do not.  In discussions with the tenant, it's been prior
25  to the winter --

EXCEPTIONAL REPORTING SERVICES, INC

## Page 85

Louderback - Redirect / By Ms. Boydston    85

1    MR. CIARDI:  Objection, Your Honor.  It would be
2  hearsay.
3    THE COURT:  Sustained.
4  BY MS. BOYDSTON:
5  Q   In your opinion of your inspection, is this property
6  habitable?
7    MR. CIARDI:  Objection --
8    THE WITNESS:  It is not.
9    MR. CIARDI:  -- Your Honor; no foundation.
10    THE COURT:  Overruled.
11  BY MS. BOYDSTON:
12  Q   Please answer, in your opinion, from your inspection, is
13  this property habitable?
14  A   It is not.  It has numerous code violations.  It's unsafe
15  for the public, in my opinion.  And if there were a fire event,
16  there's not the systems in place to notify the fire department
17  and safely evac occupants.
18    MS. BOYDSTON:  Thank you, Your Honor.  I pass the
19  witness.
20    MR. CIARDI:  No re-cross, Your Honor.
21    THE COURT:  I'm sorry, what?
22    MR. CIARDI:  I said, "No re-cross."  I didn't know if
23  you were going to give me the opportunity, but I just wanted to
24  be clear.
25    THE COURT:  Okay, thank you.

EXCEPTIONAL REPORTING SERVICES, INC

## Page 86

1    Next witness?
2    MS. BOYDSTON:  Your Honor, we subpoenaed Jeremy
3  Stoler.  But I do not see him on today.
4    MR. CIARDI:  Your Honor, Mr. Stoler --
5    MS. BOYDSTON:  So we would call --
6    MR. CIARDI:  -- is available.
7    MS. BOYDSTON:  -- Jeremy Stoler.
8    MR. CIARDI:  He's available.  We just had to give him
9  a heads-up because he is at one of the properties, Your Honor.
10  So if we could just get him log on right now, we could get
11  him available for testimony.
12    THE COURT:  Okay.
13    MR. CIARDI:  Could we have just two minutes or so to
14  just get him?
15    THE COURT:  Sure.  Thank you, Your Honor.
16  (Attn. contacting Witness)
17    MR. CIARDI:  Your Honor, they are getting him to log
18  on now.  So it should be any moment.
19    I believe Mr. Stoler is logged in, Your Honor.
20    THE COURT:  Okay.  Mr. Stoler, are you on?
21    THE WITNESS:  Yes, Your Honor.
22    THE COURT:  Okay.  And could you please raise your
23  right hand.
24    Are you logged on, or are you just phoning in?
25    THE WITNESS:  I'm logged on.  Hold on.  Sorry.  Can

EXCEPTIONAL REPORTING SERVICES, INC

## Page 87

Stoler - Direct / By Ms. Green    87

1    you see me now?
2    THE COURT:  Not yet.
3    There we are.  Okay.
4    THE WITNESS:  Sorry about that.
5    JEREMY STOLER, CREDITORS' WITNESS, SWORN
6    THE COURT:  Okay, go ahead, Ms. Boydston.
7    MS. GREEN:  Your Honor, this is Trinitee Green.  I'll
8  be cross-examining Mr. Stoler today.
9    THE COURT:  Okay.
10    DIRECT EXAMINATION
11  BY MS. GREEN:
12  Q   Thank you for joining, Mr. Stoler.  My questioning will be
13  limited to 901 East Cesar Chavez.
14    So I'll just start with confirming that you did testify at
15  a hearing, on March 24th, with respect to this property before
16  the Building and Standards Commission, right?
17  A   I believe that was the date, yes.
18  Q   Okay.  And you were there to answer any questions that
19  they might have regarding the property?
20  A   I was the -- I showed up, as I was the main party on the
21  correspondence.
22  Q   Did anyone else testify at that hearing, other than you,
23  with respect to the property?
24  A   Michael Merrick (phonetic) spoke as well.
25  Q   Okay.  Did you attend the stay-relief hearing, with

EXCEPTIONAL REPORTING SERVICES, INC

## Page 88

Stoler - Direct / By Ms. Green    88

1  respect to these properties and this bankruptcy case, in
2  December of 2020?
3  A   I don't recall.  I don't think so, but I don't know.
4  Q   You don't recall testifying at a stay-relief hearing in
5  these cases?
6  A   I don't recall.
7  Q   Okay.  Do you know that Mr. Paul testified in December, at
8  a stay-relief hearing, that these Debtors would have a purchase
9  and sale agreement finalized on 901 East Cesar Chavez by
10  January 1st?
11  A   I don't recall that.
12  Q   Are you aware of a purchase and sale agreement that was
13  being negotiated and expected to be final by January 1st on
14  this property?
15  A   I'm not aware of all of our tenant purchase and sale
16  agreements that happen.
17  Q   Are you aware of this particular purchase and sale
18  agreement, with this property?
19  A   I don't know if there was one or multiples.  I'm not aware
20  of anything there.
21  Q   Okay.  I'm sorry.  I don't want to keep repeating the
22  question.  But I do want the record to be clear.  And I'll try
23  to rephrase the question.
24    Do you know --
25  A   Sure.

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                89

1  Q    -- if the Debtors are negotiating a sale of this property?
2  A    I know that date has, you know, a lot of conversations.
3  And, you know, there could be some transactions that he's
4  working on that I'm not privy to.
5  Q    Uh-huh.  Can you identify for us the potential purchasers
6  with respect to this property?
7  A    Again, I haven't been involved in those conversations.  So
8  I'm not familiar with the details.
9  Q    Were you asked -- at the board and Building and Standards
10 Commission hearing, were you asked what the Debtors' intentions
11 were with respect to this property?
12 A    I believe they asked what we were doing with the property,
13 yes.
14 Q    And do you recall what your testimony was?
15 A    Yeah.  I believe I would say we were planning to probably
16 release the property.  But the sale is all -- everything in the
17 portfolio is always available for sale.
18      So I believe I said that with respect to the property, and
19 kind of wanting to, you know, fix up the neighborhood.
20      So, yes.  I did say that I believe we said that we would
21 kind of fix up the property and, you know, hope to lease it.
22 Which we could do in conjunction with the sale as well.
23 Q    Okay.  But you didn't actually mention anything about a
24 potential sale at that hearing, did you?
25 A    No, I didn't.  Because it wasn't relevant.  Because, as

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                91

1  that.
2       THE COURT:  He hasn't actually testified that he
3  couldn't recall either.
4       MS. GREEN:  That's true.  But I'd like to --
5  basically, it looks like I'd like to refresh his recollection
6  or impeach the witness, because the representations today do
7  not match what was stated at the hearing on March 24th.
8       THE COURT:  Okay.  So what did he say today?
9       MS. GREEN:  So when asked whether he stated that no
10 lease could be entered into because of the condition of the
11 property, the response today was that he did not say that.  But
12 he said he said that a lease couldn't be entered into because
13 of homelessness.
14      But he actually said --
15      THE COURT:  Okay.  Can you replay that exact part of
16 the hearing?
17      MS. GREEN:  Yes, Your Honor, I can.  It may take me a
18 moment to get it pulled up.  We can come back to that, if you
19 would like or I can do it now.  Okay.
20      THE COURT:  Go ahead and do it now.
21      MS. GREEN:  Okay.  Can everyone see my screen?
22      THE COURT:  It's very small.  But, yes.
23      MS. GREEN:  There's really nothing I can do about
24 that.
25      THE COURT:  Well, we're just listening.

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                90

1  the owner of the party, we're the responsible party to address
2  any concerns with that council and the property right now.
3  Q    It wasn't relevant to the question, "What are the Debtors'
4  intentions with this property?"  If they're intending to sell
5  it, that wasn't relevant?
6  A    No.  It wasn't relevant for the purpose of what we're
7  doing now in addressing the concerns.
8  Q    Do you recall stating that you could not enter into a
9  lease agreement in the current condition of the property?
10 A    I recall saying it was difficult given all the
11 homelessness and issues that were going on.
12      It wasn't the condition of the property.  It was actually
13 since the camping ban was lifted that has caused material
14 issues with the neighborhood.
15 Q    So we can actually replay the video now, if the Court
16 would permit, to refresh your recollection at what was actually
17 stated.
18      MS. GREEN:  Or, if the Court would prefer, I can try
19 to continue the questioning.  But we do have -- I can
20 absolutely represent to the Court what was stated.  But we have
21 the video and the capability of sharing that.
22      THE COURT:  You have a transcript?
23      MS. GREEN:  No.  There's no written transcript.  But
24 we did provide the Court with a link.  And if it would -- if
25 your preference would be to listen to it on your own, we can do

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                92

1       MS. GREEN:  Okay.
2       THE COURT:  Yeah.  Go to what we need to listen to.
3       MS. GREEN:  Okay.  I will play now.
4       (Attorney setting up video)
5       MS. GREEN:  I'm sorry.
6       There we go.
7       Sorry, Your Honor.  I'm trying.  I had it, and then I
8  moved it.
9       (Video playing)
10      "QUESTION:  Would you be able to sign the lease with
11 the building in the condition as it is right now, without a
12 roof?"
13      "ANSWER:  We would need to make those repairs."
14      "QUESTION:  And do you think maybe that" –
15      "ANSWER:  There is a roof.  I think there's a patch
16 that (audio glitch)."
17      MS. GREEN:  Okay.  Did everyone hear that?
18      THE COURT:  Yeah, we heard it.
19 BY MS. GREEN:
20 Q    So, Mr. Stoler, when you were asked whether the Debtor
21 could enter into the lease on this property without -- in the
22 condition that it's in, what was your testimony?
23      MR. CIARDI:  Your Honor, I'm going to object.  That's
24 not what the question of the board was.  It was specifically
25 related to the roof.  So it should be identical to what was

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                     93

1   asked at the board meeting.
2        THE COURT:  Yeah.
3        MS. GREEN:  Okay.
4   BY MS. GREEN:
5   Q    Mr. Stoler --
6        THE COURT:  Sustained.
7   BY MS. GREEN:
8   Q    Mr. Stoler, did you testify that you would need to repair
9   the roof in order to enter into a lease on this property?
10  A    For someone to take occupancy, the roof would need to be
11  repaired.  Yes.
12  Q    Okay.
13  A    Which we're currently doing.
14  Q    And you're currently repairing the roof with which vendor?
15  A    We have consultants out today that I was meeting.  You
16  know, I followed up with the City about the issues that need to
17  be resolved.  So we have them out there to get the permits.
18  Once we get the permits, we can, you know, then move forward to
19  get the work done.
20       So we haven't finalized that since the hearing was late
21  last week and I didn't hear back from the City until early this
22  week.
23  Q    Isn't it true that this case with the City has been open
24  since May 2019?
25  A    I'm not sure how long it's been open.

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                     95

1   property.
2   Q    So if the Debtor is committed to improving the property,
3   then why didn't the Debtor request a work permit?
4   A    I'm not familiar with what was going on from
5        Again, I've been working with the consultants since I was
6   aware of the issue.  And, again, I have heard about this issue
7   for less than two weeks.
8   Q    But isn't it true that you can't do stuff to work on this
9   building without a work permit?
10  A    We have someone today who works with the City regularly to
11  procure those permits.  You're, again, addressing the issues
12  that need to be address.
13       A repair isn't, you know -- doesn't require, necessarily,
14  a permit of repair.
15  Q    I'm sorry.  Can you say that again?
16  A    If you're talking about repairing the roof -- I mean,
17  obviously if you're going to make substantive changes or other
18  things, yes.  But just repairing a roof doesn't necessarily
19  require a permit.
20       We're obviously talking to the people and making sure
21  we're doing everything that needs to, and having conversations
22  with the City.
23  Q    One of the violations was actually that you did not
24  request work permits and were caught having people work at
25  night; isn't that true?

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                     94

1   Q    You've received notices of violations and notices
2   hearings, correct?
3   A    The only notice I received was -- it was two weeks -- two
4   weeks ago today.  And as soon as I got that notice, I reached
5   out to the City.  I didn't hear from anyone until last Monday.
6        I actually requested that the hearing be adjourned, or
7   that this be pulled from the hearings so I could talk to, you
8   know, people about it.  Because this was the first I had
9   actually heard about it.
10  Q    And the ceiling -- or the missing roof, there's currently
11  just plywood with boards across it, right?
12  A    I'm not certain.
13  Q    Okay.  Did the inspector, at the hearing, testify that
14  electrical components are exposed to the weather?
15  A    I don't know what he testified to.
16  Q    Okay.  And the board gave the Debtors 45 days to comply;
17  is that correct?
18  A    Yes ma'am.
19  Q    Okay.  So you did testify that you believed it was the
20  Debtors' responsibility and commitment to improve the property,
21  didn't you?
22  A    I don't recall.
23  Q    Do you believe, sitting here today, that it's the Debtors'
24  responsibility and commitment to improve the property?
25  A    We plan to make all the repairs that are needed at the

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Direct / By Ms. Green                     96

1   A    I am not familiar with what happened there.  The only
2   thing that I was to address was the current state of the
3   building.
4        And, again, I haven't -- I've been trying to speak with
5   the City in more detail.  And we've had conversations and
6   traded e-mails.  So we'll plan to address all of the concerns.
7        And, again, I was there with a permit -- a consulting
8   permit individual to meet with them and, you know, take care of
9   everything.
10  Q    When did you first learn that the building was missing a
11  roof?
12  A    The first time I was aware that there was an issue was
13  when I showed up for the hearing, that there was a roof -- part
14  of the roof missing.
15  Q    So who in management informed and knowledgeable about the
16  state of the building on a regular basis?
17  A    You know, I know Nate goes to the properties.  I go to
18  some of the properties.  But that property goes pretty much,
19  you know, has -- is fenced in.  So I don't really stop by that
20  property frequently.
21       But, again, there is a roof there.  There's just roof
22  repairs that need to be done.
23  Q    And isn't the door that the City built -- hasn't it been
24  torn through so that homeless people can actually enter the
25  building?

EXCEPTIONAL REPORTING SERVICES, INC

---

Stoler - Direct / By Ms. Green                    97

1  A    We have, you know -- and we have this problem,
2  unfortunately, all across Austin (audio glitch) properties is
3  homeless people.  And we have to secure the properties
4  continually.
5       That's just the nature of any vacant properties in the
6  entire city.  So we secure it, the City secures it.  We've
7  signed, you know, releases where the police can just go on the
8  property and address the issues.
9       Unfortunately, when people are camping and allowed to, you
10 know -- it's not to make homelessness a crime.  But there are a
11 lot of bad actors out there.  They break into a lot of
12 properties.  They're camping under the highway; they're camping
13 at the library right there.
14      It's become a big problem in Austin.
15 Q    Is this property near a school or a church?
16 A    I don't believe it's near an active school.  There might
17 be a church nearby.  I know there's a food bank nearby.
18      It's also adjacent -- it's probably less than two blocks
19 from a library.  So it's on par to condition the neighborhood
20 where everyone -- you know, and actually everyone camps at the
21 library -- the homeless people.
22 Q    Okay.  Last question.  You are the person -- you're the
23 person that was presented to answer any questions at the
24 Building and Standards Commissions.
25      So would you say that you're the most knowledgeable about

EXCEPTIONAL REPORTING SERVICES, INC

---

Stoler - Cross / By Mr. Ciardi                    99

1  either consultants or vendors looking at repairing or
2  contracting to repair the property?
3  A    I was there this morning.
4  Q    And in between first getting the notice on the building
5  from the City two-some weeks ago and today, have you or other
6  Debtor representatives been at the property?
7  A    Yes.
8  Q    Okay.  And how many times in between first getting the
9  notice and today has somebody representing the Debtor been at
10 that property?
11 A    It would hard for me to speak for, you know, how many
12 times.  You know, the firm has been there.  I've been there,
13 you know, at least five times.
14 Q    So five times in the last two weeks, you've been there?
15 A    Yes.
16 Q    Okay.  Has the Debtor taken any acts to secure any access
17 points or other things that were needed to be secured prior to
18 today?
19 A    Yes.  I mean, that's a continual ongoing thing.  I mean,
20 you secure the property, and then, you know, people, you know,
21 try to break in again.  So we're always, you know, monitoring
22 the properties for security and trying to make sure that it's,
23 you know, (indisc.).
24 Q    Okay.  So who was at the property today with you, sir, to
25 go through the repairs?

EXCEPTIONAL REPORTING SERVICES, INC

---

Stoler - Cross / By Mr. Ciardi                    98

1  the property?
2  A    I would not say I was the most knowledgeable.  I was the
3  person named, so I showed up.
4  Q    Okay, thank you.
5       MR. CIARDI:  Your Honor?
6       THE COURT:  Cross?
7       MR. CIARDI:  Okay.
8                     CROSS EXAMINATION
9  BY MR. CIARDI:
10 Q    Mr. Stoler, when you -- did the board ask you whether
11 the Debtor would be making the repairs and improvements
12 required by their order?
13 A    You know, I think when I first got on the hearing, we made
14 it very clear that it was our intention to address the issues.
15 You know, we just became aware of them.
16 Q    Okay.  And the first time you became aware of these issues
17 was two weeks ago?
18 A    Yes.  I think it was two weeks before -- two weeks from
19 today.  Yeah.
20      So does the building currently have a roof?
21 A    The building does have a roof, yes.
22 Q    Okay.  So is the issue a patch on the roof, or is it a
23 whole new roof?
24 A    A patch on the roof.
25 Q    When was the last time you were at the property with

EXCEPTIONAL REPORTING SERVICES, INC

---

Stoler - Cross / By Mr. Ciardi                   100

1  A    Sure.  I was there with a City zoning consultant.  His
2  name is Steve -- I don't know his last name offhand, but I
3  could look that up if you'd like.  But, you know, they work
4  with the City a lot to address permitting issues.  And I had
5  Jacob, who is a construction consultant that we worked with.
6  Q    Okay.  And are those two individuals to be providing
7  reports to the Debtor, or are they then to contract -- what is
8  their -- what is their role to be?
9  A    Sure, sure.  So Steve is going to work with us on the
10 permitting process.  He has a lot of familiarity with that.
11      He'll also help us, you know, coordinate, you know, kind
12 of best contractors as well, if needed.  They have a
13 contracting affiliate if we want to use them.  But, you know,
14 depending on the scope of work and the property, they can
15 potentially do the work or, you know, utilize someone else.
16      And Jacob handles, you know -- kind of works with a lot of
17 the maintenance and other construction issues that are kind of
18 more of a captive to World Class.
19 Q    Does the Debtor have the funding to make the repairs
20 needed?
21 A    I believe so, yes.
22 Q    Is the Debtor committed to making the repairs needed?
23 A    Yes.  We want to address these issues in a timely fashion.
24 Q    When you say, "timely fashion," would that be before the
25 expiration of the 45 days?

EXCEPTIONAL REPORTING SERVICES, INC

Stoler - Cross / By Mr. Ciardi                    101

1  A    Yes.  We expect these can be addressed well within the 45
2  days.  But, again, we'll be in constant contact with the City
3  if things are taking longer.
4       You know, obviously, we don't expect there will be any
5  issues here.  But given the freeze that happened, sometimes
6  getting vendors in line -- some of the damage that's going on
7  in market can take a little longer.
8       But, again, I think this can get done in that time.
9  Q    Okay.  Are you -- for the company, are you operations,
10 sales, finance?  Where do you fit in the company World Class?
11 A    I work in finance primarily.  And I tend to address other
12 issues when they appear, or I am named to them.
13 Q    Okay.  Would you always have knowledge of every pending
14 sale transaction for a property in the portfolio?
15 A    I would not.
16 Q    Okay.
17      MR. CIARDI:  No further questions for the witness,
18 Your Honor.
19      THE COURT:  Okay.  Does the lender have any other
20 witnesses?
21      MS. BOYDSTON:  No, Your Honor.
22      THE COURT:  Ms. Boydston?  Okay.
23      MS. BOYDSTON:  No, Your Honor.
24      THE COURT:  You both rest?
25      MR. CIARDI:  We both -- well, the Debtor rests, your

---

                                                  103

1  people.  It's not that much harder to come up with an LOI or an
2  expression of interest and we don't even have that there --
3  here for the most part.
4       And people ask me, what do you mean by
5  "commitment"?  And I mean a signed contract and we can talk
6  about conditions.  We can talk about ordinary conditions or we
7  can talk about due diligence conditions.  We can get into that
8  discussion but it's got to be a signed contract and it's got to
9  be a party that has a credible source of cash.
10      And people have said, well, what do you mean, Judge,
11 by "credible source of cash".  And my answer is, well, you
12 could start with a bank account or an investment statement.
13 That would be credible to me.  And, I mean, that's the level
14 and I've been saying this for eight years, ever since I got on
15 the court and I based on the 30 years' experience prior to
16 that.
17      I learned -- and maybe kind of late in my career,
18 maybe about 20 years in -- that having money in a "good-faith"
19 deposit doesn't mean a whole lot because, amazingly, it's not
20 that hard to come up with a big bunch of money that you park
21 somewhere with no strings attached and so -- anyway, that's
22 kind of what forms my view about this.
23      In December, I listened with interest to Mr. Paul's
24 hopes and projections relating to activities on these
25 properties.  I gave zero value to this testimony for purposes

---

                                                  102

1  Honor.
2       MS. BOYDSTON:  Noteholder rests, Your Honor.
3       THE COURT:  Okay.  We'll be in recess until 1:30.
4       I'm not promising to rule.  But right now, that's my
5  intent.
6       MS. BOYDSTON:  Your Honor, either --
7       THE COURT:  Until then, we're adjourned.
8       MS. BOYDSTON:  -- closing argument?
9       THE COURT:  Pardon?
10      MS. BOYDSTON:  Or at 1:30?
11      THE COURT:  Yeah, yeah.
12      MS. BOYDSTON:  Without closing arguments?
13      THE COURT:  Well, if I decide I want closing
14 arguments, I'll ask for it at that time.
15      MS. BOYDSTON:  Okay, thank you, Your Honor.
16      MR. CIARDI:  Thank you, Your Honor.
17      THE COURT:  We're adjourned.
18      (Proceeding adjourned at 11:30 a.m. and reconvened at
19 1:30 p.m.)
20            R U L I N G
21      THE COURT:  Okay.  This is W Hirshfeld Moore,
22 20-10251, ruling on confirmation and stay-lift.  Mr. Paul has
23 heard me say this before.  I don't know if Mr. Ciardi has but I
24 really need to see a contract.  I need to see a signed
25 commitment.  It's pretty easy to have conversations with

---

                                                  104

1  of the stay-lift motion because there were no signed
2  commitments but I did note that testimony for two reasons.
3       First, if any of those transactions could come to
4  fruition during the first quarter as projected, that would have
5  created a favorable track record that would support a finding
6  of feasibility.  Obviously, that track record has not been
7  established and there are -- as there are today, no signed
8  commitments and, therefore, nothing to support a finding of
9  feasibility.
10      Second, Mr. Paul's success or lack thereof in getting
11 the projected transactions done would have a bearing on value.
12 As it relates to value, the Debtor has not met its burden of
13 proving that there is enough value here alone to support a
14 finding of feasibility.
15      I noted in my more detailed observations about the
16 appraisers earlier but in sum, I thought both, with plural,
17 used appropriate methodology and applied it consistently.  The
18 Debtors' appraiser applied no COVID discount which I think
19 overstated her numbers while the lenders' appraiser attempted
20 to apply a COVID discount but did not apply adequate support to
21 show how he developed and applied his discount.  And the figure
22 arrived at by the lenders' appraiser was really pretty low to
23 be credible in terms of the Austin market, COVID or no COVID.
24      So the number I penciled in after looking at all this
25 information, subject to all the -- how the projected

105

1  transactions came in, was about 45 million.  The lenders' claim

2  as of the petition date was 40,757,000.  I heard a 49-dollar --

3  million-dollar figure today but I saw no proof of that.  But in

4  any event, even 45 million over 41 or 42 million, whatever the

5  number is at these days, is not a lot of equity.

6          At the time I penciled that number in, I told myself

7  that I could believe a higher figure if the projected

8  transactions came through, depending on what numbers were

9  realized in each of the transactions, or a lower number if the

10 transactions did not materialize and they did not materialize,

11 so probably somewhat less than 45 million.

12         But the value almost doesn't matter.  If the

13 properties cannot be sold or refinanced within a reasonable

14 time and we now know that they cannot, no feasible plan is

15 possible and so confirmation must be denied and the stay must

16 be lifted.

17         That concludes my ruling.  We are adjourned.

18     **(Proceeding adjourned at 1:35 p.m.**

19

20

21

22

23

24

25

EXCEPTIONAL REPORTING SERVICES, INC

---

**CERTIFICATION**

        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.

_____                    April 6, 2021
        Signed                                      Dated

            TONI HUDSON, TRANSCRIBER

EXCEPTIONAL REPORTING SERVICES, INC

EXHIBIT

Ex. 4

From: Mark Taylor
Sent: Tuesday, June 1, 2021 8:49 AM
To: Liz Boydston; JBillingsley@Polsinelli.com; dgoldberg@polsinelli.com; sbarlow@polsinelli.com; tggreen@polsinelli.com; bgardner@polsinelli.com; mkelsey@gibsondunn.com; jshapiro@gibsondunn.com
Cc: dtomek@standlylaw.com; chris.neilson@trigild.com; Morris Weiss; Trip Nix
Subject: Silicon Hills Campus – Foreclosure May Not Proceed


Our firm represents Silicon Hills Campus, LLC ("SHC"). You are listed as a substitute trustee or attorney for the Lender on the property owned by Silicon Hills Campus, LLC, which is noticed for a foreclosure sale to occur today at 10:00 a.m.


This email is to notify you that Exhibit A to the Silicon Hills Notice which lists the Legal Description of the Property incorrect and is not the legal description of the property owned by the SHC. Accordingly, the May 11, 2021 Notice of Foreclosure Sale ("Silicon Hills Notice") is incorrect and void. As the sale notice is invalid any foreclosure sale conducted today based on this notice will be void.


The Silicon Hills Notice purports to sell property that is not owned by SHC and the notice is void. This incorrect legal property description renders the public sale notice void as the public was improperly informed as to the property that purports to be auctioned.


Any sale of the property described in the Silicon Hills Notice containing the improper legal description will be void. Accordingly, the sale notice must be corrected and re-noticed prior to any sale, and no sale may proceed today.


You are hereby on notice of the foregoing issues and SHC reserves all rights and remedies. Please confirm you will not be proceeding with any sale of the property owned by Silicon Hills Campus, LLC today.


Mark C. Taylor
Partner
Waller Lansden Dortch & Davis LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701
o: (512) 685-6404
LinkedIn<https://www.linkedin.com/in/mark-taylor-368355162/> |
vCard<https://wallerlaw.com/resources/vcard/mark_taylor.vcf> |
Bio<https://www.wallerlaw.com/our-people/202/Mark-Taylor>

_____

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

From: Mark Taylor [mailto:Mark.Taylor@wallerlaw.com]
Sent: Monday, May 31, 2021 5:35 PM
To: Liz Boydston <LBoydston@polsinelli.com>
Cc: Morris Weiss <Morris.Weiss@wallerlaw.com>; Sheena Paul <spaul@world-class.com>; Trip Nix <Trip.Nix@wallerlaw.com>
Subject: Re: Silicon Hills foreclosure sale


Liz:

In addition to the matters set forth in the prior e-mail, the property description in the notice of sale is incorrect

Mark C. Taylor
Partner
Waller Lansden Dortch & Davis LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701
o: (512) 685-6404
LinkedIn | vCard | Bio
_____
From: Mark Taylor
Sent: Monday, May 31, 2021 3:10:37 PM
To: Liz Boydston
Cc: Morris Weiss; Sheena Paul; Trip Nix
Subject: Silicon Hills foreclosure sale

Liz:

It has come to our attention that the Silicon Hills foreclosure sale noticed for tomorrow is invalid due to the improper designation of multiple substitute trustees to conduct the noticed sale.

The Deed of Trust, by its clear terms, only allows for a single substitute trustee to be appointed. The notice for the foreclosure sale for Silicon Hills set for June 1, 2021 lists 9 different persons as substitute trustees. Any foreclosure sales administered by the improperly appointed trustees will be void.

As you know Silicon Hills intends to pay the loan in off in full, has been working with title to achieve the same, and desires finality in the ongoing disputes, including but not limited to the ongoing adversary proceeding. Given the foregoing, if you proceed with a sale, there are likely to be legal issues with any foreclosure auction.

Accordingly, we request a call as soon as possible today to address the foregoing matters and determine if a consensual resolution can be reached that provides a clean exit and resolution of the ongoing disputes, including the pending adversary.

Alternatively, please confirm you will not be proceeding with the noticed sale, will correct the appointment of trustee for any future sale. Should you insist on proceeding with the noticed sale, Silicon Hills will seek to set it aside as void. Please note that a foreclosure based on an irregularity in the process does not require showing that the irregularity caused Ann adequate price to be received.

Silicon Hills reserves all rights and remedies.


Mark C. Taylor
Partner
Waller Lansden Dortch & Davis LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701
o: (512) 685-6404
LinkedIn | vCard | Bio

_____

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.



**POLSINELLI**

2950 N. Harwood Street, Ste. 2100, Dallas, TX 75201 • (214) 397-0030

May 11, 2021

Liz Boydston
(214) 403-7901
(214) 292-847 Direct Fax
lboydston@polsinelli.com

**VIA FEDERAL EXPRESS,
VIA CERTIFIED MAIL, POSTAGE PREPAID,
RETURN RECEIPT REQUESTED
AND VIA REGULAR MAIL, POSTAGE PREPAID**

Silicon Hills Campus, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attention: Natin Paul

Silicon Hills Campus, LLC
401 Congress Avenue, 33rd Floor
Austin, Texas 78726
Attention: Natin Paul

**NOTICE OF FORECLOSURE SALE**

Dear Mr. Paul:

This Firm represents ATX Debt Fund 1, LLC ("Holder"), as the holder of the Note (defined below) in connection with the loan (the "Loan") evidenced and governed by the documents and instruments described as follows:

(i) that certain Loan Agreement, dated as of February 6, 2018 (the "Loan Agreement"), by and between Silicon Hills Campus, LLC ("Borrower") and Ladder Capital Finance, LLC ("Original Lender");

(ii) that certain Promissory Note, dated as of February 6, 2018, in the original principal amount of Sixty-Four Million and No/100 Dollars ($64,000,000.00) (as amended or modified, the "Note"), the maker of which is Borrower;

polsinelli.com

Atlanta  Boston  Chicago  Dallas  Denver  Houston  Kansas City  Los Angeles  Miami  Nashville  New York
Phoenix  St. Louis  San Francisco  Seattle  Silicon Valley  Washington, D.C.  Wilmington
Polsinelli PC, Polsinelli LLP in California
77954678.1


POLSINELLI

May 11, 2021
Page 2

Secured by, among other things:

(iii)     that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement (the "Deed of Trust"), dated as of February 6, 2018, executed by Borrower for the benefit of the Original Lender, and covering the real and personal property more particularly described therein, located in Travis County, Texas, (the "Property"), recorded as Document Number 2018017426 of the Real Property Records of Travis County, Texas (the "Records"). The legal description of the real property included within the Property is contained in the Notice (as defined below).

The Loan Agreement, Note, the Deed of Trust and all other documents and instruments securing or evidencing the Loan, as amended or supplemented from time to time, are hereinafter collectively referred to as the "Loan Documents." All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

Holder is the current holder of the Note and the current beneficiary under the Deed of Trust. Holder is the current holder of all other right, title and interest of Original Lender under the Loan Documents.

The Loan matured on August 30, 2019 and became immediately due and owing on that date (the "**Maturity Default**"). As of today, the Loan has not been paid in full.

The Loan remains fully due and payable. Holder reserves the right to exercise, in such order as Holder elects, any one or more of the remedies available to Holder pursuant to the Loan Documents or otherwise at law or in equity, and nothing contained in this letter constitutes a waiver of any rights of Holder to pursue such rights and remedies. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Holder as a result of any default is intended to constitute (and does not constitute) a waiver of any right or remedy accruing to Holder as a result of the Maturity Default or any other default. You may obtain a statement of the amounts currently due and payable under the Loan Documents by contacting me at the address and/or telephone number listed above.

Pursuant to its rights under the Loan Documents, Holder previously appointed Angela Zavala, Michelle Jones, Richard Zavala, Jr., Sharlet Watts, James L. Hollerbach, Jennifer Nicole Callaway, Ryan L. Lorenz, David Tomek, Chris Neilson, and each of them acting alone (whether acting together or alone, the "**Substitute Trustees**"), as Substitute Trustees under the Deed of Trust.

77954678.1


POLSINELLI

May 11, 2021
Page 3

      This letter is formal notice to you pursuant to Section 51.002 of the Texas Property Code that **HOLDER HAS INSTRUCTED THE SUBSTITUTE TRUSTEES TO SELL THE PROPERTY AT A NON-JUDICIAL FORECLOSURE SALE (THE "FORECLOSURE SALE") ON JUNE 1, 2021, COMMENCING AT 10:00 A.M. LOCAL TIME (OR WITHIN THREE HOURS THEREAFTER) ON THE WEST STEPS OF THE TRAVIS COUNTY COURTHOUSE LOCATED AT 1000 GUADALUPE STREET, AUSTIN, TEXAS, OR AS DESIGNATED BY THE COUNTY COMMISSIONER'S OFFICE OR IN THE AREA DESIGNATED BY THE COMMISSIONER'S COURT, PURSUANT TO SECTION 51.002 OF THE TEXAS PROPERTY CODE.** The Notice of Substitute Trustees' Sale (the "**Notice**") specifying the date, time, place, and basic terms of the foreclosure sale has been posted at the location in Travis County, Texas designated by the County Commissioners for the posting of such notices, in accordance with Section 51.002 of the Texas Property Code and the provisions of the Deed of Trust. A copy of the Appointment of Substitute Trustees is enclosed.

      Payment to Holder in an amount less than the full amount of the Obligations, or any other partial cure of the Maturity Default, will not be construed as an accord and satisfaction or as Holder's agreement to accept a lesser amount as payment in full of the Obligations. Holder's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction. Holder may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue any remedy thereunder or at law or in equity.

      Neither this letter nor any statement by or on behalf of Holder as to the amount due and owing under the Loan Documents will constitute a waiver of any rights of Holder to collect any additional amounts to which Holder may be lawfully entitled pursuant to the terms of the Loan Documents or otherwise at law or in equity. The specific enumeration of defaults and/or obligations contained in this letter does not constitute a waiver of any other default now or hereafter existing under the Loan Documents.

      No communication, written or oral, that Borrower has had or may have with Holder or anyone acting on behalf of Holder concerning the obligations evidenced or secured by the Loan Documents, including any communication concerning a modification or restructure of the Loan Documents or a forbearance in the exercise of any of Holder's remedies, in any way modifies this letter or constitutes consent to the non-payment or a waiver of any of the remedies described herein. There are currently no forbearance, modification, renewal, extension or settlement agreements between Borrower and Holder with regard to the Loan or the Loan Documents, and all proposals made by Borrower to Holder relating to the foregoing are rejected.



May 11, 2021
Page 4

All of Holder's claims, demands and accruals with respect to the Loan Documents, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

For purposes of Section 51.002(i) of the Texas Property Code, the name of the sender of this notice is Liz Boydston, my address is 2950 N. Harwood St., Suite 2100, Dallas, Texas 75201, and this notice is sent by me on behalf of Holder.

**ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU ARE OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE DUTY MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.**

Sincerely,

Liz Boydston

cc:     **VIA FEDERAL EXPRESS,
VIA CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED,
AND VIA REGULAR MAIL, POSTAGE PREPAID**

Silicon Hills Campus, LLC
c/o World Class Capital Group, LLC
767 Fifth Avenue, 16th Floor
New York, New York 10153
Attention: Legal Department

77954678.1



May 11, 2021
Page 5

Silicon Hills Campus, LLC
c/o World Class Capital Group, LLC
717 N. Harwood St.
Suite 200
Dallas, Texas 75201

Silicon Hills Campus, LLC
c/o World Class Capital Group, LLC
1600 Rosecrans Avenue
Media Center, 4th Floor
Manhattan Beach, California 90266

Natin Paul
814 Lavaca St.
Austin, Texas 78701

Natin Paul
401 Congress Avenue, 33rd Floor
Austin, Texas 78701

Natin Paul
c/o World Class Capital Group
767 Fifth Avenue, 16th Floor
New York, New York 10153

**VIA EMAIL**

Jeff Zissa (jzissa@polsinelli.com)

77954678.1

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas
May 10, 2021 10:40 AM    Fee: $ 45.50
**2021103491**
*Electronically Recorded*

After recording return to:

James H. Billingsley
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201

# APPOINTMENT OF SUBSTITUTE TRUSTEES

| | |
|---|---|
| Date: | May 7, 2021 |
| Borrower: | Silicon Hills Campus, LLC |
| Borrower's Address: | Silicon Hills Campus, LLC<br>814 Lavaca Street<br>Austin, Texas 78701<br>Attention: Natin P... |
| Holder: | ATX Debt Fund 2, LLC |
| Holder's Address: | 1209 Orange St.<br>Wilmington, DE 19801 |
| Substitute Trustees: | Angela Zavala, Michelle Jones, Richard Zavala, Jr., Sharlet Watts, James L. Hollerbach, Jennifer Nicole Galaway, Ryan L. Lorenz, David Tomek, Chris Neilson, and each of them acting alone |

Substitute Trustees'
Addresses:

Angela Zavala, Michelle Jones, Richard Zavala, Jr., Sharlet
Watts, James L. Hollerbach, Jennifer Nicole Galaway, and
Ryan L. Lorenz
6700 N. New Braunfels Ave.
San Antonio, TX 78209

David Tomek
325 North Saint Paul St., Suite 3300
Dallas, TX 75201

Chris Neilson
4131 North Central Expressway, Suite 775
Dallas, TX 75204

Deed of Trust:

Deed of Trust, Assignment of Leases and Rents and Security
Agreement

    Date:

February 6, 2018

    Grantor:

Silicon Hills Campus, LLC

    Original Lender:

Ladder Capital Finance LLC

    Trustee:

Gary S. Farmer

    Secures:

Promissory Note, dated February 6, 2018 (the "Note"),
executed by Grantor, payable to Lender, in the original stated
principal amount of Sixty-Four Million and No/100 Dollars
($64,000,000.00), presently owned and held by Holder.

    Recording:

Recorded in the Official Public Records of Travis County,
Texas (the "Records") as Document Number 2018017426.

    Assignment to
    Holder:

Evidenced by that certain Assignment of Deed of Trust dated
February 8, 2018 by Original Lender to Tuebor REIT Sub,
LLC and recorded in the Records as Document Number
2018021704, and further evidenced by that Assignment of
Deed of Trust and Assignment of Leases and Rents executed
on December 18, 2020 by Tuebor REIT Sub, LLC to Holder
and recorded in the Records as Document Number
2021018872.

77910726.1

| | |
|---|---|
| Property: | All real property, improvements and personal property described as collateral in the Deed of Trust; the legal description of the real property is also, for the sake of convenience only, described on Exhibit A attached hereto and made a part hereof for all purposes; the description of the real property, improvements and personal property in the Deed of Trust will control to the extent of any conflict or any deficiency in such description contained in this Appointment of Substitute Trustees, it being the intent that the "Property," for all purposes hereof, means all property, real, personal, tangible and intangible, which constitutes collateral under, and described in, the Deed of Trust. |

Holder, the present owner and holder of the Note, removes the Trustee and any prior substitute trustees under the Deed of Trust, and appoints Substitute Trustees to act in the place and stead of Trustee and any prior substitute trustees in accordance with the terms of the Deed of Trust and applicable law. Holder directs Substitute Trustees to foreclose the lien of the Deed of Trust in accordance with its terms and the laws of the State of Texas. Holder ratifies any prior acts taken by Substitute Trustees in connection with the sale of the Property.

[SIGNATURE ON FOLLOWING PAGE]

Unofficial copy Travis Co. District Clerk Velva L. Price

77910726.1

3

**HOLDER:**

**ATX DEBT FUND 1, LLC**



By:
Name: David Moshtaghi
Title: Authorized Representative

STATE OF CALIFORNIA )
COUNTY OF Los Angeles )ss.:

Before me, the undersigned authority, on the 7th day of May, 2021, personally appeared
DAVID MOSHTAGHI , the authorized representative of ATX Debt Fund 1, LLC,
known to me to be the person and officer whose name is subscribed to the foregoing instrument,
and he acknowledged to me that he executed the same in the capacity therein stated on behalf of
and as the act and deed of such entity.

[SEAL]

DONA L. BERGSTROM
Notary Public · California
Los Angeles County
Commission # 2281963
My Comm. Expires Apr 17, 2023

David Bergstrom
Notary Public in and for the State of CALIFORNIA

Dona L. Bergstrom
Printed Name

My Commission Expires:

APRIL 17, 2023

Unofficial copy Travis Co. District Clerk Velva L. Price

77910726.1

## EXHIBIT A
## LEGAL DESCRIPTION OF PROPERTY

<u>Real Property</u>. Lot(s) 1, 2, 3 and 4, AUSTIN CENTER/3M, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 87, Page 7B of the Plat Records of Travis County, Texas.

<u>Personal Property</u>. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever, as defined in and subject to the provisions of the Uniform Commercial Code, whether tangible or intangible, which are owned by Borrower and which are located within or about the Real Property described above, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "Personal Property").

A-1

77910726.1

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir, County Clerk
Travis County, Texas
Jun 02, 2021 03:57 PM     Fee: $126.00
**202112359**
*Electronically Recorded*

**EXHIBIT**

Ex. 5

# This page is intentionally added for electronic file stamp.

**Notice of Confidentiality Rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number**

STATE OF TEXAS       §
                                §
COUNTY OF TRAVIS    §

<div align="center">

**SUBSTITUTE TRUSTEE'S DEED**

</div>

Date: June 2, 2021

        Deed of Trust, Assignment of Leases and Rents and Security Agreement ("Deed of Trust"):

| | |
|---|---|
| Dated: | February 6, 2018 |
| Grantor: | Silicon Hills Campus LLC |
| Trustee: | Gary S. Farmer |
| Lender: | Ladder Capital Finance LLC |
| Holder: | ATX Debt Fund 1, LLC |
| Recorded in: | Recorded in the Official Public Records of Travis County, Texas (the "Official Records") as Document Number 2018017426. |
| Secures: | Promissory Note, dated February 6, 2018 (the "Note"), executed by Grantor, payable to Lender, in the original stated principal amount of Sixty-Four Million and No/100 Dollars ($64,000,000.00), presently owned and held by Holder. |
| Property: | All real property, improvements and personal property described as collateral in the Deed of Trust; the legal description of the property is also, for the sake of convenience only, described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes; however, the description of the real property, improvements and personal property in the Deed of Trust will control to the extent of any conflict or any deficiency in such description contained in this Substitute Trustee's Deed, it being the intent that the "Property," for all purposes hereof, means all property, real, personal, tangible and intangible, which constitutes collateral under, and described in, the Deed of Trust. |

<div align="center">1</div>

| | |
|---|---|
| Assignment to Holder: | Evidenced by that certain Assignment of Deed of Trust dated February 8, 2018 by Original Lender to Tuebor REIT Sub LLC and recorded in the Official Records as Document Number 2018021704, and further evidenced by that Assignment of Deed of Trust and Assignment of Leases and Rents executed on December 18, 2020 by Tuebor REIT Sub LLC to Holder and recorded in the Official Records as Document Number 2021018872. |
| Substitute Trustees: | Angela Zavala, Michelle Jones, Richard Zavala, Jr., Sharlet Watts, James L. Hollerbach, Jennifer Nicole Gallaway, Ryan L. Lorenz, David Tomek, Chris Neilson and each of them acting alone |

Foreclosure Sale:

| | |
|---|---|
| Date: | Tuesday, June 1, 2021 |
| Time: | 10:05 a.m., local time (that time being within three hours of the earliest time of the sale of the Property at public sale ("Foreclosure Sale") as stated in the Notice of Substitute Trustee's Sale) |
| Place: | On the west steps of the Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas. |
| Grantee: | ATX Debt Fund 1, LLC, a Delaware limited liability company |
| Grantee's Mailing Address: | 11755 Wilshire Blvd, Floor 1400 Los Angeles, CA 90025 |
| Purchase Price: | $53,000,000, which payment, in accordance with applicable law and the terms of the Deed of Trust, was made by crediting the Purchase Price against amounts due on or with respect to the indebtedness secured by the Deed of Trust, including the Note |

Grantor conveyed to Trustee the Property for the purposes of securing and enforcing payment of, among other things, the Note.

Holder is the owner and holder of the Note and of all liens and security interests, assignments and encumbrances securing it, including, without limitation, those under the Deed of Trust.

Unofficial copy Travis Co District Clerk Velva Price

77843898.1

Holder appointed the undersigned Substitute Trustee under the circumstances and in the manner set forth in the Deed of Trust.

Grantor defaulted under the terms of the Note and the Deed of Trust, and the maturity of the entire principal balance of the Note remains due and payable as of the date hereof.

Holder instructed the undersigned Substitute Trustee, as authorized by and provided in the Deed of Trust, to enforce the trust due to the occurrence of the foregoing events and to sell the Property at the Foreclosure Sale.

Attached hereto is an Affidavit of Filing and Posting and an Affidavit of Mailing, concerning the written notice of the earliest time, place and terms of the Foreclosure Sale filed, posted, and mailed in accordance with the Deed of Trust and Texas law.

All prerequisites required by law, the Deed of Trust and/or other documents creating, evidencing, describing or securing the Note have been duly satisfied by Holder and by the undersigned Substitute Trustee.

The Foreclosure Sale was held by the undersigned Substitute Trustee pursuant to the terms of the Deed of Trust and in accordance with the laws of the State of Texas on and at the Date, Time and Place of Foreclosure Sale as set forth in the Notice of Substitute Trustee's Sale.

The undersigned Substitute Trustee, in consideration of the foregoing and of the payment to the undersigned Substitute Trustee of the Purchase Price, by the authority conferred on the undersigned Substitute Trustee by the Deed of Trust, GRANTS, SELLS and CONVEYS to ATX Debt Fund 1, LLC, a Delaware limited liability company, its legal representatives, successors and assigns, the Property, together with, all and singular, the rights, privileges, and appurtenances thereto, subject to all matters of record affecting the Property, if any, to the extent that they remain in force and effect and have not been subordinated to the Deed of Trust (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Property, together with the rights, privileges and appurtenances thereto, subject to the Permitted Exceptions, to Grantee, its legal representatives, successors and assigns, forever. The undersigned Substitute Trustee binds Grantor and Grantor's legal representatives, successors and assigns to warrant and defend the Property to Grantee, its legal representatives, successors and assigns forever, against the claim or claims of all persons claiming or to claim the same or any part thereof.

**PURSUANT TO SECTION 51.009 OF THE TEXAS PROPERTY CODE, THE PROPERTY IS SOLD TO GRANTEE "AS-IS" WITHOUT ANY EXPRESSED OR IMPLIED WARRANTIES, EXCEPT FOR GRANTOR'S WARRANTIES OF TITLE, AND AT GRANTEE'S OWN RISK.**

3

77843898 1

_____

Chris Neilson, Substitute Trustee

### ACKNOWLEDGEMENT

STATE OF TEXAS      )
                         ) ss.
COUNTY OF DALLAS   )

This instrument was acknowledged before me, the undersigned Notary Public, on the *2nd* day of June, 2021, by Chris Neilson, who provided to me on the basis of satisfactory evidence to be the person whose name is subscribed within the instrument as a Substitute Trustee.

WITNESS my hand and official seal affixed hereto.



ANITA GALLAWAY
Notary ID #4638789
My Commission Expires
March 22, 2022

_____

Notary Public
State of Texas

_____

AFTER RECORDING, RETURN TO:

Jeff Zissa
2950 N. Harwood, Suite 2100
Dallas, Texas 75201

Attachments:   Affidavit of Filing and Posting and Affidavit of Mailing
Exhibit A:      Property Description

4

77843898.1

## EXHIBIT A

Lot(s) 1, 2, 3 and 4, AUSTIN CENTER/3M, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in <u>Volume 87, Page 7B</u> of the Plat Records of Travis County, Texas

5

77843898.1

| STATE OF TEXAS | § |
|---|---|
| | § |
| COUNTY OF ~~Travis~~ | § |

## AFFIDAVIT OF FILING AND POSTING

Date:  May 11, 2021

Affiant:  Angela Zavala

       Deed of Trust, Assignment of Leases and Rents and Security Agreement ("Deed of Trust"):

| | |
|---|---|
| Dated: | February 6, 2018 |
| Grantor: | Silicon Hills Campus, LLC |
| Original Trustee: | Gary S. Farmer |
| Original Lender: | Ladder Capital Finance, LLC |
| Recorded in: | Recorded in the Official Public Records of Travis County, Texas (the "Records") as Document Number 2018017426. |
| Secures: | Promissory Note dated February 6, 2018 (the "Note"), executed by Grantor, payable to Lender, in the original stated principal amount of Sixty-Four Million and No/100 Dollars ($64,000,000.00), presently owned and held by ATX Debt Fund 1, LLC ("Holder") |
| Property: | The real property, improvements, and personal property described in and mortgaged in the Deed of Trust, including the real property described in the attached <u>Exhibit A</u>, and all rights and appurtenances thereto |
| Notice of Foreclosure Sale: | The Notice of Foreclosure Sale filed with the County Clerk of Travis County, Texas, in compliance with Section 51.002 of the Texas Property Code and the Deed of Trust.  A true and correct copy of the Notice of Foreclosure Sale is attached hereto as <u>Exhibit A</u>. |

76378743.3

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared, Affiant, a person well known to me, who upon oath stated:

I am over the age of 18 years, have never been convicted of a felony or a crime of moral turpitude, and have personal knowledge of the facts set forth herein.  On May 11, 2021, I performed the following actions at the request of Holder:

    (a)    Filed the Notice of Foreclosure Sale with the County Clerk of Travis County, Texas, at approximately 1:45 p.m.; and

    (b)    Posted a file stamped signed original Notice of Foreclosure Sale at _Courthouse_, at approximately 2:33 p.m.

_Angela Zavala_
_____, Affiant

SUBSCRIBED AND SWORN TO before me by _Angela Zavala_ on May 11, 2021.

_Michelle Jones_
Notary Public, State of Texas

MICHELLE JONES
Notary Public, State of Texas
Comm. Expires 07-07-2022
Notary ID 6444537

Exhibit A:    Notice of Foreclosure Sale

Unofficial copy Travis Co District Clerk Velva L. Price

2

76378743.3

**EXHIBIT A**
**NOTICE OF FORECLOSURE SALE**

(Follows this Page)

76378743.3

Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.

## NOTICE OF SUBSTITUTE TRUSTEE'S SALE

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF TRAVIS** | § |

| | |
|---|---|
| Date: | May 11, 2021 |
| Borrower: | Silicon Hills Campus, LLC |
| Borrower's Address: | Silicon Hills Campus, LLC<br>814 Lavaca Street<br>Austin, Texas 78701<br>Attention: Natin Paul |
| Original Trustee: | Gary S. Farmer |
| Original Lender: | Ladder Capital Finance, LLC |
| Original Lender's Address: | 345 Park Avenue<br>8th Floor<br>New York, New York 10154 |
| Holder: | ATX Debt Fund 1, LLC |
| Holder's Address: | 1209 Orange St.<br>Wilmington, DE 19801 |
| Substitute Trustee: | Angela Zavala, Michelle Jones, Richard Zavala, Jr., Sharlet Watts, James L. Hollerbach, Jennifer Nicole Gallaway, Ryan L. Lorenz, David Tomek, Chris Neilson, and each of them acting alone |

77920662.3

<u>Substitute Trustee's Addresses:</u>

Angela Zavala, Michelle Jones, Richard Zavala, Jr., Sharlet Watts, James L. Hollerbach, Jennifer Nicole Gallaway, and Ryan L. Lorenz
6700 N. New Braunfels Ave.
San Antonio, TX 78209

David Tomek
325 North Saint Paul St., Suite 3300
Dallas, TX 75201

Chris Neilson
4131 North Central Expressway, Suite 775
Dallas, TX 75204

<u>Deed of Trust:</u>

Deed of Trust, Assignment of Leases and Rents and Security Agreement

Date: February 6, 2018

Grantor: Silicon Hills Campus, LLC

Lender: Ladder Capital Finance LLC

Trustee: Gary S. Farmer

Secures: Promissory Note, dated February 6, 2018 (the "Note"), executed by Grantor, payable to Lender, in the original stated principal amount of Sixty-Four Million and No/100 Dollars ($64,000,000.00), presently owned and held by Holder.

Recording: Recorded in the Official Public Records of Travis County, Texas (the "Official Records") as Document Number 2018017426.

Assignment to Holder: Evidenced by that certain Assignment of Deed of Trust dated February 8, 2018 by Original Lender to Tuebor REIT Sub, LLC and recorded in the Official Records as Document Number 2018021704, and further evidenced by that Assignment of Deed of Trust and Assignment of Leases and Rents executed on December 18, 2020 by Tuebor REIT Sub, LLC to Holder and recorded in the Official Records as Document Number 2021018872.

77920662.3

| | |
|---|---|
| Property: | All real property, improvements and personal property described as collateral in the Deed of Trust and any related UCC financing statements filed with state or local officials; the legal description of the property is also, for the sake of convenience only, described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes; however, the description of the real property, improvements and personal property in the Deed of Trust and any related UCC financing statements filed with state or local officials will control to the extent of any conflict or any deficiency in such description contained in this Notice of Substitute Trustee's Sale, it being the intent that the "Property," for all purposes hereof, means all property, real, personal, tangible and intangible, which constitutes collateral under, and described in, the Deed of Trust and any related UCC financing statements filed with state or local officials. |
| Foreclosure Sale: | |
| Date of Sale: | Tuesday, June 1, 2021 |
| Time of Sale: | The sale of the Property will commence between the hours of 10:00 a.m. and 1:00 p.m. local time; the earliest time at which the sale will take place is 10:00 a.m., and the sale will begin within three hours thereafter. |
| Place of Sale: | On the west steps of the Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas, or as designated by the County Commissioner's Office or in the area designated by the Commissioner's Court, pursuant to Section 51.002 of the Texas Property Code. |

Holder has appointed Angela Zavala, Michelle Jones, Richard Zavala, Jr., Sharlet Watts, James L. Hollerbach, Jennifer Nicole Gallaway, Ryan L. Lorenz, David Tomek, Chris Neilson, and each of them acting alone, as Substitute Trustee under the Deed of Trust upon the contingency and in the manner outlined by the Deed of Trust and in accordance with Chapter 51 of the Texas Property Code. Default has occurred pursuant to the provisions of the Deed of Trust and other documents relating to the indebtedness evidenced by the Note. The indebtedness evidenced by the Note has matured and is now wholly due. Holder has instructed Substitute Trustees to sell the Property toward the satisfaction of the Note.

The Deed of Trust encumbers both real and personal property. Notice is hereby given of Holder's election to proceed against and sell all the real property and any personal property described in the Deed of Trust in accordance with the Holder's rights and remedies under the Deed of Trust and Section 9.604 of the Texas Business and Commerce Code.

Notice is hereby given that on the Date of Sale, at the Time of Sale, Substitute Trustee will offer the Property for sale at public auction at the Place of Sale, to the highest bidder for

77920662.3

cash, "AS IS" and further subject to any valid leases to the Property or any portion thereof, which leases shall not terminate as a result of the sale. THERE WILL BE NO WARRANTY RELATING TO TITLE, POSSESSION OR QUIET ENJOYMENT OR THE LIKE FOR THE PERSONAL PROPERTY INCLUDED IN THE SALE. Holder may bid by credit against the indebtedness evidenced by the Note and secured by the Deed of Trust. The purchase price in a sale held by the Substitute Trustee is immediately due and payable without delay and without adjournment of the sale upon the Substitute Trustee's acceptance of the bid. Pursuant to Section 51.0075(a) of the Texas Property Code, the Substitute Trustee conducting the public sale reserves the right to set further reasonable conditions for conducting the public sale. Any such further conditions will be announced before bidding is opened for the first sale of the day held by the Substitute Trustee.

[signature on following page]

**SUBSTITUTE TRUSTEE:**

_Angela Zavala_

_____, Substitute Trustee

STATE OF _Texas_    §
                    §
COUNTY OF _Travis_  §

Subscribed and sworn to before me on this _11_ day of May 2021.

[SEAL]

_Michelle Jones_
Notary Public, State of Texas

```
MICHELLE JONES
Notary Public, State of Texas
Comm. Expires 07-07-2022
Notary ID 6444537
```

My Commission expires:
_7-7-22_

After recording return to:

Jeff Zissa
Polsinelli PC
2950 N. Harwood Street, Suite 2100
Dallas, Texas 75201

77920662.3

## EXHIBIT A

<u>Real Property</u>.  Lot(s) 1, 2, 3 and 4, AUSTIN CENTER/3M, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 87, Page 7B of the Plat Records of Travis County, Texas.

<u>Personal Property</u>. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever, as defined in and subject to the provisions of the Uniform Commercial Code, whether tangible or intangible, which are owned by Borrower and which are located within or about the Real Property described above, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively the "Personal Property").



**COPY**
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

**Dana DeBeauvoir, County Clerk**
**Travis County, Texas**

**202140156**    May 11, 2021 01:45 PM
Fee: $3.00    LOPEZS

77920662.3                              A-1

## AFFIDAVIT OF MAILING

STATE OF COLORADO          §
                           §
COUNTY OF DENVER           §

      BEFORE ME, the undersigned authority, on this day personally appeared Savanna Barlow, known to me to be the person whose name is subscribed hereto and who, after being by me duly sworn, upon oath stated as follows:

1.    My name is Savanna Barlow, and I am a person over the age of eighteen (18) years, have never been convicted of a felony or crime of moral turpitude, and have personal knowledge of the facts set forth herein.

2.    I am an employee of Polsinelli PC.

3.    At the request and direction of ATX Debt Fund 1, LLC and the Substitute Trustee appointed to enforce the power of sale contained in the Deed of Trust referenced in the attached notice, on May 11, 2021, I mailed, by certified mail, return receipt requested, and additionally by regular mail and Federal Express, a copy of the attached Notice of Substitute Trustee's Sale, such notice being enclosed in envelopes stamped with correct postage, properly addressed, respectively, as set forth below, to the following:

      Silicon Hills Campus, LLC
      c/o World Class
      814 Lavaca St.
      Austin, Texas 78701
      Attention: Natin Paul

    At the further request and direction of ATX Debt Fund 1, LLC and the Substitute Trustee appointed to enforce the power of sale contained in the Deed of Trust referenced in the attached notice, on May 11, 2021, I mailed by certified mail, return receipt requested, and additionally by regular mail and Federal Express, a copy of the attached Notice of Substitute Trustee's Sale, such notice being enclosed in envelopes stamped with correct postage, properly addressed, respectively, as set forth below, to the following:

      Silicon Hills Campus, LLC
      401 Congress Avenue, 33rd Floor
      Austin, Texas 78726
      Attention: Natin Paul

      Silicon Hills Campus, LLC
      c/o World Class Capital Group, LLC
      767 Fifth Avenue, 16th Floor
      New York. New York 10153
      Attention: Legal Department

Silicon Hills Campus, LLC
c/o World Class Capital Group, LLC
717 N. Harwood St.
Suite 200
Dallas, Texas 75201

Silicon Hills Campus, LLC
c/o World Class Capital Group, LLC
1600 Rosecrans Avenue
Media Center, 4th Floor
Manhattan Beach, California 90266

Natin Paul
814 Lavaca St.
Austin, Texas 78701

Natin Paul
401 Congress Avenue, 33rd Floor
Austin, Texas 78701

Natin Paul
c/o World Class Capital Group
767 Fifth Avenue, 16th Floor
New York, New York 10153

4.    Also attached hereto are true and correct copies of the sender's copy of the official U.S.
Postal Service form of certified mail receipt (the "white copy") for the address shown
bearing the date mailed.

5.    The Notice of Substitute Trustee's Sale attached hereto is a true and correct copy of the
Notice of Substitute Trustee's Sale referred to above and mailed by me.

<center>(SIGNATURE PAGE FOLLOWS)</center>

78254730 1

EXECUTED on May 27, 2021

Affiant Signature: _____

Printed Name: _Savanna Barlow_

STATE OF COLORADO      §
                                          §
COUNTY OF DENVER       §

This instrument was sworn to, subscribed and acknowledged before me on May 27 , 2021, by _Savanna Barlow_ _____

_____
Notary Public in and for the State of Colorado

_Elizabeth G. Gaskins_
Print Name of Notary
My Commission Expires: _1/3/2024_

**ELIZABETH G. GASKINS**
**NOTARY PUBLIC**
**STATE OF COLORADO**
**NOTARY ID 19954019703**
**MY COMMISSION EXPIRES JANUARY 3, 2024**

Unofficial copy Travis Co. District Clerk Velva L. Price

78254730 1



**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER

9414 7266 9904 2150 6537 12

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

Postmark
Here

Sent to:
Natin Paul
c/o World Class Capital
Group
767 Fifth Avenue, 16th Floor
New York, New York 10153

Reference Information

USDAG/jm8

027783/099999

PS Form 3800, Facsimile, July 2015



**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER

9414 7266 9904 2150 6533 15

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | |
| Total Postage and Fees | $ |

Postmark
Here

Sent to:
Natin Paul
401 Congress Avenue 33rd
Floor
Austin, Texas 78701

Reference Information
DAG/Ja64100
027783/099999

PS Form 3800, Facsimile, July 2015



**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER

9414 7266 9904 2150 6533 12

| | | |
|---|---|---|
| Certified Mail Fee | $ | |
| Return Receipt (Hardcopy) | $ | |
| Return Receipt (Electronic) | $ | |
| Certified Mail Restricted Delivery | $ | |
| Postage | $ | Postmark Here |
| Total Postage and Fees | $ | |

Sent to:
Natin Paul
814 Lavaca St,
Austin, Texas 78701

DAG/ jat
02/783/099999
Reference Information

USPS-64108

PS Form 3800, Facsimile, July 2015



**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

**USPS® ARTICLE NUMBER**

9414 7266 9904 2150 6535 63

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

Postmark
Here

Sent to:
Silicon Hills Campus, LLC
c/o World Class Capital
Group, LLC
717 N. Harwood St.
Suite 200
Dallas, Texas 75201

Reference Information

DAG/ jat
027783/099999

PS Form 3800, Facsimile, July 2015



**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

**USPS® ARTICLE NUMBER**

9414 7266 9904 2150 6533 40

| | | |
|---|---|---|
| Certified Mail Fee | $ | |
| Return Receipt (Hardcopy) | $ | |
| Return Receipt (Electronic) | $ | Postmark Here |
| Certified Mail Restricted Delivery | $ | |
| Postage | $ | |
| Total Postage and Fees | $ | |

Sent to:
Silicon Hills Campus, LLC
c/o World Class Capital
Group, LLC
767 Fifth Avenue, 16th Floor
New York, New York 10153
Attention: Legal Department

Reference Information

DAG/ jat
027783/099999

PS Form 3800, Facsimile, July 2015



**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER

9414 7266 9904 2150 6533

| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | |

Postmark
Here

Sent to:
Silicon Hills Campus, LLC
c/o World Class Capital
Group, LLC
1600 Rosecrans Avenue
Media Center, 4th Floor
Manhattan Beach, California
90266

DAG/ jat
027783/099999

PS Form 3800, Facsimile, July 2015

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

**USPS® ARTICLE NUMBER**

9414 7266 9904 2150 6533 ~4

| | |
|---|---|
| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ |

Postmark
Here

Sent to:
Silicon Hills Campus, LLC
c/o World Class
814 Lavaca St.
Austin, Texas 78701
Attention: Natin Paul

**Reference Information**

DAG/ jat
027783/099999

PS Form 3800, Facsimile, July 2015

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

**USPS® ARTICLE NUMBER**

9414 7266 9904 2150 6533 17

| | | |
|---|---|---|
| Certified Mail Fee | $ | |
| Return Receipt (Hardcopy) | $ | |
| Return Receipt (Electronic) | $ | **Postmark Here** |
| Certified Mail Restricted Delivery | $ | |
| Postage | $ | |
| Total Postage and Fees | $ | |

**Sent to:**
Silicon Hills Campus, LLC
401 Congress Avenue, 33rd
Floor
Austin, Texas 78726
Attention: Natin Paul

**Reference Information**

DAG/ jat
027783/099999

PS Form 3800, Facsimile, July 2015

**Exhibit A-3**

6/28/2021 8:00 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-21-002896
Chloe Jimenez



FRIEDMAN & FEIGER
ATTORNEYS AT LAW

JASON H. FRIEDMAN, ESQ.
Main Telephone (972) 88-1400
Email: jason@fflawoffice.com

June 26, 2021

***Via e-File***

Court Clerk
Travis County District Clerk
1000 Guadalupe St,
Austin, TX 78701

    Re:    *Silicon Hills Campus, LLC, et al. vs. ATX Debt Fund 1, LLC, et al.*
        Cause No. *D-1-GN-21-002896*

Dear Clerk:

    This letter is a request for issuance of citations for the following Defendants:

1. **ATX DEBT FUND 1, LLC**
2. **ATX DEBT FUND 2, LLC**
3. **CONGRESS AVENUE HOLDINGS, LLC**
4. **KARLIN REAL ESTATE, LLC**
5. **PENNYBACKER CAPITAL, LLC**
6. **CONGRESS AVENUE HOLDINGS GP, LLC**
7. **CONGRESS AVENUE HOLDINGS, LP**
8. **KARLIN ASSET MANAGEMENT, INC.**

    The respective fee is being paid contemporaneously with the filling of this letter. Once the Citations are ready, please email them to Mariam Al-Ghaziani, Paralegal - lfpara@fflawoffice.com. Please let us know if you have any questions.

        Yours very truly,

        /s/ *Jason H. Friedman*

        Jason H. Friedman

JHF/ma

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

LF PARA on behalf of Jason Friedman
Bar No. 24059784
lfpara@fflawoffice.com
Envelope ID: 54815943
Status as of 6/29/2021 3:38 PM CST

Associated Case Party: Silicon Hills Campus, LLC

| Name | BarNumber | Email | Timestamp Submitted | Status |
|------|-----------|-------|---------------------|--------|
| Mariam Alghaziani | | lfpara@fflawoffice.com | 6/26/2021 4:03:36 PM | SENT |
| Jason HFriedman | | jhfriedman@fflawoffice.com | 6/26/2021 4:03:36 PM | SENT |
| Jeff O'Dell | | jodell@fflawoffice.com | 6/26/2021 4:03:36 PM | SENT |

**Exhibit A-4**

8/18/2021 3:53 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-21-002896
Norma Ybarra

CAUSE NO. D-1-GN-21-002896

| | | |
|---|---|---|
| **SILICON HILLS CAMPUS LLC,** | § | **IN THE DISTRICT COURT** |
| **WC HIRSHFELD MOORE, LLC,** | § | |
| **WC 805-809 EAST SIXTH, LLC,** | § | |
| **WC 320 CONGRESS, LLC, WC** | § | |
| **901 EAST CESAR CHAVEZ, LLC,** | § | |
| **WC 1212 EAST SIXTH, LLC, WC** | § | |
| **9005 MOUNTAIN RIDGE, LLC,** | § | |
| **WC 103 EAST FIFTH, LLC AND** | § | |
| **WC 422 CONGRESS, LLC,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **261st JUDICIAL DISTRICT** |
| | § | |
| | § | |
| **ATX DEBT FUND 1, LLC, ATX** | § | |
| **DEBT FUND 2, LLC, CONGRESS** | § | |
| **AVENUE HOLDINGS, LLC,** | § | |
| **KARLIN REAL ESTATE, LLC** | § | |
| **KARLIN ASSET MANAGEMENT,** | § | |
| **INC., PENNYBACKER CAPITAL,** | § | |
| **LLC, CONGRESS AVENUE** | § | |
| **HOLDINGS GP, LLC, AND** | § | |
| **CONGRESS AVENUE** | § | |
| **HOLDINGS, LP,** | § | |
| | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

## PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED DISCOVERY

TO THE HONORABLE JUDGE OF SAID COURT:

**COME NOW,** Plaintiffs Silicon Hills Campus, LLC, WC Hirshfeld Moore, LLC,

WC 805-809 East Sixth, LLC, WC 320 Congress, LLC, WC 901 EAST CESAR CHAVEZ,

LLC, WC 1212 EAST SIXTH, LLC, WC 9005 MOUNTAIN RIDGE, LLC, WC 103 EAST

FIFTH, LLC, and WC 422 CONGRESS, LLC (collectively "Plaintiffs"), who file this

Plaintiffs' Emergency Motion for Expedited Discovery and, for cause, would show unto

this Honorable Court as follows:

## Factual Background & Argument

1.      Plaintiffs respectfully request that the Court allow Plaintiffs to take expedited discovery from Defendants on issues pertaining to Plaintiff's emergency request for a receiver. For the purposes of the receivership hearing, Plaintiffs seeks discovery of additional evidence relating to Defendants fraud and misconduct. Accordingly, Plaintiffs requests leave to immediately serve no more than ten (10) requests for production and five (5) interrogatories to Defendant, and that the Court order Defendants to serve their responses within five (5) days of service. Plaintiff also requests leave to immediately depose Defendants within seven (7) days of service of the petition.

2.      Under Texas Rule of Civil Procedure 190.5, a court may modify a discovery control plan at any time and must do so when the interest of justice requires. Tex. R. Civ. P. 190.5. Here, justice may only be done by allowing Plaintiffs' leave to seek limited discovery for the purposes of presenting their case on their Emergency Application for Receiver.

3.      Defendants have information that would be crucial to Plaintiffs' ability to fully and competently present their case.

4.      In addition to documents, the Plaintiffs will need to depose Corporate Representatives of all the Defendants regarding the wrongful foreclosure in order to streamline the presentation of evidence at the hearing on the Application for Receiver.

5.      Plaintiffs ask for limited document production, interrogatories and depositions targeted to develop the details of Defendants' conduct so that evidence at a receivership hearing may be presented efficiently and effectively, and so that the relief can be targeted precisely. Unless interrogatories, production of documents and depositions are permitted on an expedited basis, Plaintiffs may be unable to carry their burden of

proof and show a substantial likelihood of prevailing on the merits at the receivership hearing.

6.      For the foregoing reasons, Plaintiffs respectfully seek an Order allowing the Plaintiffs' expedited discovery as requested herein.

<u>**PRAYER**</u>

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs prays that this Honorable Court **GRANT** this Motion and Order that: **1)** documents requested in Plaintiffs' Expedited Request For Production (limited to 10 Requests) shall be produced within **five (5) days** of actual receipt of the Expedited Requests For Production; 2) answers to Plaintiffs' Expedited Interrogatories (limited to five (5) Interrogatories) be provided within **five (5) days** of actual receipt of the Expedited Interrogatories; and depositions may be taken on **five (5) days' notice**; and, for such other and further relief, both at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

**FRIEDMAN & FEIGER, L.L.P.**

*/s/ Jason H. Friedman*

By: _____
        **Lawrence J. Friedman**
        State Bar No. 07469300
        lfriedman@fflawoffice.com
        **Jason H. Friedman**
        State Bar No. 24059784
        jason@fflawoffice.com
        **Richard W. Winn**
        State Bar No. 21779700
        rwinn@fflawoffice.com

5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)
**ATTORNEYS FOR PLAINTIFFS**

Unofficial copy Travis Co. District Clerk Valva L. Price

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

LF PARA on behalf of Jason Friedman
Bar No. 24059784
lfpara@fflawoffice.com
Envelope ID: 54855713
Status as of 6/29/2021 1:18 PM CST

Associated Case Party: Silicon Hills Campus, LLC

| Name | BarNumber | Email | Timestamp Submitted | Status |
|------|-----------|-------|---------------------|--------|
| Jason HFriedman | | jhfriedman@fflawoffice.com | 6/28/2021 3:54:30 PM | SENT |
| Jeff O'Dell | | jodell@fflawoffice.com | 6/28/2021 3:54:30 PM | SENT |
| Mariam Alghaziani | | lfpara@fflawoffice.com | 6/28/2021 3:54:30 PM | SENT |

Unofficial copy Travis Co. District Clerk Velva L. Price

**<u>Exhibit A-5</u>**

CAUSE NO. D-1-GN-21-002896

| | | |
|---|---|---|
| **SILICON HILLS CAMPUS LLC,** | § | **IN THE DISTRICT COURT** |
| **WC HIRSHFELD MOORE, LLC,** | § | |
| **WC 805-809 EAST SIXTH, LLC,** | § | |
| **WC 320 CONGRESS, LLC, WC** | § | |
| **901 EAST CESAR CHAVEZ, LLC,** | § | |
| **WC 1212 EAST SIXTH, LLC, WC** | § | |
| **9005 MOUNTAIN RIDGE, LLC,** | § | |
| **WC 103 EAST FIFTH, LLC AND** | § | |
| **WC 422 CONGRESS, LLC,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **261st JUDICIAL DISTRICT** |
| | § | |
| | § | |
| **ATX DEBT FUND 1, LLC, ATX** | § | |
| **DEBT FUND 2, LLC , CONGRESS** | § | |
| **AVENUE HOLDINGS, LLC,** | § | |
| **KARLIN REAL ESTATE, LLC** | § | |
| **KARLIN ASSET MANAGEMENT,** | § | |
| **INC., PENNYBACKER CAPITAL,** | § | |
| **LLC, CONGRESS AVENUE** | § | |
| **HOLDINGS GP, LLC, AND** | § | |
| **CONGRESS AVENUE** | § | |
| **HOLDINGS, LP,** | § | |
| | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

<u>ORDER ON MOTION FOR EXPEDITED DISCOVERY</u>

On this day, the Court considered the Movants' Motion for Expedited Discovery in the above-styled lawsuit, and determined that it should be **GRANTED.**

It is therefore **ORDERED, ADJUDGED, AND DECREED** that **1)** documents requested in Plaintiffs' Expedited Request For Production (limited to 10 Requests) shall be produced within **five (5) days** of actual receipt of the Expedited Requests For Production; 2) answers to Plaintiffs' Expedited Interrogatories (limited to five (5) Interrogatories) be provided within **five (5) days** of actual receipt of the Expedited Interrogatories; and depositions may be taken on **five (5) days' notice**. Any requests

over the expedited limitations will be treated as if served in accordance with the Texas Rules of Civil Procedure.

**SIGNED this _____ day of _____, 2021.**

_____
**HONORABLE JUDGE PRESIDING**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

LF PARA on behalf of Jason Friedman
Bar No. 24059784
lfpara@fflawoffice.com
Envelope ID: 54855713
Status as of 6/29/2021 1:18 PM CST

Associated Case Party: Silicon Hills Campus, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeff O'Dell | | jodell@fflawoffice.com | 6/28/2021 3:54:30 PM | SENT |
| Mariam Alghaziani | | lfpara@fflawoffice.com | 6/28/2021 3:54:30 PM | SENT |
| Jason HFriedman | | jhfriedman@fflawoffice.com | 6/28/2021 3:54:30 PM | SENT |

Unofficial copy Travis Co. District Clerk Velva L. Price